147 P.3d 1201 (2006)
STATE of Washington, Respondent,
v.
Allen Eugene GREGORY, Appellant.
No. 71155-1.
Supreme Court of Washington, En Banc.
Argued March 22, 2005.
Decided November 30, 2006.
As Corrected December 22, 2006.
*1211 Suzanne Lee Elliott, David Zuckerman, Attorneys at Law, Seattle, WA, for Appellant.
Gerald Allen Horne, John Martin Neeb, Attorneys at Law, Kathleen Proctor, Pierce County Prosecuting Attorney Office, Tacoma, WA, for Respondent.
BRIDGE, J.
ś 1 This case involves two consolidated appeals brought by Allen Eugene Gregory. In 2000, Gregory was convicted of three counts of first degree rape for the 1998 rape of R.S (rape case). In 2001, Gregory was convicted of the 1996 aggravated first degree murder of G.H., committed in the course of a rape and robbery (murder case). The jury in the murder case determined that there were not sufficient mitigating circumstances to merit leniency, and Gregory was sentenced to death. Gregory now appeals the convictions and sentences in both cases.
ś 2 For reasons set forth below, we reverse the rape convictions, holding that the trial court abused its discretion when it declined to review in camera the dependency files of *1212 the victim's child for evidence relevant to Gregory's consent defense. Those files reveal information that we have determined would have been material to Gregory's defense, and nondisclosure was not harmless beyond a reasonable doubt. We find no other trial court error in the rape case. We further conclude that none of Gregory's arguments warrant reversal of the aggravated first degree murder conviction, and we affirm that conviction. However, we find that the prosecutor engaged in misconduct during closing arguments in the penalty phase of the murder trial. Because the rape convictions were relied upon in the penalty phase of the murder case and because we find that prosecutorial misconduct occurred in the penalty phase, we reverse the death sentence, and we remand to the trial court for resentencing in the murder case.[1]

I. Rape of R.S.

A. Rape Case Statement of Facts and Procedural History
ś 3 In 2000, Gregory was convicted of three counts of first degree rape for the 1998 rape of R.S.R.S. testified that at about 1:30 a.m. on August 21, 1998, as she was walking home, she noticed a car that she thought belonged to a friend. She approached the car. The occupant, whom she later identified as Gregory, rolled down the window. When she discovered the driver was not her friend after all, R.S. explained, "`I thought you were somebody I knew.'" RRP at 2047. Gregory asked R.S. if she needed a ride home and after some hesitation, she accepted.
ś 4 Instead of taking R.S. home, Gregory took her to a parking lot behind a nearby middle school. R.S. testified that he pulled out a knife and insisted that R.S. "give him what he wanted." RRP at 2052. She tried to escape but Gregory held her by the hair and held the knife to her side. R.S. testified that Gregory forced her to perform oral sex at knifepoint. He then put on a condom and vaginally raped her, holding the knife to her nose and threatening to cut it off. Afterward, R.S. noticed that the condom had broken. R.S. testified that she screamed and tried again to get out of the car, but Gregory punched her. Gregory then repeatedly forced her to have anal intercourse. Afterward, he opened the door and pushed her out of the car.
ś 5 As Gregory pulled away, R.S. testified that she memorized his license plate number. She then ran to a convenience store for help. The police were called and R.S. was taken to the hospital. She reported that Gregory had told her that his name was Allen. She also described the car and gave the police the license plate number. She explained that as the rapes occurred, she tried to memorize details about the interior of the car, which had several distinctive features. R.S. did not get a good look at her assailant's face because she was turned away from him during most of the assault.
ś 6 The hospital staff photographed R.S.'s injuries, including scratches and bruises to her arm, legs, and back, as well as bruises and welts on her head and face. They also took swabs from R.S.'s skin, vagina, anus, and mouth. Semen was collected from the vaginal swabs and a deoxyribonucleic acid (DNA) profile of the assailant was generated from that semen.
ś 7 Detectives identified Gregory as the owner of the car whose license plate R.S. had memorized. Officers located the car and looked in from the outside to confirm the specific characteristics described by R.S. After doing so, they arrested Gregory.
ś 8 Shortly after his arrest, Gregory denied ever having had any contact with R.S., claiming he had an alibi. Police obtained a warrant and searched Gregory's car, where they found a Buck knife and a condom. The condom had the same lot number and expiration date as a condom wrapper found in the *1213 parking lot where the incident occurred. The Washington State Patrol Crime Laboratory (WSPCL) also compared the rape kit seminal fluid with a sample of Gregory's blood and concluded that there was a DNA match. The chance of a random match in the African American population was 1 in 360 million.
ś 9 Before trial, Gregory changed his defense to one of consent, asserting that he had indeed had sex with R.S., but the encounter was consensual. In aid of his new defense, he sought to introduce evidence of R.S.'s prior convictions for prostitution. However, the trial court concluded that her prior convictions for prostitution were too remote in time to be relevant and excluded them. Gregory then asked the trial court to conduct an in camera review of the Child Protective Services dependency files of R.S.'s children to determine whether the files contained any evidence of recent (and therefore relevant) evidence of prostitution. The trial court denied this request.
ś 10 At trial, Gregory testified that R.S. had approached his car and offered to have sex with him for money. He testified that she willingly accompanied him to the middle school parking lot and that they engaged in consensual sex. He explained that R.S. became upset and demanded more money when she discovered that the condom had broken. When he refused, she became irate, and he told her to get out of the car. Gregory was never asked to provide, nor did he offer any explanation for R.S.'s injuries. The defense theory was that she accused Gregory of rape in retaliation.
ś 11 The jury found Gregory guilty of three counts of rape in the first degree. At sentencing, the trial judge concluded that counts one (forced oral intercourse) and two (forced vaginal intercourse) were the same criminal conduct, but count three (forced anal intercourse) constituted separate criminal conduct. The sentences for counts one and two would be served concurrently, but the sentence for count three would be served consecutively. Gregory was also sentenced for a deadly weapon enhancement for each count. His sentence amounted to 331 months (27˝ years) of total confinement. Gregory appealed both the rape convictions and his sentence.
ś 12 After oral argument in this case, a majority of the court concluded that the trial court had erred by refusing to conduct in camera review of R.S.'s children's dependency court files. We issued an order remanding to the superior court for in camera review of the relevant dependency files that were pending at the time of the rape trial. The superior court entered findings of fact and conclusions of law finding that the dependency files of one child contained information relevant to the case. This court requested additional briefing from the parties as to whether the information revealed by the in camera review required reversal of the rape convictions. Such briefing has since been submitted to this court.

B. Rape Case Analysis

Evidence Excluded Pursuant to Washington's Rape Shield Statute
ś 13 Gregory's theory of the case was that R.S. consented to oral and vaginal sex with him in exchange for money, but she demanded more money when she discovered that the condom had broken. When he refused, they argued and he kicked her out of his car; then, she fabricated the rape story to retaliate. Gregory asserts that he should have been allowed to present evidence of R.S.'s prior prostitution activities to support this theory. Washington's rape shield statute provides, in part:
Evidence of the victim's past sexual behavior including but not limited to the victim's marital history, divorce history, or general reputation for promiscuity, nonchastity, or sexual mores contrary to community standards is inadmissible on the issue of credibility and is inadmissible to prove the victim's consent except as provided in subsection (3) of this section. . . .
*1214 RCW 9A.44.020(2) (emphasis added). Subsection (3) provides that evidence of the victim's past sexual behavior (as described above) is admissible on the issue of consent only if specific procedural requirements are met. RCW 9A.44.020(3). The statute requires a written offer of proof that a victim's prior sexual history is relevant to the issue of consent. Then, if the trial judge finds the offer of proof to be sufficient, the court must order a hearing outside of the presence of the jury. RCW 9A.44.020(3)(a). At the conclusion of the hearing, if the court finds that evidence offered is relevant to the issue of the victim's consent, that its probative value is not substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice, and that its exclusion would result in denial of substantial justice to the defendant, the court is required to enter an order stating what evidence may be introduced by the defendant. RCW 9A.44.020(3)(d). This court has read RCW 9A.44.020 to mean that "credibility is ruled out altogether as the basis for introducing past sexual conduct and consent is made a suspect justification for the introduction of such evidence." State v. Hudlow, 99 Wash.2d 1, 8, 659 P.2d 514 (1983). Even so, if the State opens the door in its case in chief by presenting evidence tending to prove the nature of the victim's past sexual behavior, then the defense may cross-examine the victim on the subject. RCW 9A.44.020(4).
ś 14 In this case, R.S. had prior convictions for sexual misconduct in 1992 and prostitution in 1995. Gregory presented evidence of these convictions to the trial judge in an offer of proof pursuant to RCW 9A.44.020(3).[2] The trial judge determined that Gregory did not meet the threshold relevance requirement necessary to justify a full hearing on admissibility of the evidence. The trial court ruled that the 1992 and 1995 convictions were too remote in time from the 1998 incident to be relevant. Even though the defense offered a declaration from David Moon, a friend of R.S.'s, that R.S. admitted that she was engaging in prostitution in 1998, the evidence offered was based at least in part on hearsay, and the trial court did not find Moon's testimony to be credible. Therefore, there was insufficient evidence to warrant a hearing under the rape shield statute.
ś 15 The trial court did allow the defense to interview R.S. again and inquire into whether she had engaged in prostitution activity on the streets of Tacoma between 1995 and 1998. In that interview, R.S. admitted to working as a prostitute through an escort service in 1996 and early 1997 but denied any prostitution activity in 1998. She denied any streetwalking activity after 1995. After the interview, the trial court again refused to admit any evidence of R.S.'s prostitution activity because it was too remote in time and the factual circumstances were not similar enough to this incident to make the history relevant. However, Gregory was permitted to argue that R.S. was acting as a prostitute on the night of her encounter with Gregory.
ś 16 Evidence of Prior Acts of Prostitution Generally: Gregory first argues that the trial court erred in excluding evidence of R.S.'s prior acts of prostitution because he claims that prior prostitution activities are not governed by the rape shield statute at all. In a related argument, Gregory contends that even if the rape shield statute applies to prior acts of prostitution, it should be interpreted to always allow admission of those acts. One purpose of the rape shield statute is to promote the reporting and prosecution of rapes. Hudlow, 99 Wash.2d at 16, 659 P.2d 514. According to Gregory, this purpose is not undermined by the revelation at trial of prior prostitution convictions because such convictions are already a matter of public record. Therefore, there is little risk that the victim will be unduly harassed or embarrassed by the introduction of such evidence.
ś 17 However, Gregory acknowledges but then ignores a related purpose that is *1215 evident from the plain language of RCW 9A.44.020(3)(d) â to eliminate prejudicial evidence that has little, if any, relevance to the issues of credibility or consent. The statute clearly contemplates that where there is a substantial danger of undue prejudice to the truth finding process, such evidence will be excluded. Hudlow, 99 Wash.2d at 16, 659 P.2d 514. Such prejudice might occur if the victim's past sexual conduct "confuse[s] the issues, mislead[s] the jury, or cause[s][it] to decide the case on an improper or emotional basis." Id. at 14, 659 P.2d 514. Because the introduction of prior acts of prostitution could create substantial prejudice to the truth finding process, we decline the defendant's invitation to make a sweeping ruling that the rape shield statute does not apply to prior acts of prostitution.[3]
ś 18 Gregory next points to other state courts that have allowed evidence of prior prostitution under rape shield laws. However, many of these cases reflect a case by case evaluation of the trial court's exercise of its discretion, rather than a sweeping rule. See, e.g., State ex rel. Pope v. Superior Court, 113 Ariz. 22, 545 P.2d 946, 953 (1976) (contemplating an exception to the rape shield law for prior prostitution activities, but allowing admission only after a hearing shows the evidence is credible and not too remote); State v. Williams, 21 Ohio St.3d 33, 487 N.E.2d 560, 562-63 (1986) (allowing evidence of the victim's prior acts of prostitution to rebut the victim's testimony on direct examination that she never consents to sex with men). Other courts have properly rejected this sweeping argument, noting that a woman who has worked as a prostitute is able to refuse consent to have sexual intercourse. See, e.g., Brewer v. United States, 559 A.2d 317, 321 (1989) ("In short, it cannot be assumed that prostitutes will accept every opportunity that comes along to engage in sexual relations. The fact that a woman is a prostitute . . . has nothing to do with whether she consented to sexual intercourse with a particular defendant."). We also decline the defendant's invitation to conclude that prior prostitution activity is always admissible under the rape shield statute. Trial courts must evaluate the admissibility of prior acts of prostitution on a case by case basis under RCW 9A.44.020.
ś 19 Application of the Rape Shield Statute in this Case: Gregory argues that even if the rape shield statute applies, and even if prior acts of prostitution may be excluded under the statute in some cases, the trial court erred by excluding evidence of R.S.'s prior prostitution in this case.
ś 20 The admissibility of evidence of past sexual conduct is within the sound discretion of the trial court. Hudlow, 99 Wash.2d at 17-18, 659 P.2d 514. As set forth earlier, according to the procedure adopted in RCW 9A.44.020(3), the defendant must provide a written offer of proof to establish the relevance of the prior sexual conduct. If the defendant's offer of proof does not establish relevance, then the trial court is not obligated to set a hearing to determine whether the other two prongs of the rape shield test are met. Id. In this case, the trial court concluded that the defendant's offer of proof was not sufficient to establish relevance, so the trial court did not proceed to a hearing on the issue.
ś 21 This court has concluded that the rape shield relevancy inquiry must be whether, under ER 401, "the [victim's] consent to sexual activity in the past, without more, makes it more probable or less probable that [he or] she consented to sexual activity on this occasion." Hudlow, 99 Wash.2d at 10, 659 P.2d 514. "Factual similarities between prior consensual sex acts and the questioned sex acts claimed by the defendant to be *1216 consensual would cause the evidence to meet the minimal relevancy test of ER 401." Id. at 11, 659 P.2d 514. However, the factual similarities must be particularized, not general. Id. "For instance, if a [victim] frequently engages in sexual intercourse with men shortly after meeting them in bars, this would have some relevancy if the defendant claims she consented to sexual intercourse with him under similar circumstances." Id. Similarly, in State v. Morley, 46 Wash.App. 156, 730 P.2d 687 (1986), the Court of Appeals did not take issue with the trial court's ruling allowing a witness to testify that, shortly before the incident with the defendant, the victim had offered the witness sex in exchange for $40 in circumstances very similar to the defendant's version of events. Id. at 159-60, 730 P.2d 687.[4]
ś 22 In the instant case, the trial court concluded that R.S.'s prior convictions for prostitution and sexual misconduct were too remote in time and too different in character to be relevant and nothing suggested that R.S. was prostituting herself in 1998. In her interview with defense counsel, R.S. admitted to having worked for an escort service in 1996 and early 1997, but such activity is not factually similar to Gregory's account of the incident in question. R.S. denied streetwalking after 1995, but R.S.'s encounter with Gregory did not occur until late August 1998. The Court of Appeals has recognized that in the context of determining the relevance of a victim's prior sexual conduct, questions of remoteness are matters within the sound discretion of the trial court. State v. Kalamarski, 27 Wash.App. 787, 790, 620 P.2d 1017 (1980).[5] The trial court did not abuse its discretion in excluding R.S.'s prior convictions where at least two years separate the defendant's prior streetwalking conduct and the incident in question.
ś 23 Because all three prongs of the statutory test must be met to justify admission of such evidence, and Gregory has failed to show that the trial court abused its discretion with regard to its ruling on relevance, we need not evaluate whether the second and third prongs of the statutory test are met. See RCW 9A.44.020(3).[6]
ś 24 Opened Door: Gregory also asserts that he should have been allowed to cross-examine R.S. regarding her prior prostitution because the State opened the door to admission of that evidence. RCW 9A.44.020(4) provides that
Nothing in this section shall be construed to prohibit cross-examination of the victim on the issue of past sexual behavior when the prosecution presents evidence in its case in chief tending to prove the nature of the victim's past sexual behavior, but the court may require a hearing pursuant to subsection (3) of this section concerning such evidence.
*1217 In State v. Camara, 113 Wash.2d 631, 642-43, 781 P.2d 483 (1989), this court discussed this subsection of the rape shield statute:
To hold that evidence which in any manner concerns a rape victim's past sexual behavior affords an opportunity for cross examination about the victim's sexual past would weaken the statutory shield protecting victims from disclosures of their prior sexual conduct. We do not conceive RCW 9A.44.020(4) to be so broad. Rather, we believe it permits cross examination on a victim's sexual past only when the State's evidence casts the victim's sexual history in a light favorable to the State's case.
Id. at 643, 781 P.2d 483. First we note that any claim that the State opened the door during its cross-examination of Gregory necessarily fails because it does not constitute evidence presented during the State's case in chief, as required by the plain language of the statute. RCW 9A.44.020(4).
ś 25 In addition, Gregory was properly allowed to argue that R.S. consented to have sex with him on the night in question in exchange for money. Therefore, there was necessarily discussion at trial about whether R.S. was acting as a prostitute on that night. However, this discussion can be distinguished from one of prior acts of prostitution. To open the door to R.S.'s sexual history, the State would have had to present that history in a favorable light. Camara, 113 Wash.2d at 643, 781 P.2d 483. Merely arguing that she was not a prostitute on August 21, 1998 would not open the door to discussion of her sexual history.
ś 26 Gregory contends R.S.'s testimony on direct that she was currently in counseling at a sexual assault center cast her sexual history in a favorable light. R.S. revealed that she was in counseling in response to the State's general inquiry into the list of people with whom she had discussed the rape. To justify the admission of the statement, the State argued, outside of the presence of the jury, that "[i]t's highly unlikely that a prostitute who is angry about a $20 prostitution deal gone awry will pay out of her own pocket to go to counseling for two years." RRP at 2080. However, the State's argument logically rebuts the consent defense â a consensual sexual encounter would not lead someone to seek sexual assault counseling. R.S.'s testimony does not speak to her sexual history; instead the State merely sought to contradict Gregory's version of the events on the night in question.[7]
ś 27 Similarly, the State questioned R.S. about how the incident had affected her. Gregory claims that this evidence was presented to show that R.S. did not react as a prostitute would have reacted to this incident. However, the more logical conclusion is that R.S. did not react as someone who consented to a sexual encounter would act. The State's argument does not seem to implicate prostitution activities at all.
ś 28 Finally, Gregory claims that the State opened the door during its closing argument when it belittled Gregory's theory that R.S. was working as a prostitute on the night in question. RRP 2923-24 ("He has got to make [R.S.] look like a prostitute, got to make her look bad."); RRP 2967 ("Allen Gregory wants you to believe that [R.S.] is a prostitute. . . . He wants you to believe that she is a prostitute who somehow got it into her head that she was angry and wanted to report this rape."). But again, these arguments refer only to the events of August 21, 1998; they do not refer to R.S.'s sexual history. We conclude that in its case in chief, the State did not open the door to evidence of R.S.'s sexual history.
ś 29 Admission of Prior Sexual Conduct to Prove a Motive to Lie: Gregory argues the trial court should have allowed him to cross-examine R.S. about her prior acts of prostitution because doing so would allow him to establish that she had a motive to falsely accuse him of rape. According to Gregory, the trial court's refusal to admit evidence of R.S.'s prior sexual conduct violated his state and federal confrontation rights because he could not explore R.S.'s bias. The rape shield statute does not allow evidence *1218 of prior sexual conduct to be admitted on the issue of a victim's credibility under any circumstances. Hudlow, 99 Wash.2d at 8, 659 P.2d 514. Gregory acknowledges that "[o]n its face the statute strictly prohibits evidence of [R.S.'s] past sexual behavior for any issue other than consent." Appellant's Opening Br. at 61. However, Gregory argues that it is unconstitutional to apply the statute in this way, despite its plain language, if it prevents him from exposing through cross-examination R.S.'s bias or motive to lie.[8]
ś 30 Even if we assume for the sake of argument that Gregory is correct on this point, the defense's offer of proof established only remote prostitution activities. The trial court concluded that R.S.'s prior acts of prostitution were too remote to be relevant, a determination that was, as discussed above, well within the discretion of the trial court. If R.S.'s prior prostitution activities were too remote to be relevant to the issue of consent, then certainly they were too remote to be relevant to whether she lied to get revenge for lack of payment.
ś 31 Gregory cites to Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) and Olden v. Kentucky, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988), to support his theory. While those cases found that the defendants should have been able to cross-examine witnesses on issues pertaining to potential bias, both courts were clear that the evidence in question was relevant. Davis, 415 U.S. at 314, 94 S.Ct. 1105; Olden, 488 U.S. at 232, 109 S.Ct. 480. Gregory has no constitutional right to present irrelevant evidence. Hudlow, 99 Wash.2d at 15, 659 P.2d 514.
ś 32 Gregory also cites to cases from other states to support his argument. In one case, the court speculated that evidence of prostitution would have supported the defendant's argument that the rape story was fabricated in retaliation for failure to pay for sex. Yet this statement was dicta, and the prostitution was not remote. Commonwealth v. Davis, 438 Pa.Super. 425, 652 A.2d 885, 889 n. 3, 890 (1995). In other cases, the evidence in question would have been relevant, where here it was not. See Commonwealth v. Joyce, 382 Mass. 222, 415 N.E.2d 181, 183-84 (1981) (police interrupted the encounter between the victim and the defendant and she had recently been charged for prostitution under similar circumstances); see also Lewis v. State, 591 So.2d 922, 923, 925 (Fla.1991); State v. Jalo, 27 Or.App. 845, 557 P.2d 1359, 1360, 1361-62 (1976) (sexual history of young victims was relevant because making a false accusation would have kept the youth from getting in trouble for consensual sexual activity).[9] In another case, the prior exchange of sex for drugs was relevant because it had occurred only one week before the incident in question. See Johnson v. State, 332 Md. 456, 632 A.2d 152, 153-54 (1993).[10] None of these cases stands for the proposition that remote prostitution convictions should be admitted to show motive for the victim to fabricate a rape accusation. We conclude that R.S.'s remote acts of prostitution are not relevant to show a motive to lie, and we reiterate that a defendant has no constitutional right to present irrelevant evidence. In sum, the trial court's evidentiary rulings pursuant to the rape shield statute were proper.

In Camera Review of R.S.'s Dependency Files and Counseling Records
ś 33 In Camera Review, Generally: The United States Supreme Court has *1219 held that for due process to justify in camera review of a record that is otherwise deemed privileged or confidential by statute, the defendant must establish "a basis for his claim that it contains material evidence." Pennsylvania v. Ritchie, 480 U.S. 39, 58 n. 15, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). There must be a "`plausible showing'" that the information will be both material and favorable to the defense. Id. (quoting United States v. Valenzuela-Bernal, 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982)). Evidence is material only if there is a reasonable probability that it would impact the outcome of the trial. Ritchie, 480 U.S. at 57, 107 S.Ct. 989. A reasonable probability is probability sufficient to undermine confidence in the outcome. Id. The decision whether to conduct an in camera review of privileged records is subject to abuse of discretion review. State v. Kalakosky, 121 Wash.2d 525, 550, 852 P.2d 1064 (1993).
ś 34 In Ritchie, the defendant was prosecuted for sexually abusing his daughter. Ritchie, 480 U.S. at 43, 107 S.Ct. 989. He argued that his daughter's Children and Youth Services (CYS) file might contain the names of favorable witnesses or other exculpatory evidence, and thus, the trial court erred in refusing to conduct and in camera review of the CYS file. Id. at 44, 107 S.Ct. 989. Even though it was impossible to say whether any information in the CYS records would actually support Ritchie's arguments, the Court held that the defendant was entitled to have the file reviewed by the trial court to determine whether it contained information that probably would have changed the outcome of Ritchie's trial. Id. at 57-58, 107 S.Ct. 989.
ś 35 In Kalakosky, this court evaluated whether the trial court should have conducted an in camera review of a sexual assault victim's counseling file, which is subject to a qualified privilege by statute. RCW 70.125.065 requires a written motion and affidavits setting forth specifically the reasons why the defendant is requesting discovery. The court concluded, based upon the statutory language, that "before a rape victim's privacy should be invaded by a review of crisis center counseling notes . . . the defendant must make a particularized showing that such records are likely to contain material relevant to the defense." Kalakosky, 121 Wash.2d at 550, 852 P.2d 1064 (emphasis added). The Kalakosky court concluded that the motion in that case, which stated only that the counseling notes "`may contain details which may exculpate the accused or otherwise be helpful to the defense,'" did not make the required particularized showing. Id. at 544, 550, 852 P.2d 1064.[11]
ś 36 In sum, mere speculation is not enough to justify in camera review and a defendant must establish a basis for his or her claim that the records in question contain material evidence. Ritchie, 480 U.S. at 58 n. 15, 107 S.Ct. 989. Based on the statutory language protecting rape crisis center records, a particularized showing is required to support review of those records. See RCW 70.125.065; Kalakosky, 121 Wash.2d at 550, 852 P.2d 1064.
ś 37 Counseling Records: On direct, when the prosecutor asked R.S. if she had discussed the rape with anyone else, she reported that she had discussed the incident in counseling at a rape crisis center. Gregory objected and outside of the presence of the jury, his counsel argued that the State should not be allowed to present evidence regarding counseling when the defense could not have access to the counseling records. The trial court concluded that the State did *1220 not "[go] into the content of the counseling" but rather only mentioned "the fact that she has received counseling." RRP at 2086.
ś 38 The defense may not circumvent the statutory requirements for in camera review of a rape crisis center file. Kalakosky, 121 Wash.2d at 549, 852 P.2d 1064. In this case, the defense did not submit a written pretrial motion supported by affidavits, as required by RCW 70.125.065(1). Gregory cites to no place in the record where defense counsel made a motion for in camera review of the counseling records at all. We conclude that Gregory did not meet the statutory requirements for in camera review.[12],[13]
ś 39 Dependency Files: The defendant requested that the trial court review in camera the dependency files of R.S.'s children. Gregory claimed that the files might contain evidence of recent prostitution activities that might be admissible under the rape shield statute. Defense counsel explained that R.S. had admitted that she had entered drug treatment in April 1999 because of a pending dependency action. He asserted that because she had not "cleaned up her act" before April 1999, it was likely that the dependencies were open in 1998 when the rape occurred. He argued that if caseworkers were aware of any prostitution activity in 1998, the file would reflect that awareness.
ś 40 The trial judge denied Gregory's request, believing R.S. had been forthcoming in her interview when she stated that the dependency centered around her drug addiction and theft to support her drug habit. The trial court granted defense counsel's request to interview R.S. again, this time asking questions about recent prostitution activity. The trial judge believed that R.S.'s answers to these questions would directly provide the sought after information, and thus, in camera review of the files was unnecessary. The trial judge also cited the children's privacy as a reason for denying in camera review. The defense countered that if R.S. denied recent prostitution, in camera review of the dependency files would ensure that they contained no evidence that would impeach R.S. on this point. Even so, the trial judge declined to change her ruling.[14]
ś 41 RCW 13.50.010 and RCW 13.50.100 provide that dependency files shall be confidential and shall be released only under certain circumstances, none of which are being argued here. RCW 13.50.100(2). Therefore, in camera review of the dependency files would have been appropriate only if the Ritchie test was met. To justify in camera review, Gregory had to establish a basis for his claim that the dependency file would likely contain evidence of recent prostitution activities.
ś 42 This case came down to a credibility contest between Gregory and R.S. The State, in closing argument, repeatedly emphasized that the ultimate determination for the jury in this case was who was more credible, Gregory or R.S. Because Gregory's version of events was that R.S. had consensual sex with him for money, admissible evidence of recent, factually similar prostitution would have been reasonably likely to impact the outcome of the trial. It is also reasonable to *1221 conclude that if the Department of Social and Health Services (DSHS) were aware of any recent prostitution activity, it would have been addressed in the dependency files. Moreover, R.S.'s deposition testimony indicated that at least one dependency was likely active during 1998. Thus, in camera review of the dependency files might have led to witnesses that could confirm or refute R.S.'s claim that she did not engage in streetwalking after 1995. In camera review of the files would not have unnecessarily delayed the trial because the trial judge had already agreed to allow for a second interview of R.S. On balance, the invasion of the children's privacy interests upon in camera review does not overcome Gregory's interest in obtaining a fair trial. We conclude that the trial judge should have reviewed the then-pending dependency files to determine if they contained information that could lead to admissible evidence that R.S. engaged in similar prostitution activity near to the time of this incident.[15] We hold that the trial court's failure to do so amounted to abuse of discretion.
ś 43 The proper remedy for such an abuse of discretion is remand to the trial court for in camera review of the relevant files. Ritchie, 480 U.S. at 58, 107 S.Ct. 989. If the information in the files would probably have changed the outcome of the trial, then the defendant is entitled to a new trial. But if nondisclosure was harmless beyond a reasonable doubt, then the convictions can be reinstated. Id.; see also State v. Allen, 27 Wash.App. 41, 49, 615 P.2d 526 (1980); State v. Harris, 91 Wash.2d 145, 152, 588 P.2d 720 (1978). The intent on remand is to place the parties in the position they were in pretrial. United States v. Alvarez, 358 F.3d 1194, 1209 (9th Cir.2004). Thus, after oral argument in this case, we remanded to the trial court for review of the dependency files of R.S.'s children that were pending at the time of the rape trial. The trial court conducted review and submitted to this court public findings of fact and conclusions of law, supplemental sealed findings of fact, and the sealed dependency files themselves.[16]
ś 44 The public findings of fact reveal that the dependency files contain R.S.'s criminal history, including reference to prostitution that occurred many years before the 1998 incident with Gregory. But the dependency files "contain no information regarding prostitution activities as a reason for the dependency." RCP at 927, Finding of Fact (FOF) 6. Even so, the trial judge concluded that the dependency court's social file
contains information that might have been used to impeach some of the answers [R.S.] gave at the August 8, 2000, [pretrial] interview with Mr. Gregory's attorney, but that information does not relate to prostitution or the consent issue raised by Mr. Gregory.
RCP at 927, FOF 5. The trial judge concluded:
Without deciding whether such information would have been admissible, material, or whether its exclusion was harmless error, to the extent either the defendant or the State would have used the information as evidence, or whether it would have led to evidence, the undersigned finds that it was relevant to the above-entitled case.
RCP at 927, FOF 7 (emphasis added).[17]
ś 45 In his supplemental briefing, Gregory argues that various evidence revealed *1222 in the dependency files was relevant, admissible, and material, and that its nondisclosure was not harmless beyond a reasonable doubt. Both the United States Supreme Court and this court have held that due process guarantees criminal defendants access to material information in the possession of the court or the prosecution, including material impeachment evidence. State v. Knutson, 121 Wash.2d 766, 771-72, 854 P.2d 617 (1993); see also Ritchie, 480 U.S. at 56-57, 107 S.Ct. 989; Alvarez, 358 F.3d at 1207-08 ("Evidence affecting the credibility of . . . witnesses is material. . . ."). Evidence is material, for the purposes of this due process rule, if there is a "`"reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,"'" or if the information "probably would have changed the outcome of [the] trial." Knutson, 121 Wash.2d at 772, 854 P.2d 617 (quoting In re Rice, 118 Wash.2d 876, 887, 828 P.2d 1086 (1992) (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985))); Ritchie, 480 U.S. at 58, 107 S.Ct. 989. A reasonable probability is "`a probability sufficient to undermine confidence in the outcome.'" Knutson, 121 Wash.2d at 773, 854 P.2d 617 (quoting Rice, 118 Wash.2d at 887, 828 P.2d 1086). To be material, there must be "more than a `mere possibility' that evidence `might have affected the outcome of the trial.'" Id. at 773, 854 P.2d 617 (quoting State v. Mak, 105 Wash.2d 692, 704-05, 718 P.2d 407 (1986)).
ś 46 "Wrapped up in this standard of materiality are issues of admissibility; if evidence is neither admissible nor likely to lead to admissible evidence[,] it is unlikely that disclosure of the evidence could affect the outcome of a proceeding." Id. To be admissible, and possibly material, evidence must also be relevant. Id. Evidence is relevant if it makes the existence of a fact of consequence to the case more likely or less likely to be true than without the evidence. ER 401. Finally, the Ritchie Court held that despite a trial court's erroneous refusal to conduct in camera review, a conviction could stand if "nondisclosure was harmless beyond a reasonable doubt." Ritchie, 480 U.S. at 58, 107 S.Ct. 989. In considering the impact of nondisclosure, a court must consider whether the information was already known to the defense or whether reasonable diligence would have uncovered the information through alternative means. Cf. Thomas, 150 Wash.2d at 851, 83 P.3d 970 (nondisclosure does not result in a Brady violation if the defendant could have obtained the information himself through reasonable diligence).
ś 47 In this case, R.S. told defense counsel in an interview on August 8, 2000, that her last drug use was in April 1999. However, the dependency file reveals that R.S. had a serious relapse in June 2000 and had to go into drug treatment. In addition, while R.S. told defense counsel that she did not believe the dependency court had ordered her to get drug treatment, the court, in fact, had done so.[18]
ś 48 Evidence Rule 608(b) provides that specific instances of a witness's conduct, introduced for purposes of attacking the witness's credibility, may not be proved by extrinsic evidence, but may, "in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination of the witness." ER 608(b). In exercising its discretion, the trial court may consider whether the instance of the witness's misconduct is relevant to the witness's veracity on the stand and whether it is germane or relevant to the issues presented at trial. State v. O'Connor, 155 Wash.2d 335, 349, 119 P.3d 806 (2005). While R.S.'s lie to defense counsel about her recent drug use *1223 was not a lie under oath because the August 8, 2000 interview was not a deposition, it was a very recent lie in response to questioning from defense counsel in the context of this case. R.S.'s lie was relevant to her veracity on the stand and it was relevant to this case. See O'Connor, 155 Wash.2d at 351, 119 P.3d 806. Thus, it is likely that the trial court would have allowed defense counsel to cross-examine her on the subject. Cf. RRP 2100-01 (allowing cross-examination of R.S. regarding instances of dishonesty with police that were more remote in time).
ś 49 The State argues that because there were other avenues for impeaching R.S., the lie to defense counsel would not have been likely to change the outcome of the trial and nondisclosure was harmless. On cross-examination, defense counsel asked R.S. about five convictions for theft in the third degree that had occurred over the course of the prior 10 years, about R.S. giving false names to police on several occasions throughout the 1990s, about R.S.'s use of alcohol, marijuana, and crack cocaine on the day of the rape, and about inconsistencies in her accounts to police.
ś 50 These other avenues for impeachment call into question the materiality of R.S.'s lie to defense counsel. However, the theft convictions and the instances of giving false names to police were not recent, while the August 2000 lie to defense counsel had occurred only weeks before. The lie occurred in the context of questioning regarding this case, and it undercut any argument that R.S. had reformed her old ways. Moreover, the State in closing argument repeatedly emphasized that the ultimate determination for the jury in this case was who was more credible, Gregory or R.S. RRP at 2906 ("Did [R.S.] tell you the truth, or did Allen Gregory tell you the truth? That's the determination that you are going to have to make."); 2910 "( [I]t's his word against [R.S.'s]. It's 50-50. He has got a 50-50 chance you are going to believe him."); 2913 ("It comes down to credibility. The question is, who are you going to believe, [R.S.] or Allen Gregory?"); see also 2967 (noting that R.S. admitted that getting in the car was stupid and arguing that if she were lying, she would have made up a better story). While the State asserts that other avenues of impeachment render this additional information superfluous, at least one court has held that where credibility is a central question, if there is a reasonable probability that the cumulative effect of the undisclosed impeachment evidence, together with the disclosed impeachment evidence, "would have affected the jury's assessment of the witness's credibility," then the exclusion should be considered prejudicial. See Benn v. Lambert, 283 F.3d 1040, 1056 (9th Cir. 2002). Materiality of this impeachment evidence is a close question, but it seems impossible to conclude, beyond a reasonable doubt, that cross-examination illuminating R.S.'s recent lie would not have impacted the outcome of the trial. To the contrary, under the facts of this case, the additional impeachment evidence in the dependency files could have reasonably impacted the outcome of the trial and nondisclosure was not harmless beyond a reasonable doubt. We therefore reverse the rape convictions.
ś 51 Of the evidence discussed in Gregory's supplemental briefing, this was the only evidence that the trial court found to be relevant. Despite Gregory's additional arguments, we also conclude that no other information revealed in the dependency files is material, and Gregory has failed to successfully challenge any other evidentiary ruling in this case.[19] Gregory has raised several *1224 additional claims of error in the rape case. In the event of retrial, those issues could arise again and thus, we proceed to address Gregory's other claims of error.

Jury Instruction on the Defense of Consent
ś 52 In the rape case, Gregory pleaded not guilty and before trial he changed his defense from denial to consent; he admitted to having had sex with R.S., but claimed the encounter was consensual. The jury was instructed that to convict Gregory of any one of the three counts of first degree rape, it had to conclude that the sexual intercourse occurred as the result of "forcible compulsion." RCP at 480-82. The jury was also instructed that "[t]he burden is on the defendant to prove by a preponderance of the evidence that the sexual intercourse was consensual." RCP at 483. This instruction defined consent to mean "at the time of the act of sexual intercourse there are actual words or conduct indicating freely given agreement to have sexual intercourse." RCP at 483; see also RCW 9A.44.010(7). The defense requested an instruction that defined consent but did not impose a separate burden apart from the burden on the prosecution to prove each element beyond a reasonable doubt.[20]
ś 53 Any instruction on the burden of proof must comply with the requirement that the State must bear the burden to prove every element of the crime beyond a reasonable doubt. Camara, 113 Wash.2d at 638, 781 P.2d 483 (citing In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). Gregory now argues that requiring him to prove consent by a preponderance of the evidence violated due process because the jury could have become confused, thinking that it could acquit only if consent is proved by a preponderance of the evidence, even if a reasonable doubt may have been raised with regard to the element of forcible compulsion. See State v. Riker, 123 Wash.2d 351, 366-67, 869 P.2d 43 (1994) (describing a similar potential problem with regard to the defense of duress). While Gregory admits that this court resolved this issue in Camara, 113 Wash.2d at 640, 781 P.2d 483, he contends that Camara should be overruled.
ś 54 In holding that due process permits an instruction requiring the defendant to prove consent, the Camara court relied on Martin v. Ohio, 480 U.S. 228, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987). In Martin, the United States Supreme Court held that a defendant could be required to prove self-defense even where the evidence necessary to prove self-defense would often tend to negate an Ohio element of aggravated first degree murder, "purposeful killing by prior calculation and design." Id. at 234, 107 S.Ct. 1098. The Martin Court noted that there are two distinct questions that a jury must answer. The jury must determine whether each element of the crime has been proven beyond a reasonable doubt, and the jury must determine whether the elements of the defense have been met. Even if a defendant could not prove self-defense by a preponderance of the evidence, the jury nevertheless could acquit if it believed there was reasonable doubt as to any fact necessary to support the elements of the crime. Id. at 234, 107 S.Ct. 1098. Therefore, while evidence offered to support a defense may also tend to negate an element of the crime, that does not necessarily shift to the defendant the burden of disproving any element of the State's case. See id. The Martin dissent doubted that a jury could reliably grasp this distinction, arguing that a jury would become confused and shift the burden to the defendant. See id. at 237-38, 107 S.Ct. 1098 (Powell, J., dissenting). However, the Martin majority refused to "harbor the dissent's mistrust of the jury" and concluded *1225 that the instructions were sufficiently clear to convey that the State's burden did not shift. Id. at 234 n. 1, 107 S.Ct. 1098, n. 1.
ś 55 After Martin, the Camara court expressed substantial doubt as to the continued viability of the so-called "negates" analysis (asking only whether a defense negates an element of the crime), and the court declined to apply the negates analysis to the consent defense. Camara, 113 Wash.2d at 639, 781 P.2d 483. Following Martin, the Camara court held that "while there is a conceptual overlap between the consent defense to rape and the rape crime's element of forcible compulsion, we cannot hold that for that reason alone the burden of proof on consent must rest with the State." Id. at 640, 781 P.2d 483. The burden to prove consent properly lies with the defendant. Id. Even so, the instructions must reflect the State's unalterable burden to prove each element of the crime beyond a reasonable doubt. Id.
ś 56 Then, in Riker, this court noted that self-defense and alibi defenses could negate elements of a crime. 123 Wash.2d at 367-68, 869 P.2d 43. The Riker court distinguished the defense of duress because it condones the defendant's admittedly unlawful conduct. Id. at 368, 869 P.2d 43. Yet the Riker court included the consent defense to rape in its list of defenses that did not negate an element of the crime, and the Riker court did not question the Camara holding. Id. at 366-67, 869 P.2d 43.
ś 57 Gregory concedes that the instructions read to the jury in his rape case provide a correct statement of current law but claims that the Camara court incorrectly analyzed the Martin decision. We disagree; the Martin analysis clearly supports the Camara court's conclusion. The jury in a first degree rape case must be convinced that none of the evidence presented raises a reasonable doubt that sexual intercourse occurred as the result of forcible compulsion. See Martin, 480 U.S. at 233, 107 S.Ct. 1098. Therefore, so long as the jury instructions allow the jury to consider all of the evidence, including evidence presented in the hopes of establishing consent, to determine whether a reasonable doubt exists as to the element of forcible compulsion, the conceptual overlap between the consent defense and the forcible compulsion element does not relieve the State of its burden to prove forcible compulsion beyond a reasonable doubt.[21] We decline to overrule Camara and conclude that the jury instructions here complied with due process.[22]

Evidence Regarding R.S.'s Reputation in the Community
ś 58 At trial, Gregory sought to present testimony from Eric Larson, R.S.'s ex-boyfriend and the father to one of her children. Larson sought to testify about R.S.'s poor reputation for truth and honesty within the community. The trial court ruled that Larson's testimony was inadmissible because R.S.'s family did not constitute a community that is both neutral and general, since the community consisted only of Larson and R.S.'s sister, and Larson's understanding of R.S.'s reputation was too remote from the time of the trial.
ś 59 Evidence Rule 608 provides that the credibility of a witness may be attacked by evidence of the witness's reputation for untruthfulness in the community. *1226 "To establish a valid community, the party seeking to admit the reputation evidence must show that the community is both neutral and general." State v. Land, 121 Wash.2d 494, 500, 851 P.2d 678 (1993). Relevant factors include "the frequency of contact between members of the community, the amount of time a person is known in the community, the role a person plays in the community, and the number of people in the community." Id. Whether a party has established proper foundation for reputation testimony is within the trial court's discretion. Id.
ś 60 The trial court found that R.S.'s family was neither neutral nor sufficiently generalized to constitute a community for the purposes of ER 608.[23] We agree. First, the inherent nature of familial relationships often precludes family members from providing an unbiased and reliable evaluation of one another. In addition, the "community" with which Larson had discussed R.S.'s reputation included only two people, Larson and R.S.'s sister. Any community comprised of two individuals is too small to constitute a community for purposes of ER 608. State v. Lord, 117 Wash.2d 829, 874, 822 P.2d 177 (1991) (community must be general). Finally, the trial court found that any awareness that Larson had of R.S.'s reputation for truthfulness was too remote in time to be relevant. This court has previously held that information several months old is too remote. Lord, 117 Wash.2d at 874-75, 822 P.2d 177. A review of the record indicates that Larson was testifying based upon knowledge he obtained several years prior to the time of trial. Under the circumstances, the trial court properly ruled that Larson's testimony was inadmissible as reputation evidence under ER 608(a). The trial court did not abuse its discretion.

R.S.'s Testimony About How She Felt About Testifying
ś 61 Upon examination of R.S., the prosecutor asked, "how do you feel about having to testify in court and . . . be cross-examined?" RRP at 2153. Defense counsel objected as to relevance, but the court overruled the objection. R.S. answered:
You know, it's like I had stated. I've tried for two years to put this behind me, you know. I want to get on with my life. It's a horrific experience. I'm angry. I just want to get it over with. You know, it's like for two years, I tried to forget about it. And since this trial started, I've had to remember it. I've had sleepless nights again. I've gone through nightmares again. And I'm just â I'm upset. I'm really upset. And I just would like to get on with my life and, you know, put this behind me, you know. It's just one of those things that â 
I don't like having to recall all this stuff. I hate it. I hate having to remember it, you know. I hate having to go through all these feelings, you know, that I went through, you know. And it's just â I just â I just â I just â I wouldn't want my worst enemy to have to go through what I've gone â 
RRP at 2153-54. Defense counsel objected to the narrative form of the response and the court directed the prosecutor to move on. In closing, the prosecutor read back to the jury R.S.'s answer to this question. He then argued that R.S. would not have subjected herself to the trial process just to avenge a broken condom. The defense did not object. Gregory now argues that the prosecutor chilled the exercise of his federal and state constitutional rights to trial and to confrontation by asking how R.S. felt about cross-examination. In the alternative, Gregory argues that the question and the prosecutor's argument in closing improperly appealed to the jury's sympathy.
ś 62 Comment on Constitutional Rights: This court has recognized that "[t]he State can take no action which will unnecessarily `chill' or penalize the assertion of a constitutional right and the State may not draw adverse inferences from the exercise of a constitutional right." State v. Rupe, 101 Wash.2d 664, 705, 683 P.2d 571 (1984). The *1227 Court of Appeals has specifically concluded that the State may not invite the jury to draw a negative inference from the defendant's exercise of his right to cross-examine witnesses. State v. Jones, 71 Wash.App. 798, 811-12, 863 P.2d 85 (1993). However, both the United States Supreme Court and Washington courts have recognized that not all arguments touching upon a defendant's constitutional rights are impermissible comments on the exercise of those rights. See Portuondo v. Agard, 529 U.S. 61, 69, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000); State v. Miller, 110 Wash.App. 283, 284, 40 P.3d 692, review denied, 147 Wash.2d 1011, 56 P.3d 565 (2002). This court has characterized the relevant issue as "whether the prosecutor manifestly intended the remarks to be a comment on that right." State v. Crane, 116 Wash.2d 315, 331, 804 P.2d 10 (1991). These cases suggest that so long as the focus of the questioning or argument "is not upon the exercise of the constitutional right itself," the inquiry or argument does not infringe upon a constitutional right. Miller, 110 Wash.App. at 284, 40 P.3d 692.
ś 63 Gregory acknowledges that this case came down to a credibility contest between Gregory and R.S. Gregory claimed that R.S. fabricated the rape story and pursued prosecution in revenge for his failure to pay $20 to compensate R.S. for a broken condom. The State sought to rebut this attack on R.S.'s credibility by showing that R.S. did not relish having to testify and be cross-examined. The State's theory was that it was unlikely that R.S. would have put herself through a trial to avenge a broken condom. The State did not specifically criticize the defense's cross-examination of R.S. or imply that Gregory should have spared her the unpleasantness of going through trial.
ś 64 Gregory points to Jones, 71 Wash. App. at 811, 863 P.2d 85, in which the Court of Appeals concluded that the defendant's Sixth Amendment rights were violated when the prosecutor, in cross-examination and closing, commented that the defendant insisted upon staring at the seven-year-old victim as she testified. The prosecutor's arguments also suggested that the victim's courtroom contact with Jones was so traumatic that she could not return to court. Id. The Jones court held that this amounted to an improper comment on the defendant's right to confront his accuser. Id. at 811-12, 863 P.2d 85. While the State in Jones asserted that these arguments were offered to rebut Jones' contention that he loved the victim, the Jones court concluded that the prosecutor's argument invited the jury to draw a negative inference from the defendant's exercise of his right of confrontation. Id.
ś 65 The Jones case is distinguishable from the facts of this case because in Jones the prosecutor's comments directly implicated Jones' constitutional right of confrontation. In contrast, the questioning and argument in this case focused on the credibility of the victim versus Gregory. See Crane, 116 Wash.2d at 331, 804 P.2d 10; Miller, 110 Wash.App. at 284, 40 P.3d 692. Gregory does not point to any case in which a general discussion of the emotional cost of victim testimony, offered to support the victim's credibility, amounted to an improper comment on the defendant's right to confrontation.
ś 66 We conclude that the questioning and argument at issue here were not improper because they did not focus on Gregory's exercise of his constitutional rights to trial and to confront witnesses. Instead they focused on the credibility of the victim as compared to the credibility of the accused. To the extent that Gregory also argues that the prosecutor's reference to R.S.'s testimony in closing argument amounted to prosecutorial misconduct, that argument also fails.[24]
*1228 ś 67 Appeal to the Jury's Sympathy: In the alternative, Gregory asserts that the introduction of the above testimony improperly appealed to the jury's sympathy. Mere appeals to the jury's passion or prejudice are improper. State v. Belgarde, 110 Wash.2d 504, 507-08, 755 P.2d 174 (1988). In State v. Claflin, 38 Wash.App. 847, 690 P.2d 1186 (1984), review denied, 103 Wash.2d 1014 (1985), the Court of Appeals condemned an argument where the prosecutor read a poem that poignantly reflected how the rape victim "`probably felt.'" Id. at 849-50, 690 P.2d 1186. However, as discussed above, the State's purpose in presenting this testimony was to rebut Gregory's argument that R.S.'s version of events was not credible. In addition, the jury instruction explaining that the jury should not let sympathy guide its decision would arguably have cured any sympathetic tendencies the jury may have had in this regard. Therefore, it cannot be said that the State improperly appealed to the jury's sympathy.[25]

Prosecutor's Closing Argument
ś 68 During closing argument at trial, the prosecutor argued that for Gregory's defense to succeed, "[Gregory] has got to make [R.S.] look like a prostitute, got to make her look bad." RRP 2923. The prosecutor also argued that accusing R.S. of being a prostitute added "a little extra insult to injury." RRP at 2923-24. Defense counsel objected to both statements and was overruled. Gregory argues that these statements were so improper they require reversal. We disagree.
ś 69 To establish prosecutorial misconduct during closing argument, the defendant bears the burden of demonstrating that the prosecutor's remarks were improper and that they prejudiced the defense. State v. Kwan Fai Mak, 105 Wash.2d 692, 726, 718 P.2d 407, cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). Where, as here, defense counsel objected, this court must evaluate the trial court's ruling for abuse of discretion. Id.
ś 70 Gregory argues that the prosecutor's closing arguments left the jury with the false impression that R.S. was never a prostitute. Gregory cites to Giglio v. United States, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) for the proposition that reversal is required where deliberate deception of the court and jurors has occurred. However, that is clearly not what happened here. The prosecution in Giglio suppressed material evidence regarding a promise of leniency. Id. at 152, 154, 92 S.Ct. 763. Here, there was no suppression of relevant evidence. The prosecutors were very careful not to state that R.S. had never acted as a prostitute. The prosecutor sought to rebut defense counsel's theory that R.S. was prostituting herself on the night in question and got angry over a fee dispute. We conclude that the trial court did not abuse its discretion.
ś 71 During closing argument, the prosecutor also stated that "[R.S.] has come in here to be 100 percent honest." RRP at 2967. Defense counsel objected but was overruled. Gregory argues that reversal is required because this statement expressed the prosecutor's personal opinion with regard to R.S.'s credibility. We disagree. Allegedly improper statements should be reviewed in the context of the entire argument, the issues in the case, the evidence addressed in the argument, and the instructions given. State v. Russell, 125 Wash.2d 24, 85-86, 882 P.2d 747 (1994), cert. denied, 514 U.S. 1129, 115 S.Ct. 2004, 131 L.Ed.2d 1005 (1995). Just before and just after this comment, the prosecutor reviewed R.S.'s admissions about that night. R.S. "stupid[ly]" got into a car *1229 with a stranger. RRP at 2967. She also admitted to having smoked marijuana and crack cocaine earlier in the evening. In context, it is clear that the prosecutor was not personally vouching for the credibility of R.S. Rather, the prosecutor invited the jury to draw the inference that R.S.'s was willing to tell the truth, even if it made her look bad. The prosecutor enjoys reasonable latitude in arguing inferences from the evidence, including inferences as to witness credibility. State v. Johnson, 40 Wash.App. 371, 381, 699 P.2d 221 (1985). The trial court acted within its discretion in overruling the objection to this statement.
ś 72 We conclude that none of the prosecutor's comments during closing argument in this case constituted prosecutorial misconduct. Because the individual statements discussed above do not amount to prosecutorial misconduct, Gregory's claim based on cumulative effect also fails.
ś 73 Gregory also argues that the trial court imposed an improper sentence in the rape case. Because we reverse the rape convictions, we need not address this issue.

C. Conclusion
ś 74 Because the trial court erred when it declined to conduct an in camera review of the dependency files of R.S.'s children that were open at the time of trial, we reverse Gregory's rape convictions. The files contained material impeachment evidence, the nondisclosure of which cannot be said to have been harmless beyond a reasonable doubt. While Gregory makes several other claims, we find no additional error.

II. Murder of G.H.

A. Murder Case Facts and Procedural History
ś 75 In 1996, two years before the R.S. rapes, 43-year-old G.H. moved into a house next door to her mother's. On July, 27, 1996, when G.H. did not show up for work at the restaurant where she was employed as a bartender, her coworkers became concerned and sent someone to check on her. A coworker found the back door of G.H.'s residence unlocked. She let herself in, looked through the house, and found G.H.'s body face down on her bed.
ś 76 The evidence suggested that G.H. had been attacked in her kitchen. She was probably stabbed once in the neck and then dragged into her bedroom. G.H.'s work clothes had been cut off of her and her hands were tied behind her back with apron strings. She was then stabbed three times in the back. In addition she had three deep slicing wounds to the front of her throat. One of the throat wounds was inflicted so violently that a vertebra in G.H.'s neck was broken. The medical examiner concluded that G.H. suffered blunt force trauma to the head and she had several bruises, but the cause of death was multiple sharp force injuries to her back and neck. Semen was found in G.H.'s anal and vaginal swabs, on her thigh, and on the bedspread. The evidence suggested that she was still alive when she was raped. Missing from her home were a pair of diamond earrings, jewelry, and her cash tips from that evening.
ś 77 Gregory lived with his grandmother across an alley from G.H.'s home. Police began to suspect him of complicity in the murder when he gave them inconsistent statements about his whereabouts at the time of the crime. However, the police could not definitively connect him to the crime until 1998. In 1998, DNA analysis of semen found at the G.H. crime scene was compared with blood samples obtained from Gregory in the R.S. rape case. The Washington State Patrol, the Federal Bureau of Investigation (FBI), and a private lab all reported that Gregory was, to a high degree of probability, the source of the semen found at the G.H. crime scene. The various DNA tests compared differing alleles and thus produced varying odds of a random match. For example, the private lab, conducting short tandem repeat (STR) DNA testing, concluded that the chance of a random match in the African American population was 1 in 190 billion. The Washington State Patrol, conducting restriction fragment length polymorphism (RFLP) DNA testing concluded that the chance of a random match was 1 in 235 million.
*1230 ś 78 Gregory was already incarcerated awaiting trial in the R.S. rape case. He was questioned and then charged with aggravated murder in the first degree for the G.H. murder. The aggravating circumstance was that he committed the murder in the course of rape in the first degree and robbery in the first degree. The State elected to seek the death penalty. After a lengthy trial, the jury found Gregory guilty of aggravated first degree murder. Evidence was then presented to the same jury at the penalty phase. The jury concluded that "[h]aving in mind the crime of which the defendant [was] found guilty," it was convinced "beyond a reasonable doubt that there [were] not sufficient mitigating circumstances to merit leniency." MCP at 2983. Accordingly, Gregory was sentenced to death. Gregory appeals the aggravated first degree murder conviction and death sentence. Facts specific to particular issues will be discussed in more detail below.

B. Murder Case Guilt Phase Analysis

Jury Selection-Juror 1
ś 79 Gregory argues that juror 1 was improperly dismissed for cause. The sixth amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a defendant the right to an impartial jury. State v. Brown, 132 Wash.2d 529, 593, 940 P.2d 546 (1997), cert. denied, 523 U.S. 1007, 118 S.Ct. 1192, 140 L.Ed.2d 322 (1998). In order to protect a defendant's right to a fair sentencing hearing, as well as the State's ability to present its arguments to an impartial tribunal, the trial court in a death penalty case must "death qualify" the jury. Brown, 132 Wash.2d at 593, 940 P.2d 546; see also Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).
ś 80 Death qualification is the process whereby the trial court may dismiss prospective jurors for cause if the juror's philosophical views against the death penalty would "`prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Witt, 469 U.S. at 424, 105 S.Ct. 844 (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)); State v. Davis, 141 Wash.2d 798, 856-57, 10 P.3d 977 (2000). The juror's bias need not be "`unmistakably clear'" before dismissal is allowed. Witt, 469 U.S. at 424-25, 105 S.Ct. 844 (rejecting the Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) test). Instead the trial judge can dismiss a juror when "left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." Witt, 469 U.S. at 425-26, 105 S.Ct. 844. Deference must be paid to the trial judge who sees and hears the juror. Id. at 426, 105 S.Ct. 844.[26]
ś 81 Under the Witt test, a juror may express scruples about capital punishment, or even personal opposition to the death penalty, so long as he or she can ultimately defer to the rule of law. Lockhart v. McCree, 476 U.S. 162, 176, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Whether a juror can set aside personal feelings about the death penalty involves a credibility determination that is necessarily factual in nature. Witt, 469 U.S. at 429, 105 S.Ct. 844. A trial court's ruling on a challenge for cause is reviewed for manifest abuse of discretion. Brown, 132 Wash.2d at 601-02, 940 P.2d 546.
ś 82 In this case, juror 1 indicated seven times that if the alternative was life with no chance of release, then she could not vote for the death penalty. In contrast, she later testified that she thought she could follow the court's instructions and impose the death penalty if the State proved death was warranted beyond a reasonable doubt. Significantly, she said that she could tell which answers counsel were looking for and she was not comfortable in disagreeing with the attorneys. She explained the inconsistencies in her answers by stating that she had had time to think about the issue. The State challenged juror 1 for cause, and the defense objected. After argument, the trial court concluded:
This juror repeated approximately three times according to my notes, when asked if *1231 she could vote for the death penalty if she knew a person could get life in prison without parole, she said "probably not" at least three times. I know that on her questionnaire and during some of her other answers, she stated that she could if it was a serial murder type of case.
I believe it's very clear from her answers that she probably is not capable of voting for the death penalty, knowing the alternative is life in prison. So I will grant the state's challenge for cause.
MRP at 2224.
ś 83 Given juror 1's initial answers to questions regarding the death penalty and the suggestion that she changed her answers to please the attorneys, it is not surprising that the trial judge had the definite impression that juror 1 could not "faithfully and impartially apply the law." Witt, 469 U.S. at 426, 105 S.Ct. 844. "[D]eference must be paid to the trial judge who sees and hears the juror." Id. We find there is ample evidence in the record to support the dismissal for cause and hold that the trial court did not abuse its discretion.

Closed Courtroom
ś 84 Gregory argues that when the trial court required his aunt, Tonetta Johnson, to leave the courtroom for the duration of his grandmother's testimony, the court closed the courtroom in violation of his right to a public trial under the Sixth Amendment and article I, section 22 of the Washington Constitution. State v. Brightman, 155 Wash.2d 506, 514, 122 P.3d 150 (2005); In re Pers. Restraint of Orange, 152 Wash.2d 795, 804, 100 P.3d 291 (2004). At trial, the State called Mae Hudson, Gregory's grandmother, to testify. The trial judge abruptly interrupted, excused the jury, and asked Hudson to step out of the courtroom. Then, the trial judge explained:
Counsel, I have been observing that the woman seated behind [defense counsel] on the last question was shaking her head no to the witness before the witness was answering.
MRP at 5051-52. The judge ordered Johnson to step outside of the courtroom for the duration of Hudson's testimony. The court further explained:
I earlier had seen [Johnson] smiling and laughing at the witness, but it wasn't until this last question about the facial hair that I saw her shaking her head no to Ms. Hudson. So I wanted the state and defense counsel to be apprised of that and why I need to exclude her from the courtroom.
Is there any objection to that from the defense?
MRP at 5052. Defense counsel had no objection. The court ordered:
She needs to definitely stay outside for the rest of the testimony. This could be as simple as prompting the witness, or it also could be tampering with the witness in this case. I am especially concerned because this witness may be having some memory problems in this regard. She will need to remain outside the rest of the time.
MRP at 5053. After Hudson's testimony Johnson returned to the courtroom and apologized.
ś 85 In Brightman, Orange, and State v. Bone-Club, 128 Wash.2d 254, 906 P.2d 325 (1995), the trial court ordered that all spectators be excluded from the courtroom during some part of the trial. See Brightman, 155 Wash.2d at 511, 122 P.3d 150; Orange, 152 Wash.2d at 802, 100 P.3d 291; Bone-Club, 128 Wash.2d at 256-57, 906 P.2d 325. The Orange and Bone-Club courts emphasized that the closures in those cases were full closures. Orange, 152 Wash.2d at 808, 100 P.3d 291; Bone-Club, 128 Wash.2d at 256-57, 906 P.2d 325. Here, the trial court never fully closed the courtroom. Further, neither Orange, Brightman, nor Bone-Club explicitly limited or undermined the trial court's inherent authority to regulate the conduct of a trial by excluding one person from the courtroom for a limited period of time. See, e.g., State v. Pacheco, 107 Wash.2d 59, 67-68, 726 P.2d 981 (1986). The trial judge here explained the reason for excluding Johnson, she offered the defendant a chance to object, which he chose not to do, and she limited the exclusion to the duration of Hudson's testimony.[27] *1232 Under these circumstances, it cannot be said that the trial court abused its broad discretion to regulate the conduct of a trial. We conclude that Gregory's right to a public trial was not violated.

Sufficiency of the Evidence to Prove Premeditation
ś 86 Gregory argues that there was insufficient evidence in the record to support the element of premeditation. Evidence is sufficient to support a finding of guilt if "viewed in the light most favorable to the state, a rational trier of fact could have found guilt beyond a reasonable doubt." State v. Clark, 143 Wash.2d 731, 769, 24 P.3d 1006, cert. denied, 534 U.S. 1000, 122 S.Ct. 475, 151 L.Ed.2d 389 (2001). "All reasonable inferences from the evidence must be drawn in favor of the state and interpreted most strongly against the defendant." Id.
ś 87 The legislature has declared that the premeditation necessary to support conviction for murder in the first degree must "involve more than a moment in point of time." RCW 9A.32.020(1). This court has defined premeditation as
deliberate formation of and reflection upon the intent to take a human life [that] involves the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short.
State v. Hoffman, 116 Wash.2d 51, 82-83, 804 P.2d 577 (1991). Premeditation may be proved by circumstantial evidence where inferences supporting premeditation are reasonable and the evidence is substantial. Clark, 143 Wash.2d at 769, 24 P.3d 1006.
ś 88 This court has found that sufficient evidence supported the jury's finding of premeditation in cases where multiple wounds were inflicted with a knife or other weapon, there were signs of a struggle, the victim was at some point struck from behind, and there was evidence that sexual assault or robbery was an underlying motive. Id. at 769-70, 24 P.3d 1006; State v. Gentry, 125 Wash.2d 570, 599-601, 888 P.2d 1105, cert. denied, 516 U.S. 843, 116 S.Ct. 131, 133 L.Ed.2d 79 (1995); State v. Ortiz, 119 Wash.2d 294, 312-13, 831 P.2d 1060 (plurality), 315 (Dolliver, J., concurring), 119 Wash.2d 294, 831 P.2d 1060 (1992); State v. Ollens, 107 Wash.2d 848, 853, 733 P.2d 984 (1987). In Clark, the seven-year-old victim was stabbed at least seven times in the neck, cuts on her hands suggested a struggle, and she was sexually assaulted. 143 Wash.2d at 739, 769-70, 24 P.3d 1006. In Gentry, the defendant picked up a large rock to use as a weapon, he struggled with the victim over the course of 148 feet of a wooded trail, blows were struck on both sides of the victim's head, and sexual assault was apparently attempted. 125 Wash.2d at 600-01, 888 P.2d 1105. In Ortiz, the victim was found in her home, defensive wounds indicated a prolonged struggle through more than one room, and the victim had been raped. 119 Wash.2d at 297, 312-13, 831 P.2d 1060. In Ollens, the victim was stabbed several times with a knife and his throat was then slashed, the victim was struck from behind, and the evidence suggested that robbery was the motive. 107 Wash.2d at 849, 853, 733 P.2d 984.
ś 89 The facts in the instant case similarly evince premeditation. There was no sign of forced entry into G.H.'s house, G.H. was stabbed in the throat in her kitchen and then dragged to her bedroom, G.H.'s hands were tied behind her back, her clothes were cut off of her, and G.H. was stabbed three times in the back, her throat was slit three separate times, and a vertebra in her neck was fractured. Despite her severe injuries, G.H. struggled. G.H. was raped both vaginally and anally before she died. Moreover, none of G.H.'s tip money from that evening was found, and the diamond earrings that she always wore were never recovered. Juxtaposing the facts of the instant case with those from the cases discussed above, it is evident that here there was equally substantial evidence from which the jury could have found premeditation. We conclude that there is *1233 sufficient evidence to support a finding of premeditation.

Right to Counsel During Questioning
ś 90 On November 2, 1998, Gregory was in police custody after arraignment on the R.S. rape charges. Tacoma police detectives transported Gregory from the Pierce County jail to an interview room in a Tacoma police department building. The detectives read Gregory his Miranda[28] rights, questioned Gregory about an unrelated and still uncharged shooting, and then questioned him about the G.H. murder. At the time, Gregory was represented by counsel on the R.S. rape charges, but police did not contact counsel nor invite him to the interview. At trial, one of the detectives testified that during the interview, Gregory refused to be audiotaped, but stated that he thought DNA evidence was good evidence, and became sullen after he was accused of raping and murdering G.H. Gregory also denied ever having sex with G.H. or being in her house. Gregory now argues that the interrogation without his counsel present violated his constitutional rights.
ś 91 In Texas v. Cobb, 532 U.S. 162, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001), the United States Supreme Court held that the Sixth Amendment right to counsel is offense specific, attaching only to "charged offenses," which the Court defined to include any offenses that would amount to the same offense under the Blockburger test. Id. at 172-73, 121 S.Ct. 1335.[29] Gregory concedes that under this standard, police could interview him about the murder without violating the Sixth Amendment.
ś 92 Employing a Gunwall[30] analysis, Gregory asserts that this court should interpret article I, section 22 of the Washington Constitution to provide greater protection than the Sixth Amendment. Specifically, Gregory urges this court to adopt a standard suggested by the Cobb dissenters, which is based upon the federal courts' pre-Cobb test: "[o]nce a charged defendant has requested counsel, he may not be interrogated about related matters without counsel's knowledge and consent." Appellant's Opening Br. at 101-02 (emphasis added). The Cobb dissent would have defined "offense" for purposes of the Sixth Amendment right to counsel as "criminal acts that are `closely related to' or `inextricably intertwined with' the particular crime set forth in the charging instrument." Cobb, 532 U.S. at 186, 121 S.Ct. 1335 (Breyer, J., dissenting). Prior to Cobb, courts had held that "`closely related'" offenses involved "the same victim, set of acts, evidence, or motivation." Id.
ś 93 Even if we were to adopt this "closely related" test as the Washington constitutional test, the R.S. rape and the G.H. rape/murder were not closely related. They involved different victims, they occurred two years apart, and they occurred in different locations. Other than the fact that they both involved rapes, the factual circumstances were distinct. Although Gregory claims that the cases involved the same evidence, namely his DNA, he does not point to a single pre-Cobb case in which the mere fact that the defendant's fingerprints or DNA were collected at both crime scenes rendered two crimes "closely related." In fact, crimes that were deemed closely related, pre-Cobb, involved the same course of conduct, the same cast of characters, were closely related in time, and/or occurred at the same location. See, e.g., United States v. Melgar, 139 F.3d 1005, 1014 (4th Cir.1998); United States v. Arnold, 106 F.3d 37, 42 (3d Cir.1997). Even if a Gunwall analysis were to lead to the adoption of the test suggested by the defendant, there would still be no constitutional violation. Therefore, in this case, we decline to address whether the Washington Constitution should require a different test than the *1234 one articulated by the majority in Cobb.[31]

Admission of DNA Evidence Acquired By Rape Case Blood Draws
ś 94 The trial court entered orders on two different occasions in the R.S. rape case permitting collection of the defendant's blood. The State first made a motion for a blood draw at the defendant's arraignment. The motion incorporated by reference the declaration for determination of probable cause. At the defense's request, the motion was set over. In September 1998, the trial court entered an order authorizing the first blood draw. The order was signed by the defendant's attorney, and the words "[a]pproved as to [f]orm" appear just above the attorney's signature. RCP 6-7. Gregory's blood was drawn in September 1998 pursuant to that order.
ś 95 Counsel later withdrew as the result of a conflict. A new attorney was appointed to defend Gregory in the rape case, and he moved to suppress the results of the September 1998 blood draw, arguing that (1) the order had not been authorized by the defendant and (2) the order was not supported by probable cause. In response, the State moved for a second blood draw. The State presented an affidavit using only the information known to the State at the time of the first blood draw. The court found that probable cause supported the second blood draw and granted that motion. Gregory's blood was drawn pursuant to the second order in January 2000.[32]
ś 96 In the murder case, Gregory brought a motion to suppress information gained from the two blood draws taken in the rape case, making the same arguments. MRP 699. The court determined that collateral estoppel compelled the conclusion that the September 1998 blood draw was the result of a proper agreed order and that the January 2000 order was supported by probable cause. MRP at 700. The court refused to suppress evidence resulting from the blood draws in the rape case.[33]
ś 97 In this court, the defendant argues that the September 1998 blood draw was improper because he did not consent and the record is insufficient to conclude that he waived a substantive right. He also argues that the information presented to the trial court in the rape case did not establish probable cause and that it is irrelevant whether other information available to the State at that time would have established probable cause. Gregory contends that the January 2000 blood draw should have been suppressed because it was the fruit of the first unlawful blood draw and it was not supported by probable cause. Finally, Gregory asserts that evidence obtained from both blood draws should have been suppressed in the murder case because he maintained an expectation of privacy in his DNA profile under both the fourth amendment to the United States Constitution and article I, section 7 of the Washington Constitution such that a DNA profile obtained in the rape case could not be used in the murder prosecution.
ś 98 Validity of the Blood Draw: Criminal Rule (CrR) 4.7(b)(2)(vi) allows the court, on a motion from the prosecuting attorney, to order the taking of a blood sample from the defendant. CrR 4.7(b)(2) is subject to constitutional limitations. Generally, a trial court's decisions regarding discovery under CrR 4.7 will not be disturbed absent manifest abuse of discretion. State v. Yates, 111 Wash.2d 793, 797, 765 P.2d 291 (1988). Yet while the determination of historical facts relevant to the establishment of probable cause is subject to the abuse of discretion standard, the legal determination of whether qualifying information as a whole amounts to probable cause is subject to de novo review. In re Det. of Petersen, 145 Wash.2d 789, 799-801, 42 P.3d 952 (2002).
*1235 ś 99 In order to comply with the Fourth Amendment, an order for a blood draw pursuant to CrR 4.7(b)(2)(vi) must be supported by probable cause. See United States v. Wright, 215 F.3d 1020, 1025 (9th Cir.), cert. denied, 531 U.S. 969, 121 S.Ct. 406, 148 L.Ed.2d 313 (2000). The United States Supreme Court has recognized that three requirements must be met to establish the reasonableness of a blood draw. State v. Judge, 100 Wash.2d 706, 711-12, 675 P.2d 219 (1984) (discussing Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)). "First, there must be a `clear indication' that in fact the desired evidence will be found." Id. at 711-12, 675 P.2d 219 (quoting Schmerber, 384 U.S. at 770-71, 86 S.Ct. 1826). The chosen test must also be reasonable and it must be performed in a reasonable manner. Id. at 712. In this case, Gregory does not challenge the reasonableness of the blood test or the manner in which the blood draws were performed.
ś 100 The January 2000 Blood Draw: The prosecutor explained that after the September 1998 blood draw was challenged, the January 2000 blood draw was requested to eliminate any potential problems with the September 1998 blood draw.[34] The court granted the State's motion for the January 2000 draw before ruling on the admissibility of the September 1998 draw.
ś 101 Gregory first argues that the January 2000 blood draw is fruit of the arguably unlawful September 1998 blood draw. Gregory was first definitively connected to the G.H. murder through the comparison of his September 1998 blood sample against the semen left at the G.H. murder scene. Gregory argues that the sole reason for conducting the January 2000 blood draw was to establish an independent, untainted connection between Gregory and the G.H. crime scene. He claims that if the September 1998 draw was unlawful, then the January 2000 blood draw is the "fruit[] of the poisonous tree." Appellant's Opening Br. at 114.
ś 102 Gregory's assertion that the sole reason for conducting the January 2000 blood draw was to connect him to the G.H. murder is simply incorrect. Assuming for the sake of argument that the September 1998 blood draw was unlawful, Gregory's argument ignores the fact that the motion to compel the January 2000 blood draw occurred in the context of the rape case. The evidence presented to support the January 2000 blood draw consisted only of evidence and arguments relevant to the rape case that were available to the State in September 1998.
ś 103 There were valid reasons, arising only from the rape case, for drawing Gregory's blood in 2000. It was the State's burden to prove each element of the crime beyond a reasonable doubt. See Sandstrom v. Montana, 442 U.S. 510, 520-21, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). Initially, Gregory denied having had sexual intercourse with R.S., asserting an alibi defense, but then switched to a consent defense before trial. Given Gregory's inconsistent story, it made sense that the State would feel it necessary to establish that the swabs taken from R.S. contained Gregory's DNA. The trial judge also suggested there was a difference between the question of whether there was probable cause to draw Gregory's blood and whether the resulting evidence should be suppressed. Gregory could later move for suppression of the DNA results in the rape case based on relevance if he indeed decided to present the defense of consent.
ś 104 Gregory also argues that the January 2000 blood draw was an unreasonable search and seizure because it became unnecessary when the trial court eventually held that the September 1998 blood draw was valid. Gregory's arguments on this point are circular. On the one hand he argues that the 1998 blood draw was invalid. On the other he argues that because the 1998 blood draw was valid, the 2000 blood draw was unnecessary. Under the circumstances, the trial court acted reasonably in allowing the 2000 blood draw.
*1236 ś 105 De novo review of the evidence available to the trial court in September 1998 shows that there was sufficient evidence to support probable cause to draw Gregory's blood in January 2000. The facts presented in the declaration in support of probable cause are unchallenged. The declaration established R.S.'s account of the events of August 21, 1998, including her allegations that she was raped by a man matching Gregory's description and who drove a car registered to Gregory. R.S. reported that the condom used by the rapist had broken and he had ejaculated several times. Police transported R.S. to the hospital where swabs were collected, some of which contained semen. Finally, Gregory told police he was at a friend's home at the time of the rape, but Gregory's friends could not confirm his whereabouts all evening. This information established probable cause to draw Gregory's blood in order to determine whether he deposited the semen collected during R.S.'s hospital visit. We conclude that the January 2000 blood draw was supported by probable cause and was valid.
ś 106 September 1998 Blood Draw: Gregory's DNA remained constant between the September 1998 and January 2000 blood draws and any tests performed on one blood sample could have been performed on both samples. Russell, 125 Wash.2d at 38, 882 P.2d 747 ("[A] given person's DNA . . . remains the same throughout life."). We have found that the January 2000 blood draw was valid, and all of Gregory's DNA profile results could have been obtained from that untainted source. See State v. Warner, 125 Wash.2d 876, 889, 889 P.2d 479 (1995) ("Absolute inevitability of discovery is not required but simply a reasonable probability that evidence in question would have been discovered other than from the tainted source."); see also Wilson v. State, 132 Md. App. 510, 752 A.2d 1250, 1269 (2000) (explaining that the defendant's DNA signature is the common denominator, regardless of which blood sample is used to read that signature). Thus, all DNA results would have been inevitably discovered and no evaluation of the September 1998 blood draw is necessary.
ś 107 September 1998 Blood Draw: Comparison of DNA with Evidence from an Unrelated Crime: Gregory contends that even if his blood was validly collected, it violates either the Fourth Amendment or article I, section 7 of the Washington Constitution to use DNA evidence in the State's possession in the rape case, to prove that Gregory committed an entirely separate crime. Essentially, Gregory argues that he has an expectation of privacy in the information contained in his blood, namely his DNA profile, and a separate probable cause determination was required to support its comparison with the semen collected from the G.H. crime scene. Because there was no such independent probable cause determination, he contends that the DNA evidence should have been suppressed in the murder trial.
ś 108 Fourth Amendment: The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The application of the Fourth Amendment depends upon whether the person invoking its protection can claim a legitimate, objectively justifiable expectation of privacy that has been invaded by the State. Smith v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). Gregory asserts that he has an ongoing privacy interest in the characteristics of his DNA such that the State must obtain a warrant to compare his DNA profile with material collected in connection with an unrelated crime.
ś 109 While this court has not directly addressed this question, we recently held that once a suspect's property is lawfully in the State's control, the State may perform forensic tests and use the resulting information to further unrelated criminal investigations, without violating the owner's Fourth Amendment rights. State v. Cheatam, 150 Wash.2d 626, 638, 81 P.3d 830 (2003). In Cheatam, the defendant asserted that police violated the federal and state constitutions when, acting without a warrant, they retrieved Cheatam's tennis shoes from a jail property bag several days after Cheatam had been arrested on an unrelated charge. Id. at *1237 633-34, 81 P.3d 830. We recognized that most courts have determined that
once an inmate's property is taken from him or her and inventoried and placed in a property room, the inmate's expectation of privacy is substantially or entirely reduced to the point that no constitutionally protectable interest remains. Thus, a "second look" at an inmate's inventoried property in connection with investigation of a crime unrelated to the one for which the defendant is arrested does not violate the constitution.
Id. at 636, 81 P.3d 830 (listing cases). Accordingly, we held that "once an inmate's personal effects have been exposed to police view in a lawful inventory search and stored in the continuous custody of the police, the inmate no longer has a legitimate expectation of privacy in the items free of further governmental intrusion." Id. at 638, 81 P.3d 830.
ś 110 While unique requirements must be met to support a blood draw, Gregory has failed to adequately explain why, after the blood draw is complete, a DNA profile that is lawfully in the State's possession should be treated differently from other items of a defendant's property with regard to subsequent criminal investigations.[35] Gregory's blood was drawn for the very purpose of conducting DNA analyses and the resulting DNA profile was lawfully in the possession of police, regardless of which evidence that DNA profile was being compared against, swabs from R.S.'s rape kit or samples from the G.H. crime scene. Gregory does not point to any court that has concluded that DNA evidence, lawfully in the possession of the State for the purposes of one criminal investigation, cannot be compared with evidence collected for the purposes of an unrelated criminal investigation. We conclude that once the suspect's DNA profile is lawfully in the State's possession, the State need not obtain an independent warrant to compare that profile with new crime scene evidence.[36]
ś 111 Article I, Section 7: Article I, section 7 of the Washington Constitution provides that "[n]o person shall be disturbed in his private affairs . . . without authority of law." "`If no search occurs, then article I, section 7 is not implicated.'" Cheatam, 150 Wash.2d at 642, 81 P.3d 830 (quoting State v. Young, 123 Wash.2d 173, 181, 867 P.2d 593 (1994)). Whether a search has occurred depends upon "`whether the State has unreasonably intruded into a person's "private affairs."'" Id. (quoting State v. Boland, 115 Wash.2d 571, 577, 800 P.2d 1112 (1990)). The inquiry is broader under the state constitution than under the Fourth Amendment. Id.
*1238 ś 112 The Cheatam court held that once police have lawful possession of a piece of a suspect's property, "the inmate has lost any privacy interest in those items that have already lawfully been exposed to police view. He or she is no longer entitled to hold a privacy interest in the already searched items free from further governmental searches" Id. The Cheatam court explained that "one's privacy interest does not change depending on which crime is under investigation once lawful exposure has already occurred." Id. Because Cheatam's shoes were lawfully searched when booking occurred, Cheatam had no ongoing privacy interest in them, even under the Washington Constitution. See id. at 642-43, 81 P.3d 830.
ś 113 We follow the reasoning of Cheatam and conclude that article I, section 7 is not implicated here because no additional search occurs when a defendant's DNA profile already in the State's possession is compared against evidence taken from a new crime scene. Gregory's DNA profile had already been lawfully exposed to the police; thus, its comparison against evidence from a new crime scene did not constitute a search under article I, section 7.[37] Article I, section 7 of the Washington Constitution does not require a different result than our Fourth Amendment analysis in this case.

Frye Hearing and DNA Evidence
ś 114 Washington has adopted the Frye test for evaluating the admissibility of new scientific evidence. State v. Cauthron, 120 Wash.2d 879, 886, 846 P.2d 502 (1993) (citing Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923)). The primary goal is to determine "whether the evidence offered is based on established scientific methodology." State v. Gore, 143 Wash.2d 288, 302, 21 P.3d 262 (2001). Both the scientific theory underlying the evidence and the technique or methodology used to implement it must be generally accepted in the scientific community for evidence to be admissible under Frye. Id. "If there is a significant dispute among qualified scientists in the relevant scientific community, then the evidence may not be admitted," but scientific opinion need not be unanimous. Id.
ś 115 Once a methodology is accepted in the scientific community, then application of the science to a particular case is a matter of weight and admissibility under ER 702, which allows qualified expert witnesses to testify if scientific, technical, or other specialized knowledge will assist the trier of fact. ER 702; see also State v. Copeland, 130 Wash.2d 244, 263, 272, 922 P.2d 1304 (1996) (citing Cauthron, 120 Wash.2d 879, 846 P.2d 502). For example, once we conclude that it is generally accepted that genetic frequency calculations can be made from an adequate DNA database, then whether a particular database is large enough, representative of the relevant population, or of sufficient quality, are all matters of weight and admissibility under ER 702. Id. at 272-74, 922 P.2d 1304. "DNA admissibility issues recur with some frequency and, needless to say, often involve time-consuming, expensive Frye hearings." Gore, 143 Wash.2d at 304-05, 21 P.3d 262. Therefore, courts should analyze scientific evidence under ER 702 whenever possible. In Washington, whether a given scientific technique has *1239 been performed correctly in a particular instance, i.e., whether laboratory error has occurred, goes to its weight, not admissibility. Copeland, 130 Wash.2d at 270, 922 P.2d 1304; Gentry, 125 Wash.2d at 586, 888 P.2d 1105.
ś 116 At trial Gregory moved for a Frye/ER 702 hearing, but the trial court denied the motion because the State had established that the tests and methodologies used by the WSPCL and Forensic Science Associates (FSA) were generally accepted in the scientific community. On appeal, Gregory argues that the trial court should have conducted a Frye hearing because three aspects of the DNA testing are not generally accepted in the scientific community. Gregory raises no ER 702 issues.
ś 117 Appellate review of a Frye ruling (issued after a Frye hearing) is de novo. It is not clear what standard of review should be applied to a trial court's decision not to conduct a Frye hearing at all. Yet the trial court here declined to conduct a Frye hearing because it found that the scientific evidence has been generally accepted in the scientific community, the same question ultimately addressed on appeal after a Frye hearing. Thus, application of a de novo standard is appropriate.
ś 118 First, Gregory contends that the use of a flatbed scanner to memorialize the typing strips produced during DQ-alpha and polymarker testing is not a generally accepted technique. The result of a DQ-alpha analysis of DNA is typing strip showing a series of blue dots. To determine whether two samples could have come from the same person, the scientist checks whether the samples have produced the same pattern of dots. Russell, 125 Wash.2d at 39, 882 P.2d 747. The strip itself will eventually turn blue and the results will fade in time. Therefore, the scientist in this case scanned the testing strips into a computer while they were still wet and printed the images to memorialize the strips. The strips revealed that the DNA from the vaginal swab matched Gregory's DNA. The odds of a random match were 1 in 2,500 in the African American population.
ś 119 According to Gregory, the accepted protocol calls for Polaroid photography, rather than flatbed scanning. However, the trial court concluded that the use of the scanner did not implicate the underlying methodology of the DQ-alpha or polymarker testing, which this court has recognized as having been generally accepted in the scientific community. Gore, 143 Wash.2d at 305, 21 P.3d 262. We agree. Gregory's chief complaint with the use of the flatbed scanner is that the analyst will be able to alter the intensity of the dots on the typing strip. Whether the analyst adjusted the dot intensity in a particular case is a question of what occurred in the laboratory during the test. Because the lab analyst can be cross-examined on this point, the issue goes to weight, not admissibility. See Copeland, 130 Wash.2d at 276, 922 P.2d 1304 (holding an analyst's ability to override a computer, making a band fall within a five percent match window, goes to weight not admissibility). Gregory does not contend that the analyst in this case actually altered the dot intensity.
ś 120 Second, Gregory asserts that the techniques used by FSA in its polymerase chain reaction (PCR)-based STR testing are not generally accepted. Samples taken from G.H.'s body and bedspread as well as Gregory's blood samples were subjected to PCR-based STR DNA testing using the profiler plus testing kit and capillary electrophoresis. Gregory's DNA profile matched the sperm found on G.H.'s bedspread and on and in her body. The odds of a random match were 1 in 190 billion in the African American population.
ś 121 In Gore, this court concluded that PCR based DQ-alpha, polymarker, and D 1 S80 systems are generally accepted in the scientific community. Gore, 143 Wash.2d at 304-07, 21 P.3d 262. In the PCR procedure, enzymes are used to locate and replicate "genes of interest." Russell, 125 Wash.2d at 38, 882 P.2d 747. The chosen genes are replicated billions of times, a process called amplification. Id. Then the amplified DNA is either (1) flooded over a nylon membrane which has been treated such that different variations of the genes of interest (possible variations are called alleles) will show up as *1240 varying dots on the membrane, id. at 37-39, 882 P.2d 747, or (2) run through a gel where an electric current causes them to spread over the gel in a distinct manner depending on variations in the gene of interest (a process called gel electrophoresis). See Gore, 143 Wash.2d at 305-06, 21 P.3d 262. If two samples create the same pattern on the membrane or gel then there is a match, meaning they could have come from the same person. Russell, 125 Wash.2d at 39, 882 P.2d 747. The DQ-alpha and D1S80 systems have been approved by this court. See Gore, 143 Wash.2d at 305-07, 21 P.3d 262. In Gore, we concluded that a Frye hearing on admissibility of typing techniques is not necessary for PCR based systems, and we declined to require new Frye hearings each time new loci are involved in DNA testing. Gore, 143 Wash.2d at 305, 307, 21 P.3d 262.
ś 122 STR testing is a type of PCR testing where different regions of the DNA are amplified by the PCR process. In its 1996 report, the National Research Council noted that STR testing is particularly appropriate for forensic use and many courts have held that STR testing is generally accepted in the scientific community. See, e.g., Troxell v. State, 778 N.E.2d 811, 816 (Ind.2002); State v. Deloatch, 354 N.J.Super. 76, 804 A.2d 604, 610-11 (2002) (noting that 48 states and the FBI use and recognize STR testing); State v. Butterfield, 2001 UT 59, 27 P.3d 1133, 1143 (2001); State v. Jackson, 255 Neb. 68, 582 N.W.2d 317, 325 (1998). While the amplified DNA here was separated by capillary electrophoresis, rather than gel electrophoresis, other courts have recognized that capillary electrophoresis in STR testing is generally accepted in the scientific community. See, e.g., People v. Henderson, 107 Cal.App.4th 769, 132 Cal.Rptr.2d 255, 267 (2003); Butterfield, 27 P.3d at 1144-45. Furthermore, use of the profiler plus testing kit, the kit used by FSA in this case, has also been found to be generally accepted in the scientific community. See State v. Traylor, 656 N.W.2d 885, 890, 900 (Minn.2003); Yisrael v. State, 827 So.2d 1113, 1114-15 (Fla.Dist.Ct.App. 2002); Butterfield, 27 P.3d at 1144-45. Finally, Gregory does not dispute the trial court's findings that "[h]undreds of scientific articles have been published regarding the use of STR technology," and "[t]he use of STRs has been extensively validated in inter-laboratory comparisons conducted throughout the world." MCP at 2952; see also Traylor, 656 N.W.2d at 892-93 nn. 5, 6 (listing articles).
ś 123 Notably, Gregory does not cite to a single appellate case or scientific article that concludes that STR testing, use of the profiler plus testing kit, or capillary electrophoresis, is not generally accepted. He cites only to the testimony of Dr. Randall Libby, a defense expert whose conclusions this court has questioned before. See Gore, 143 Wash.2d at 309 n. 9, 21 P.3d 262 (noting Dr. Libby's personal financial interest in having the courts hold that there is significant disagreement in the scientific community). We conclude that the STR techniques used in this case are generally accepted in the scientific community and no Frye hearing was necessary here. While Gregory complains that FSA failed to perform internal validation, there was no evidence that FSA procedures compromised the test results in this case. Further, as noted, issues of laboratory error are properly the subject of cross-examination and go to weight not admissibility. See Copeland, 130 Wash.2d at 271, 922 P.2d 1304.
ś 124 Third, Gregory asserts that application of the product rule to the genotype frequencies used for STR analysis is not generally accepted in the scientific community. See id. at 264, 922 P.2d 1304 (statistical evidence of genetic profile frequency probabilities must be presented to the jury). The product rule means that
"the probability of a genetic profile occurring in the population is the product of the probabilities of each individual allele's occurrence in the population. Validity of the rule depends upon whether the individual alleles are actually statistically independent. . . . Two assumptions underlie use of the product rule when calculating genetic profile frequencies: linkage equilibrium, which means that the alleles at different loci are inherited independent of each other, and Hardy-Weinberg equilibrium, *1241 which means that one allele at a locus is not predictive of the other allele at that locus (one allele is inherited from the mother, the other from the father). Hardy-Weinberg equilibrium depends upon an assumption of a large population in which there is random mating.
Gore, 143 Wash.2d at 308, 21 P.3d 262 (quoting Copeland, 130 Wash.2d at 264-65, 922 P.2d 1304 (citations omitted)). Gregory asserts that because these determinations are dependent upon the particular loci used in the DNA test, prior holdings that the product rule could be applied to the results of particular PCR based tests cannot govern whether the product rule can be used with STR tests. Because defense expert, Dr. Laurence Mueller,[38] raised questions about linkage equilibrium in STR databases, Gregory contends the trial court should have conducted a Frye hearing on this issue.
ś 125 However, this court has already held that whether a particular database is large enough, representative of the relevant population, or of sufficient quality are all matters of weight and admissibility under ER 702. Copeland, 130 Wash.2d at 272-74, 922 P.2d 1304. Similarly, questions concerning linkage equilibrium in STR databases would be more properly discussed by experts at trial whose testimony has been evaluated under the ER 702 standard. Based on this court's prior case law and our preference for evaluation of evidence under ER 702, we conclude that the trial court did not err in declining to hold a Frye hearing in this case.

Admission of Evidence That Gregory Possessed a Buck Knife
ś 126 During the murder trial, the trial court admitted into evidence a Buck knife found in Gregory's car during the 1998 rape investigation. A Pierce County medical examiner testified at trial that this knife could have inflicted the stab wounds in the murder case. But on cross-examination, he also agreed that "there are thousands of instruments that could possibly have caused those injuries." MRP at 5383. In addition, a witness for the defense testified that he gave the defendant the knife in 1997, after the G.H. murder. MRP at 6507-08. Gregory argues that the knife was not relevant to the case and its admission chilled his constitutional right to bear arms.
ś 127 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. The threshold to admit relevant evidence is low and even minimally relevant evidence is admissible. State v. Darden, 145 Wash.2d 612, 621, 41 P.3d 1189 (2002). A trial court's relevancy determinations are reviewed for manifest abuse of discretion. Bell v. State, 147 Wash.2d 166, 181-82, 52 P.3d 503 (2002). In this case, Gregory's objections were based on the absence of direct evidence that the knife was used to commit the murder. However, these objections went to weight, not admissibility. We conclude that the trial court did not abuse its discretion when it admitted the knife.
ś 128 Gregory relies on Rupe, for the proposition that reference to his ownership of the knife improperly chilled his right to bear arms. 101 Wash.2d 664, 683 P.2d 571. However, the facts of Rupe are clearly distinguishable from the instant case. In Rupe, the prosecutor sought to admit evidence of Rupe's gun collection in the penalty phase of the capital trial specifically to emphasize that Rupe was a dangerous man. Id. at 703-04, 683 P.2d 571. The Rupe court found that because the defendant was constitutionally entitled to possess the weapons, "without incurring the risk that the State would subsequently use the mere fact of possession against him in a criminal trial unrelated to their use," due process prohibited their admission. Id. at 707, 683 P.2d 571 (emphasis added). The Rupe court emphasized that the gun collection was wholly unrelated to the crime. Id. at 706-07, 683 P.2d 571. Here the State sought to connect the knife with the murder at issue in this case. We *1242 conclude that admission of the knife did not chill any constitutional right.

Testimony That Gregory Refused to be Tape Recorded or Give a Formal Statement
ś 129 During the November 1998 interview, Gregory declined to be tape recorded. At trial the prosecutor asked DeVault, "[d]uring that [interview], did you ask him if you could record your conversation with him?" MRP at 6005. Defense counsel objected as to relevance. The jury was excused, and the prosecutor replied that lack of a tape recording would be relevant "if there is any attack at all regarding the accuracy or veracity of the reported statements by Detective DeVault." MRP at 6006. The defense noted that it had not challenged the contents of DeVault's statement and argued again that the refusal to be tape recorded was not relevant. The trial court concluded that the testimony was admissible. DeVault testified that "[Gregory] didn't want the conversation recorded. He didn't trust the recordings." MRP at 6015. Later, the prosecutor asked, "[d]id you ask [Gregory] that day if he wished to give you a formal statement about that case?" MRP at 6019. DeVault replied, "I continued to try to get him to talk to me about it. I asked him if he would like to give a formal statement, with or without the recorder, and he declined to do so." MRP at 6019. This exchange did not draw an objection. Gregory does not point to any instance where the prosecutor referred to this testimony in closing arguments.
ś 130 Gregory now argues that DeVault's testimony improperly commented on his right to remain silent. Because this argument is raised for the first time on appeal, Gregory must establish that the alleged constitutional error was manifest. RAP 2.5(a). Yet, it is unclear how DeVault's testimony implicates Gregory's Fifth Amendment right to remain silent where Gregory did not remain silent. Although he declined to be tape-recorded, he discussed the crime with DeVault, denying ever having been inside G.H.'s house or ever having sex with her. Gregory does not seem to have refused to answer any question posed to him. While Gregory attempts to draw a comparison between this case and State v. Silva, 119 Wash. App. 422, 81 P.3d 889 (2003), Silva involved a defendant who answered preliminary questions, but then refused to answer more incriminating questions about the crime. Id. at 426-27, 81 P.3d 889. The detective in Silva testified that when confronted with specific incriminating facts during the interview, he expected Silva to affirm or deny those facts, but instead Silva remained silent and did not answer the question. Id. While Silva clearly exercised his Fifth Amendment right to remain silent, Gregory does not establish that his refusal to be recorded or make a formal statement implicates the Fifth Amendment right where there was no testimony that Gregory ever refused to answer a question.
ś 131 Gregory also argues that DeVault's testimony commented on a statutory right not to be recorded without his consent and that such a comment violates due process. RCW 9.73.030 states that, except as otherwise provided in the statute, the State may not record any private conversation without first obtaining the consent of all parties. RCW 9.73.030(1)(b). Gregory asserts that the statute creates a right to decline to be recorded which cannot be commented upon at trial. See State v. Carneh, 153 Wash.2d 274, 289, 103 P.3d 743 (2004) (listing cases in which Washington courts have held that the State may not invite the jury to infer guilt from the exercise of a statutory privilege). Even assuming Gregory is correct that the statute creates the described right, testimony constitutes an improper "comment" on a right only if the State invites the jury to infer guilt from the exercise of the right. See id. at 289-90, 103 P.3d 743; State v. Lewis, 130 Wash.2d 700, 707, 927 P.2d 235 (1996) ("A comment on an accused's silence occurs when used to the State's advantage either as substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt."); State v. Henderson, 100 Wash.App. 794, 798, 998 P.2d 907 (2000) ("`Comment' means that the State uses the accused's silence to suggest to the jury that the refusal to talk is an admission of guilt."). *1243 Here, DeVault's testimony regarding Gregory's refusal to give a formal statement or allow recording was not mentioned in closing arguments nor was it used to imply guilt. The prosecutor asked the question to defend against any attack on the accuracy or veracity of the reported statements. We conclude that the testimony did not amount to a comment even if RCW 9.73.030 created the suggested statutory right, nor did the testimony implicate Gregory's Fifth Amendment right to remain silent.

Testimony and Argument Regarding Gregory's Failure to Contact De Vault
ś 132 The State asserted at trial that soon after G.H.'s murder, Detective DeVault asked Mae Hudson, Gregory's grandmother, to have Gregory contact the detective. The State sought to question Hudson about this fact. Defense counsel argued that such testimony would improperly comment on Gregory's Fifth Amendment right to prearrest silence. When Hudson testified, she denied ever having been asked to give such a message to Gregory. Later in the State's case, DeVault testified that although Gregory was not home when he initially canvassed the neighborhood, he left a business card with Hudson and asked her to pass a message to Gregory that the detective wished to talk to him. He also explained that Hudson later reported that she had relayed the message. That testimony drew a hearsay objection which was sustained. Defense counsel did not make any other objection to this portion of DeVault's testimony. DeVault then explained that he contacted Gregory at the Hudson home three days after G.H.'s body was found. Based on this testimony, the prosecutor, during closing, argued:
[Gregory] is not there when the detectives go to talk to him. His grandmother is. It's not necessarily suspicious that the defendant isn't there when the detectives go to talk to him. But three days go by after Detective DeVault says to Ms. Hudson, [p]lease have Allen Gregory give us a call. No word. By the time Detective DeVault goes out to Mae Hudson's house to talk to Allen Gregory, the defendant knows that his grandmother has told the police that he was not home when she checked the bedroom at about 1:30 in the morning on the night of the killing.
MRP at 6714.
ś 133 The only unsuccessful defense objection was to the questioning of Mae Hudson, and that questioning produced only Hudson's denial that DeVault had asked her to pass a message to Gregory. Defense counsel did not object to DeVault's testimony on Fifth Amendment grounds, and he did not object to the prosecutor's closing argument. Without objection at trial, reversal based on either is warranted only if there has been a manifest error affecting a constitutional right. RAP 2.5(a). "[T]he appellant has the burden to demonstrate that the alleged error actually affected his or her rights. `[I]t is this showing of actual prejudice that makes the error "manifest", allowing appellate review.'" State v. McNeal, 145 Wash.2d 352, 357, 37 P.3d 280 (2002) (quoting State v. McFarland, 127 Wash.2d 322, 333, 899 P.2d 1251 (1995)).
ś 134 This court has been clear that the State may not comment on the accused's exercise of his Fifth Amendment prearrest right to remain silent. See State v. Sweet, 138 Wash.2d 466, 480-81, 980 P.2d 1223 (1999); Lewis, 130 Wash.2d at 705-06, 927 P.2d 235; Crane, 116 Wash.2d at 331, 804 P.2d 10. However, not all remarks amount to a "comment" on the exercise of a constitutional right. Sweet, 138 Wash.2d at 481, 980 P.2d 1223; Lewis, 130 Wash.2d at 706, 927 P.2d 235. In Crane, we characterized the issue as "whether the prosecutor manifestly intended the remarks to be a comment on that right." Crane, 116 Wash.2d at 331, 804 P.2d 10. The Crane court then noted that a prosecutor's statement will not be considered a comment on a constitutional right to remain silent if "standing alone, [it] was `so subtle and so brief that [it] did not "naturally and necessarily" emphasize defendant's testimonial silence.'" Id. (second alteration in original) (quoting State v. Crawford, 21 Wash.App. 146, 152, 584 P.2d 442 (1978)). Then, in Lewis, we concluded that "[a] comment on an accused's silence occurs when used to the State's advantage either as substantive *1244 evidence of guilt or to suggest to the jury that the silence was an admission of guilt." 130 Wash.2d at 706-07, 927 P.2d 235 (citing Tortolito v. State, 901 P.2d 387, 390 (Wyo.1995)).
ś 135 Under Crane and Lewis, DeVault's testimony and the prosecutor's reference in closing argument to the fact that Gregory failed to contact DeVault for three days did not amount to comments on prearrest silence. Gregory did not refuse to talk with police; to the contrary, he freely discussed with DeVault his whereabouts on the night in question. The State explains that DeVault's testimony was offered to explain the investigative process in this case, not to comment on Gregory's delay in contacting police. The prosecutor's argument implies that the delay gave Gregory time to make his story consistent with the statement given by his grandmother, but it does not imply that he was avoiding the police because he was guilty. Furthermore, the prosecutor's argument regarding suspiciousness was so subtle and brief that it did not naturally and necessarily emphasize any testimonial silence. Neither the testimony nor the argument amounted to a comment on Gregory's right to remain silent.

Prosecutorial Misconduct During Guilt Phase Closing Argument
ś 136 Gregory contends that during closing argument, the prosecutors committed misconduct by improperly denigrating defense counsel, arguing facts not in evidence, and improperly shifting the burden to the defense. The defendant bears the burden of showing that the prosecutor's remarks were improper. State v. Stenson, 132 Wash.2d 668, 718, 940 P.2d 1239 (1997), cert. denied, 523 U.S. 1008, 118 S.Ct. 1193, 140 L.Ed.2d 523 (1998). Even if the defendant does so, the error does not require reversal unless "the appellate court determines there is a substantial likelihood the misconduct affected the jury's verdict." Id. at 718-19, 940 P.2d 1239. A defendant's failure to object to a prosecutor's improper remark constitutes a waiver, unless the remark was "so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice" that could not have been cured by an instruction to the jury. Id. at 719, 940 P.2d 1239; see also Gentry, 125 Wash.2d at 596, 888 P.2d 1105; Hoffman, 116 Wash.2d at 93, 804 P.2d 577.[39] Where the defendant objects and requests a curative instruction or moves for a mistrial, we give deference to the trial court's ruling because it is in the best position to evaluate whether the prosecutor's comment prejudiced the defendant. Stenson, 132 Wash.2d at 719, 940 P.2d 1239. Allegedly improper comments must be viewed in the context of the entire argument, and a prosecutor enjoys wide latitude "in drawing and expressing reasonable inferences from the evidence." Gentry, 125 Wash.2d at 641, 888 P.2d 1105.
ś 137 Comments Regarding Cross-Examination of Dr. Brown: Dr. Brown, formerly of the WSPCL, testified at Gregory's trial. In an earlier, unrelated case, Dr. Brown conducted an RFLP test and drafted a report for his coworker to review. The coworker noted a mistake, which Dr. Brown then corrected. When questioned during an interview with defense counsel in that case, Brown lied to cover up the mistake. During cross-examination here, Gregory's defense counsel focused, in part, on this incident and Brown's subsequent resignation.
ś 138 In closing, the prosecutor remarked that the defense strategy in this case was "to attack the scientists personally." MRP at 6724. The prosecutor argued:
John Brown is the perfect example of how the defense tactic in DNA cases has changed, because John Brown suffered an unbelievable attack personally. It wasn't professional. It was personal.
MRP at 6727. Defense counsel objected. The court sustained and ordered this argument to be stricken from the record. The prosecutor then argued:
John Brown was questioned about every single thing except his work in this case. What does that tell you? Distract, deflect, *1245 divert, get your attention away from the work that John Brown did in this case so maybe you won't see how well it was done, so maybe you won't see how much it matches and how much the defendant committed this crime.
MRP at 6727. There was no objection to this argument.
ś 139 Where the defense failed to object, we must determine whether the argument was so flagrant and ill-intentioned that it resulted in an enduring prejudice that could not be obviated by a curative instruction. Stenson, 132 Wash.2d at 719, 940 P.2d 1239. "[T]he prosecutor, as an advocate, is entitled to make a fair response to the arguments of defense counsel." Russell, 125 Wash.2d at 87, 882 P.2d 747. In Russell, this court evaluated a prosecutor's statement that the defense had "`attacked and vilified'" a DNA expert. Id. at 92, 882 P.2d 747 (quoting Verbatim Report on Appeal at 7289). The Russell prosecutor argued that defense counsel would "`stoop to any level'" to call scientific evidence into question. Id. The Russell court found that the prosecutor's remarks "appear to have been provoked by defense counsel and arguably constitute a fair response to attacks made by the defense on the deputy prosecutor, her witnesses, and the work of government agents." Id. at 93, 882 P.2d 747. The court held that "[w]hile inflammatory, the remarks were not so prejudicial that a curative instruction would have been ineffective." Id.
ś 140 We conclude that the prosecutor's remarks in this case were no worse than the prosecutor's remarks in Russell. The trial court struck from the record the characterization of the attack on Brown as personal. Gregory has not shown that the trial court abused it discretion in crafting a remedy, especially where no further curative instruction was requested. The prosecutor's other remarks, arguing that the defense was trying to divert the jury's attention away from the DNA evidence, seem to be a fair response to defense counsel's cross-examination of Brown. While Gregory points to various other cases in which courts have found due process violations, those cases are distinguishable in that they involve characterizations of defense counsel as liars. See Appellant's Opening Br. at 139-40 (listing cases). Prosecutors in this case simply did not go so far.
ś 141 Facts not in Evidence: Gregory also argues that the prosecutor argued facts not in evidence and misstated the evidence presented to the jury. Specifically, he contends that the prosecutor improperly referred to the population of the United States and the world, the prosecutor improperly argued that the results of the three DNA tests could be combined to create a single probability of a random match, and the prosecutor improperly listed nonforensic uses for DNA testing. Notably, the defense did not object to any of the above challenged statements during closing argument. Therefore, we must determine only whether the prosecutor's comments were so flagrant and ill-intentioned that an enduring prejudice resulted such that a curative instruction could not have been effective. Stenson, 132 Wash.2d at 719, 940 P.2d 1239.
ś 142 Population Statistics: During closing argument, the prosecutor referred to testimony that the chance of a random match between the defendant and the DNA left at the scene under the RFLP test was "1 in 325 million, roughly the population of the United States." MRP at 6729. The prosecutor also repeated that the chances of a random match between Gregory and the crime scene DNA under the STR test was "1 in 180 billion people," which amounted to "[r]oughly 30 times the population of the world." MRP at 6732.[40] The State acknowledges that there was no evidence presented at trial as to the populations of the United States or the world, but in argument, the parties are granted wide latitude in drawing inferences from the evidence, and Gregory does not show that the argument was flagrant and ill-intentioned. See Gentry, 125 Wash.2d at *1246 641, 888 P.2d 1105. The jury instruction explaining that the jury must not consider facts not in evidence would have cured any error. Therefore, these statements do not warrant reversal.
ś 143 Additional Application of the Product Rule: During closing argument, the State combined the results of all three types of DNA testing by multiplying the results of each, using the product rule:
What are the odds of a person having the six locations that match between Allen Gregory and the vaginal swabs using DQ-Alpha, the six locations between the defendant and the bedspread sperm RFLP, and the nine locations on all of the evidence and the defendant using STRs, 1 in 2,500, times 1 in 325 million, times 1 in 180 billion. It's a 5-digit number with 19 zeroes after it. That's the chance. That's the odds of somebody else besides this defendant raped and murdered [G.H.]. MRP at 6733. Gregory now argues that there was no evidence that the product rule can properly be applied across results obtained from different DNA tests. However, the State is entitled to draw reasonable inferences from the evidence, and again, Gregory has not shown that the argument was flagrant or ill-intentioned. Finally, there was evidence that the odds of a random match were at least 1 in 180 billion. The odds were already so high as to virtually eliminate the chances of a random match such that this argument would not have prejudiced the defense.
ś 144 Other Uses for DNA Evidence: Finally, Gregory argues that the prosecutor improperly referred to other high stakes uses of DNA testing. Specifically, the prosecutor noted that DNA testing has been used in medical diagnosis and transplant procedures and identification of casualties of war, victims of the Oklahoma City bombing, and victims of plane crashes. The prosecutor then emphasized the trustworthiness of DNA testing. While Gregory argues that this comment was not supported by evidence at trial, one of the scientists testified, without objection, that PCR and RFLP testing have been used in "medical research and diagnostic transplant, organ research, the identification of war dead, the identification of remains in the Oklahoma City bombing and plane crashes." MRP at 4714. Any minor departure from the actual testimony is not enough to warrant reversal here.
ś 145 Comment on the Missing Witness: Gregory also asserts that the prosecutor improperly shifted the burden of proof by commenting that the defense failed to call Mike Barth, G.H.'s ex-boyfriend, whom the defense suggested had actually killed G.H. The prosecutor argued:
Now the defense didn't call Mike Barth. They didn't call him and say, Did you kill her? The state didn't call him either. The state did one better. The state called in his biological evidence, confirmed it with the evidence at the murder scene, and there isn't any chance at all.
MRP at 6723.[41] The "missing witness doctrine" allows a prosecutor to comment on the defendant's failure to call a witness in certain circumstances:
Under this doctrine, where a party fails to call a witness to provide testimony that would properly be a part of the case and is within the control of the party in whose interest it would be natural to produce that testimony, and the party fails to do so, the jury may draw an inference that the testimony would be unfavorable to that party.
Cheatam, 150 Wash.2d at 652, 81 P.3d 830. However, this court has held that the missing witness doctrine is limited; "the inference is not available if the witness's testimony would necessarily be self-incriminatory if favorable to the party who could have called the witness." State v. Blair, 117 Wash.2d 479, 489-90, 816 P.2d 718 (1991). The missing witness doctrine would not apply here where, if Barth's testimony were favorable to Gregory, it would have incriminated Barth.
ś 146 Even though the missing witness doctrine does not permit the argument in this case, Gregory has not shown how the prosecutor's comment was prejudicial. See *1247 Blair, 117 Wash.2d at 491, 816 P.2d 718. In fact, during closing argument, the prosecutor discussed the State's burden of proof. Defense counsel never requested a curative instruction, which could easily have reminded the jury of the proper burden of proof. The comment was not so flagrant and ill-intentioned that it would have resulted in enduring prejudice. Stenson, 132 Wash.2d at 718-19, 940 P.2d 1239. We conclude that none of the challenged closing arguments amount to misconduct.

Viewing of the Videotape During Deliberations
ś 147 One of the exhibits admitted at trial was an edited copy of a video of the crime scene. Outside of the presence of the jury, the trial court asked if the defense had any objections to the jury replaying the video during deliberations. The defense replied that it had no objection. The trial court also mentioned that the jury might be able to use the courtroom for deliberations. The defendant was present during discussion of both of these matters.
ś 148 During the first day of deliberations for the guilt phase, March 20, 2001, the jury notified the judicial assistant that they wished to view the video. The viewing equipment was in the courtroom with the power cords secured to the floor. The judicial assistant made sure the courtroom doors were locked, then escorted the jury into the courtroom. The judicial assistant exited the courtroom and remained outside in a hallway where he could see the jurors but could not see what they were watching or hear what was being said. After the jury returned to the jury room, the judicial assistant closed the door to the jury room and then unlocked the doors to the courtroom.
ś 149 Gregory now asserts that his constitutional right to be present at all critical stages of his criminal proceeding was violated when the judicial assistant allowed the jury to replay the video during guilt phase deliberations. Gregory also contends that the judicial assistant had ex parte contact with the jury. Because the hearing was not recorded and because the defendant was not notified until afterward, Gregory argues that the action amounted to constitutional error, which the State cannot demonstrate was harmless.
ś 150 This court has recognized that in the eyes of the jury, the bailiff is an agent of the trial judge. See State v. Bourgeois, 133 Wash.2d 389, 407, 945 P.2d 1120 (1997). Therefore, when an ex parte communication takes place between the bailiff and the jury "that relates to an aspect of the trial" the trial judge should generally disclose the communication to counsel for all parties. Id. Although an improper communication between the court and the jury amounts to constitutional error, it is subject to the harmless error analysis. Id.
ś 151 Here, Gregory cites to various cases in which bailiffs or judges have engaged in or allowed improper communications with the jury. See, e.g., State v. Caliguri, 99 Wash.2d 501, 505, 664 P.2d 466 (1983) (trial court had FBI agent replay tapes for the jury, including portions that were not played at trial); O'Brien v. City of Seattle, 52 Wash.2d 543, 546-47, 327 P.2d 433 (1958) (bailiff allegedly discussed a jury instruction with the jury). However no such improper communication occurred here. The bailiff merely facilitated the use of the courtroom video equipment and ensured that the jury would not be interrupted.
ś 152 Gregory also argues that the trial court erred in allowing the jury to play the tape during deliberations without Gregory present. CrR 6.15(e) provides that when the jury retires for deliberation, it "shall take with it the instructions given, all exhibits received in evidence and a verdict form or forms." Accordingly, we have held that the jury can take into deliberation tapes that have been admitted into evidence. State v. Elmore, 139 Wash.2d 250, 294-96, 985 P.2d 289 (1999) (discussing State v. Castellanos, 132 Wash.2d 94, 935 P.2d 1353 (1997)). Unrestricted access to recordings during deliberations does not place undue emphasis on the tape. Id. at 295, 985 P.2d 289. While the above cases involved audiotapes, the same principles should apply to videotapes.
ś 153 Gregory distinguishes this case on the fact that the viewing occurred in the *1248 courtroom. However, the jury was alone when viewing the videotape, distinguishing this case from those where the jury was accompanied by a government agent. See Caliguri, 99 Wash.2d at 505, 664 P.2d 466; United States v. Kupau, 781 F.2d 740, 742-43 (9th Cir.1986). The tape viewed by the jury was the same one admitted into evidence at trial, distinguishing it from cases in which the jury gained access to new information during deliberations. See United States v. Noushfar, 78 F.3d 1442, 1444-45 (9th Cir. 1996). The only reason the viewing did not occur in the deliberation room was that the cords to the video equipment had been attached to the courtroom floor. There is no reason to distinguish this case from Castellanos and Elmore. The trial court did not abuse its discretion when it allowed the jury to review an admitted videotape exhibit during deliberations.

Conclusion
ś 154 Finding no constitutional violation or other error during the guilt phase of the murder trial, we conclude that Gregory's cumulative error argument also fails. We affirm the murder conviction.

C. Murder Case Penalty Phase Analysis

Impact of Reversal of Rape Convictions
ś 155 The defendant's rape convictions were admitted at the penalty phase in the murder trial. If the rape convictions had not existed at the time of the penalty phase, then the jury would not have considered them when deciding whether sufficient mitigating circumstances existed to avoid the death penalty. Because we reverse the rape convictions here, we must also reverse the death sentence and remand for resentencing.[42] But since the State may seek the death penalty at resentencing, the issues raised in this appeal may arise again. See, e.g., Rupe, 108 Wash.2d at 738, 743 P.2d 210. Thus, we address Gregory's penalty phase claims of error below.

Penalty Phase Review
ś 156 Following Gregory's conviction of aggravated first degree murder, the case proceeded to the penalty phase of the trial. We review assignments of error in the guilt phase of a capital case according to the same standards of review applicable in noncapital cases, but claims of error at the sentencing phase are given more searching scrutiny because the death penalty is qualitatively different from all other punishments. State v. Benn, 120 Wash.2d 631, 648, 845 P.2d 289, cert. denied, 510 U.S. 944, 114 S.Ct. 382, 126 L.Ed.2d 331 (1993). Procedural rules regarding arguments raised for the first time on appeal are also construed more liberally in the sentencing phase. Lord, 117 Wash.2d at 849, 822 P.2d 177.

Victim Impact Testimony
ś 157 The State sought to present victim impact testimony from Lee Peden, G.H.'s mother. The court heard several motions regarding the scope of the victim impact testimony and eventually detailed the resulting limitations in an order, concluding that Peden would not be allowed to give her opinion of the defendant, her opinion as to the appropriate sentence, or her opinion of the crime. Peden would be allowed to describe "[G.H.], her interests, and her plans for the future." MCP at 2794. The court also permitted Peden to describe the impact on G.H.'s family; Peden could discuss her observations of the effects of the crime on family members, but she could not relate any statements made by them. Finally, the court limited the State to presenting six pictures of G.H. during various stages of her life.
ś 158 During her testimony, Peden gave a brief overview of G.H.'s life, her interests and hobbies, and described the pictures that were entered into evidence. In part, Peden described how G.H. enjoyed Christmas:
[Peden]: We always had a very large Christmas. Patty always came over. And we would have everybody there on Christmas morning, friends and family.
[Prosecutor]: Where was this photo taken?

*1249 [Peden]: This was taken at my home. We always had Christmas there,
[G.H.'s] favorite holiday.
We have not celebrated Christmas since her death.
MRP at 7250-51. The prosecutor then asked Peden to relate the impact that G.H.'s death had on her siblings. She replied:
[Peden]: My son is very angry. It's really hard on him. He was raised with his two sisters. He married a young woman that has four sisters. He has four daughters and a granddaughter.

And what was done to his sister is something that, to him, is just unspeakable. You don't â you know, his whole life is, women are to be protected, and you know, high regard. So for him, this has just brought such horrible anger for him. I feel bad for him. He can hardly talk about it.
[Prosecutor]: And how about [G.H.'s] sister Mary?
[Peden]: Well, Mary has had a terrible time with this too. She has been seeing somebody for quite some time now because she has nightmares about it and she is always dreaming that she is trying to save [G.H.] from something, but she doesn't know what. And she just wakes up and â 
MRP at 7251 (emphasis added). Defense counsel objected and the court sustained the objection. The prosecutor then repeated the question, and Peden replied, "[s]he has had a real bad time. She really could use a sister right now. Her husband has terminal cancer." MRP at 7252. Defense counsel again objected, but the court overruled that objection. Peden then explained, "I miss her terribly. I just â it's all backwards. You are not supposed to bury your children. They are supposed to bury you. And I guess the suddenness of it and â it just makes it so much harder to bear. I just miss her so bad." Id.
ś 159 After this testimony, the defense moved for a mistrial, arguing that it violated the pretrial order and the hearsay rule, and that Peden expressed an opinion of the crime, albeit through her son. In the alternative the defense asked for a curative instruction, which would have told the jury to ignore Peden's answers as to the impact of the crime on G.H.'s brother and sister. The trial court denied the motion, concluding that the testimony about her son's reaction to the crime did not amount to an opinion about the crime, nor did it amount to hearsay. Regarding the impact of the crime on Peden's daughter, the court noted that it had sustained one objection because the testimony seemed to include hearsay. The next question and answer were proper and stayed within the confines of the court's order. Finally, the court concluded that the impact statement was no more inflammatory than testimony found admissible by the United States Supreme Court.
ś 160 In Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the United States Supreme Court evaluated the constitutionality of victim impact evidence that described the emotional trauma suffered by the family and the personal characteristics of the victim. Id. at 503, 107 S.Ct. 2529. In a separate section of the opinion, the Court evaluated victim impact evidence that described the family members' opinions of the defendant and characterizations of the crime. Id. at 508, 107 S.Ct. 2529. Admission of both types of victim impact evidence was deemed to violate the Eighth Amendment. Id. at 507-09, 107 S.Ct. 2529. Then in 1991, the Court overruled Booth, in part, in Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), holding that certain victim impact evidence can be admitted:
We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.
Id. at 827, 111 S.Ct. 2597 (second emphasis added). Similarly, this court has found no per se bar to the introduction of impact *1250 statements in the penalty phase of a capital trial. Gentry, 125 Wash.2d at 617, 888 P.2d 1105.
ś 161 However, given the limited facts presented in Payne, this court has reasoned that the Eighth Amendment still prohibits the introduction of evidence and argument concerning "characterizations of the crime, the defendant, and the appropriate punishment." State v. Pirtle, 127 Wash.2d 628, 672, 904 P.2d 245 (1995), cert. denied, 518 U.S. 1026, 116 S.Ct. 2568, 135 L.Ed.2d 1084 (1996). Moreover, if victim impact testimony "so infects the sentencing proceeding as to render it fundamentally unfair, the defendant may seek appropriate relief under the Due Process Clause." Payne, 501 U.S. at 831, 111 S.Ct. 2597 (O'Connor, J., concurring). Thus, constitutional principles still limit the scope of victim impact testimony and "evidence introduced in capital cases [must] conform to the Rules of Evidence." Gentry, 125 Wash.2d at 622, 888 P.2d 1105 (citing State v. Bartholomew, 101 Wash.2d 631, 639, 683 P.2d 1079 (1984)).
ś 162 Here, Gregory argues that Peden's victim impact statement (1) was highly emotional and so infected the proceedings as to deny Gregory due process, (2) included hearsay testimony in violation of this court's holding in Bartholomew, 101 Wash.2d at 639, 683 P.2d 1079, as well as the Sixth Amendment right to confrontation, and (3) expressed an opinion regarding the crime in violation of the Eighth Amendment and Washington's due process and cruel punishment clauses.[43]
ś 163 Emotional Character of the Testimony: In Payne, the defendant was convicted of murdering a 28-year-old mother and her 2-year-old daughter with a butcher knife. Payne, 501 U.S. at 811-13, 111 S.Ct. 2597. Her three-year-old son managed to survive the assault, but was severely injured. Id. The facts of the crime were particularly gruesome and disturbing. Id. During the penalty phase of the trial, the State presented testimony from the children's grandmother. Id. at 814-15, 111 S.Ct. 2597. When asked how the little boy had been affected by the murders, she replied:
"He cries for his mom. He doesn't seem to understand why she doesn't come home. And he cries for his sister Lacie. He comes to me many times during the week and asks me, Grandmama, do you miss my Lacie. And I tell him yes. He says, I'm worried about my Lacie."
Id. at 814-15, 111 S.Ct. 2597 (quoting App. 3). Victim impact testimony can be so inflammatory as to render the sentencing proceeding fundamentally unfair, but the Court did not find the above testimony reached that threshold. See id at 827, 831, 111 S.Ct. 2597 (O'Connor, J., concurring). The above testimony was brief and it "did not inflame [the jury's] passions more than did the facts of the crime." Id. at 832, 111 S.Ct. 2597. Similarly, in Gentry, the young victim's father properly discussed his child's interests and plans for the future. Gentry, 125 Wash.2d at 617, 888 P.2d 1105. He was also permitted to explain the impact of his daughter's murder on "his work, his emotions and his family." Id.
ś 164 In this case, Peden's testimony discussed the family's sadness around Christmas, the victim's favorite holiday, and the impact on adult siblings. An objection was sustained when Peden tried to recount Mary's dreams. The testimony here certainly was not more inflammatory than the testimony offered in Payne and Gentry. We conclude that it did not render the sentencing proceeding fundamentally unfair, and we find no due process violation.
ś 165 Hearsay Testimony: In Bartholomew, 101 Wash.2d 631, 683 P.2d 1079, we held that the due process clause of our state constitution requires the evidence introduced in capital cases to conform to the Rules of Evidence. Id. at 640-41, 683 P.2d *1251 1079. Therefore, victim impact testimony must comply with the hearsay rule. In this case, the court sustained a hearsay objection to testimony about the sister's dreams. However, the court admitted testimony regarding the impact of the crime on the brother. Specifically, Peden testified that the crime was "unspeakable" to him. "He can hardly talk about it." MRP at 7251.
ś 166 Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. ER 801. Peden's testimony about her son describes her opinion as to his reaction to the crime, but it does not relate a statement made by him. Moreover, the information was presented not to prove the truth of the matter asserted, but to show the impact of the crime on G.H.'s brother. Therefore, the trial court correctly concluded that the testimony did not amount to hearsay.
ś 167 Opinion About the Crime: Even after Payne, the Eighth Amendment still prohibits victim impact evidence that characterizes the crime, the defendant, or argues for a particular punishment. Pirtle, 127 Wash.2d at 672, 904 P.2d 245. "The admission of these emotionally charged opinions as to what conclusions the jury should draw from the evidence clearly is inconsistent with the reasoned decisionmaking [required] in capital cases." Booth, 482 U.S. at 508-09, 107 S.Ct. 2529
ś 168 In Booth, the trial court admitted a report from a social worker that relayed the feelings of the victims' family members about the crimes. The victims' son explained that his parents had been "`butchered like animals.'" Booth, 482 U.S. at 508, 107 S.Ct. 2529. The victims' daughter said that "`animals wouldn't do this.'" Id. The Court concluded that these statements should not have been admitted. Id. at 509, 107 S.Ct. 2529. Gregory argues that the characterization of G.H.'s murder as unspeakable should have been excluded under the same reasoning.
ś 169 But even if we assume that use of the term "unspeakable" improperly characterized the crime in violation of Booth and Pirtle, such an error is subject to harmless error analysis. See Turrentine v. Mullin, 390 F.3d 1181, 1200 n. 2 (10th Cir.2004) (stating that Booth error would be subject to harmless error analysis); DeRosa v. State, 2004 OK CR 19, 89 P.3d 1124, 1152 n. 141 (2004). The jury in this case would undoubtedly have already been aware of the "unspeakable" nature of the crime, and Peden's statement here was fleeting compared with those made in Booth. We conclude that admission of this characterization of the crime did not amount to reversible error.
ś 170 Presentation of Evidence Regarding Other Defendants and Other Crimes: The State moved to exclude evidence of other contemporaneous capital crimes, like the cases of Timothy McVeigh and Robert Yates. The defense argued that it should be able to comment upon other "high publicity cases where the death penalty has been imposed as illustrations of the class of severe cases for which the death penalty should be reserved." MCP at 2683. In making this argument, Gregory did not rely upon any particular constitutional authority. The trial court excluded such evidence and argument, but both parties could still argue whether Gregory was "`the worst of the worst'" "so long as no individual person or facts of a particular case are mentioned." MCP at 2788.
ś 171 Accordingly, the State argued in closing that the death penalty is not applicable in all cases of murder, not even all cases of first degree murder, and it is not applicable even in all cases of aggravated first degree murder. "This kind of decision is reserved for the worst of the worst. That's what this case is, the worst of the worst." MRP at 7711. The prosecutor then asked the jury to keep two questions in mind, "[i]f not now, then when? And if not Allen Gregory, then whom?" Id. Defense counsel did not object to this argument. A few moments later, the prosecutor again reminded the jury that "[w]e have said that there are some cases, the worst of the worst, where the death penalty should be imposed and it should be carried out." MRP at 7717. Again, there was no objection. In the context of a discussion about mercy, the prosecutor later urged the jury to "ignore comparisons whether or not this defendant's acts are more or less egregious than other persons in our country who have committed acts against *1252 humanity . . . [w]e are talking about the defendant's conduct and the defendant's conduct alone." MRP at 7741. In contrast, defense counsel argued, "[t]his is not the worst of the worst. The law tells you not to just look at the offense, but to look at the person too. This is not the worst of the worst." MRP at 7789.
ś 172 Gregory now argues that the due process clauses of the federal and state constitutions, the Eighth Amendment, and the cruel punishment clause of the state constitution all grant the defendant wide latitude to present mitigating evidence at the penalty phase of a capital trial,[44] and thus, the trial court erred in preventing him from discussing other highly publicized death penalty cases. In Lord, this court evaluated a similar argument and held that during a death penalty sentencing phase, only "those circumstances that arise in connection with the specific crime and defendant" are relevant. 117 Wash.2d at 914, 822 P.2d 177. While Gregory relies on Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and Bartholomew, 101 Wash.2d 631, 683 P.2d 1079, for the proposition that mitigating evidence could include sentences handed down in other cases, Lockett in fact notes that "[n]othing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." Lockett, 438 U.S. at 604 n. 12, 98 S.Ct. 2954 n. 12. Moreover, the Bartholomew court discussed the admission of "relevant" evidence in support of statutory and nonstatutory mitigating factors. Bartholomew, 101 Wash.2d at 642, 683 P.2d 1079. The Bartholomew court seemed to follow Lockett, holding "when a jury is faced with the question whether or not the defendant should be put to death, the defendant should be allowed to submit any evidence of his `character or record and any of the circumstances of the offense . . .' to convince the jury that his life should be spared." Bartholomew, 101 Wash.2d at 646-47, 683 P.2d 1079 (quoting Lockett, 438 U.S. at 604, 98 S.Ct. 2954). Neither Lockett nor Bartholomew indicates that a trial court is required to admit evidence that does not bear on this defendant or this crime.
ś 173 Gregory argues that even if the trial court properly excluded mention of other defendants' crimes and their corresponding punishments, the prosecutor's reference to "the worst of the worst" violated due process. However, this court has allowed similar arguments in capital cases, despite their dramatic character. See Brown, 132 Wash.2d at 568-69, 940 P.2d 546. Gregory also points to United States Supreme Court cases holding that a defendant may not be sentenced to death on the basis of information which he had no opportunity to deny or explain. Appellant's Opening Br. at 156-57 (citing Simmons v. South Carolina, 512 U.S. 154, 164-65, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994)) (discussing Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) and Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977)). However, the evidence at issue in each of these cases was evidence that related to that defendant, the circumstances of that crime, or the sentencing alternatives in that particular case. See Simmons, 512 U.S. at 161-62, 114 S.Ct. 2187 (defendant was erroneously prohibited from showing that if spared the death penalty, he would not be eligible for parole); Skipper, 476 U.S. at 4-5, 106 S.Ct. 1669 (defendant was erroneously prohibited from introducing evidence of his good behavior in prison to rebut the argument of future dangerousness); Gardner, 430 U.S. at 362, 97 S.Ct. 1197 (defendant was erroneously prohibited from viewing a presentence report prior to trial and thus he was unable to deny or explain the information contained therein). The information that the defendant sought to introduce in this case was not relevant to Gregory, his crime, or the specifics of his sentencing alternatives. Washington's death penalty scheme clearly assigns the task of proportionality review to this court, not the jury in a penalty phase. RCW 10.95.130(2)(b). Gregory does not present sufficient authority to support introduction *1253 of evidence regarding sentences imposed upon other murderers. He also does not establish that the prosecutor's argument violated due process.
ś 174 Finally, Gregory asserts that the State essentially argued facts not in evidence by claiming Gregory fit into the category of "the worst of the worst" without comparing the facts of his crime with other murders, especially those for which the defendant has been sentenced to death. This argument amounts to a claim of prosecutorial misconduct, and the defense failed to object to this argument. We cannot find the State's statement so flagrant and ill-intentioned that it created an enduring prejudice at the penalty phase. We conclude that trial court did not err in suppressing evidence of sentences imposed in other murder cases.

Prosecutorial Misconduct During Closing Argument
ś 175 Gregory contends that during closing argument in the penalty phase the prosecutors committed misconduct in a number of ways. The same standards of review that apply to the guilt phase apply to the penalty phase in a capital case. See State v. Davis, 141 Wash.2d at 870-72, 10 P.3d 977. The defendant bears the burden of showing that the prosecutor's argument was both improper and prejudicial. Failure to object to a prosecutor's improper remark constitutes a waiver, unless the remark was "`so flagrant and ill intentioned that it evinces an enduring and resulting prejudice'" that could not have been cured by an instruction to the jury. Id. at 872, 10 P.3d 977 (quoting Gentry, 125 Wash.2d at 640, 888 P.2d 1105). We also conduct a more searching review of penalty phase claims of error. Lord, 117 Wash.2d at 888, 822 P.2d 177. Procedural rules regarding arguments raised for the first time on appeal are construed more liberally in the sentencing phase of a death penalty case. Id. at 849, 822 P.2d 177.
ś 176 Shifting Burden: Gregory argues that the prosecutor improperly shifted the burden of proof at the penalty phase and improperly commented on Gregory's failure to call certain witnesses. The court instructed the jury at the beginning of the penalty phase that in order to determine what sentence should be imposed, it must determine whether there are sufficient mitigating circumstances to merit leniency. A mitigating circumstance could be "any relevant fact about the defendant or the offense, which although not justifying or excusing the offense, suggests a reason for not imposing the death penalty." MRP at 7214. Gregory contends that the burden was shifted when the prosecutor emphasized the lack of mitigating evidence presented by the mitigation specialist:
[Y]ou can be certain, you can be certain, they put on everything they had and the very best that they had because there is no incentive to do anything else. So what you heard from the witness stand presented by the defense is the best that can be said about Allen Gregory. It's the best they can do as far as mitigating his conduct.
They hired a mitigation specialist who testified yesterday and said he spent 200 hours working on this case. That's the equivalent of five 40-hour weeks without anything else interfering. They presented you with one police report [regarding an incident of child abuse Gregory suffered at the hands of his father].
MRP at 7726-27; see also RRP at 7640. The prosecutor also noted that a number of Gregory's family members did not testify and none of Gregory's middle school, high school, or Job Corps instructors testified on his behalf. On rebuttal, the prosecutor again stated:
You know that they hired a mitigation expert to try to dig up anything they could [that was] positive to say about Allen Gregory, anything they could.
. . . .
And you can bet that they put on the very best and all the evidence they could scrape together that they thought could possibly mitigate his responsibility.
MRP at 7795-96. Defense counsel did not object to any of these remarks.
ś 177 The State is generally afforded wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence. *1254 Gentry, 125 Wash.2d at 641, 888 P.2d 1105. The State is entitled to comment upon quality and quantity of evidence presented by the defense. An argument about the amount or quality of evidence presented by the defense does not necessarily suggest that the burden of proof rests with the defense. E.g., People v. Boyette, 29 Cal.4th 381, 127 Cal.Rptr.2d 544, 58 P.3d 391, 425 (2002) (holding in a capital case that argument commenting on the lack of corroboration for the defendant's story did not shift the burden of proof); see also United States v. Lopez, 803 F.2d 969, 973 (9th Cir.1986), cert. denied, 481 U.S. 1030, 107 S.Ct. 1959 (1987).
ś 178 Gregory cites to two Washington cases in which arguably similar arguments were found to be improper. In State v. Cleveland, 58 Wash.App. 634, 648, 794 P.2d 546 (1990), the prosecutor commented on the skill of defense counsel stating "`you can bet your bottom dollar that Mr. Jones would not have overlooked any opportunity to present admissible, helpful evidence to you.'" Id. at 647, 794 P.2d 546. The Cleveland court held that the argument was improper because the inference was that Cleveland had a duty to present favorable evidence if it existed. Id. at 648, 794 P.2d 546. However, the jury was instructed that it could find that there was a reasonable doubt, even in the absence of defense evidence. Id. The court was "satisfied that the result in this case would have been the same had the portion of the closing argument objected to not been made." Id. at 649, 794 P.2d 546.
ś 179 Gregory also points to State v. Music, a death penalty case in which the prosecutor commented in closing argument about the failure of the defense to present witnesses at the penalty phase to speak for the defendant. 79 Wash.2d 699, 716-17, 489 P.2d 159 (1971), vacated pursuant to Music v. Washington, 408 U.S. 940, 92 S.Ct. 2877, 33 L.Ed.2d 764 (1972) (relying on Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)). The court was "convinced beyond a reasonable doubt that with or without the remarks of the prosecutor the jury would have reached the same result." Id. at 718, 489 P.2d 159.
ś 180 In this case, the prosecutor reminded the jury during his argument that the State had the burden of proof:
The same presumption applies here: presumption of innocence at trial; presumption of a life sentence in this phase. The same party bears the burden of proof, the state. The same burden of proof applies, and that is proof beyond a reasonable doubt. It's not higher, and it's not lower.
MRP at 7713. The jury instructions at the penalty phase also reinforced the proper burden of proof. Given the proper instructions regarding burden, we conclude that even absent the remarks, the jury would have reached the same result.
ś 181 Diminished Sense of Responsibility: Gregory contends that when the prosecutor said that Gregory would face "another court with another judge at a different time," MRP at 7739, he diminished the jurors' sense of responsibility for the death sentence by suggesting that the sentence would be reviewed on appeal. However, allegedly improper comments must be viewed in the context of the entire argument. Gentry, 125 Wash.2d at 640, 888 P.2d 1105. In closing, the prosecutor discussed mercy:
Religion plays a[n] important part [in] many of our lives. Faith plays an important part in many of our lives. The question is whether or not religious law should be held to take priority over the law the court just gave you. Each and every one of you told us, in your questionnaire and in your jury selection, that you did not have a religious belief that would interfere with your ability to apply the law, you didn't have a religious belief that said, "The death penalty is an inappropriate sentence in any and all occasion."

Whether or not the defendant faces another court with another judge at a different time and with a different standard, that's another question. But mercy here has to be based on the evidence that's presented.
The instruction that the court gave you says the appropriateness of the exercise of mercy may be considered. A mitigating circumstance is a fact which in fairness and mercy may be considered.
*1255 MRP at 7738-39 (emphasis added). There was no objection from defense counsel.
ś 182 It is clear from the context surrounding the prosecutor's argument that he was referring to a religious interpretation of the concept of mercy. It seems highly unlikely that the jury would have interpreted this comment in any other way given the context surrounding it. While the defense claims that the comment about another court and another judge "switched gears" from a religion-based discussion of mercy to a discussion of the appellate process, the record belies this contention. Appellant's Reply Br. at 50. The discussion of mercy occurred both before and after the statement at issue. While Gregory cites to Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) to support his argument, that case involved a clear argument that the jury's verdict would be automatically reviewable by the state supreme court. Id. at 325-26, 105 S.Ct. 2633. We conclude that the comment here did not improperly diminish the jurors' responsibility.
ś 183 Inflammatory Comments: Gregory contends that the prosecutor denigrated the defense and made other inflammatory comments. During closing argument, the prosecutor discussed and criticized what he anticipated would be the defense's arguments. The prosecutor stated:
You should keep in mind that the defense only wants one of you to vote for life. It requires a unanimous verdict to impose the death penalty. Anything less is life without parole. It takes 12 to find a defendant not guilty, but it only takes 1 for a life sentence. The goal for the defense is not 12. The goal is just 1.
MRP at 7716. Defense counsel objected, arguing, "[t]he motivations of the defense is a personal comment on the argument," but the objection was overruled. Id. Then briefly in rebuttal, the prosecutor again referred to the defense counsel's wish for "one holdout." MRP at 7801.
ś 184 Gregory contends that these comments amount to a personal attack on defense counsel. However, this court has noted that "the prosecutor, as an advocate, is entitled to make a fair response to the arguments of defense counsel." Russell, 125 Wash.2d at 87, 882 P.2d 747. Defense counsel, in both opening and closing remarks at the penalty phase, encouraged each juror at the beginning of deliberations to
when you go back into this room here, I want you to stop, stop listening to the words in your head from me and the prosecutor or even your fellow jurors. Take a few moments to go off by yourself and look deep inside yourself, look at those things that you hold dear.
MRP at 7790. Defense counsel emphasized that every juror should decide for himself or herself what the penalty should be. The prosecutor's argument did not denigrate the defense, but merely responded to defense counsel's arguments.
ś 185 In addition, Gregory argues that the prosecutor resorted to name calling, characterizing Gregory as "evil" and a "menace to society," MRP at 7796-97, which so infected the proceeding with unfairness that Gregory was denied due process. First, the prosecutor is entitled to draw inferences from the evidence and these inferences could have been justified given Gregory's criminal history and the facts of this case. See, e.g., In re Pers. Restraint of Davis, 152 Wash.2d 647, 717, 101 P.3d 1 (2004); Brown, 132 Wash.2d at 568-69, 940 P.2d 546. Moreover, neither of these comments drew an objection from defense counsel and an instruction to the jury to disregard these brief characterizations could have neutralized any prejudice. Therefore, we decline to find that these comments denied Gregory due process.
ś 186 Discussion of Prison Conditions and Possibility of Escape: The State made a motion in limine arguing that evidence at the penalty phase should be limited to the defendant's character, criminal record, and the circumstances of the crime. This argument was specifically targeted at preventing the introduction of evidence regarding prison conditions for prisoners sentenced to life without parole. The defense agreed. The trial court ordered that "[f]or purposes then of the penalty phase, . . . evidence not related to the defendant's character or criminal record or to any circumstances of the *1256 crime be inadmissible." MRP at 6895. In accordance with this ruling, the defense did not offer any evidence regarding prison conditions of those sentenced to life without parole. Then, in closing, the prosecutor argued:
[C]onsider life without parole and whether or not it's as bleak as has been presented to you. Prison is just another form of society, albeit with guards and fences. But inside of the prison walls, the defendant will still be allowed to watch television, listen to the radio, listen to music, read the newspaper, read books and magazines. He will be allowed to go outside under the sun and sky, to exercise in an equipment room fully provided for him. When he is sick, he will go to the infirmary. When he is hungry, he will go to the commissary. He is allowed to have visits from his family and from his friends. He is allowed to have social interaction with the other people who are within the prison walls. All of those things are things [G.H.] doesn't have anymore.
There is one other thing that a person who is incarcerated for life without parole can do, and that is escape. What incentive would the defendant have to conform his behavior to the rules of society inside of prison when he couldn't conform them and wouldn't conform them to the rules outside? If he breaks a law while he is in prison, tries to escape, gets in a fight, what are they going to do? Lock him up in prison? He is already there for life without parole.
MRP at 7721-22. Defense counsel did not object. In rebuttal, the prosecutor argued the possibility that Gregory could escape. Defense counsel objected based on "facts not in evidence," but the objection was overruled. MRP at 7799.
ś 187 Defense counsel attempted to respond in his closing argument. He stated:
Mr. Neeb wanted to suggest to you that life in prison is some sort of country club atmosphere. Well, he later exhorted you only to base your decision on the evidence that you have before you. You didn't hear anything about that it was a country club. Common sense will tell you a number of things about prison life.
Life in prison without the possibility of parole is just that. It's life. Allen Gregory will die in prison. He will end his days behind concrete walls and iron bars and concertina wire. His life will be controlled from the time he is told to get up in the morning until he lays his head down on that prison-issued pillow at night. His life will be contained in a 9-by-7-foot cell lit by a single light bulb. And he will go to sleep at night listening to the lullabies of other men who are just waiting out the minutes and the hours and the days and the weeks and the years until old age and infirmity and death come to take them away.
MRP at 7753. Defense counsel later argued:
Allen Gregory will be punished every time he wakes up in his cell and sees only bars and a single commode; every time he walks to the chow hall with the other men who have forfeited their right to be among us for the rest of their lives; every time his head hits that prison pillow and he has to think about what he has done, every minute of every hour of every day of every week of every month of every year for the rest of his life.
MRP at 7755.
ś 188 Gregory now argues that the prosecutor's statements based on prison conditions violated due process because they were based on facts not in evidence and the defense was unable to rebut the argument with his own evidence. It is clear that the prosecutor's argument at the very least violates the trial court's order excluding "any reference to the conditions that exist in prison." MCP 2788.
ś 189 Whether the prosecutors' arguments amounted to reversible error is a close question. The fact that the State made the motion in limine and then blatantly violated the resulting order strongly suggests that the argument was flagrant and ill-intentioned. The characterization of prison life is central to the question of which sentence is appropriate, life without parole or death, suggesting also that the argument was prejudicial. However, without an objection from defense *1257 counsel, in order to find that prejudice resulted, we must also conclude that a curative instruction would not have been effective, a very difficult standard to meet.
ś 190 Even so, this court has held that procedural rules regarding arguments raised for the first time on appeal are construed more liberally in the sentencing phase of a capital case. Lord, 117 Wash.2d at 849, 822 P.2d 177. Three factors weigh in favor of a finding of prosecutorial misconduct here. First, the violation of the trial court's order is blatant and the original motion in limine was targeted at preventing the defense from effectively responding to the prosecutor's argument.[45] Second, although defense counsel attempted to paint a contrary picture of prison life, he was unable to introduce evidence to support his argument and his argument simply was not as compelling as the prosecutor's (perhaps because he did not expect to be allowed to make such an argument). Third, the images of Gregory watching television and lifting weights, when juxtaposed against the images of the crime scene, would be very difficult to overcome with an instruction. Again, these images would be central to the question of whether life without parole or death was the more appropriate sentence. Although this presents a close question, we conclude that the prosecutor's argument characterizing prison life amounted to prosecutorial misconduct that could not have been cured by an instruction.[46] The prosecutor's misconduct independently requires reversal of the death sentence.

D. Murder Case Conclusion
ś 191 In sum, we find no reversible error in the guilt phase of Gregory's aggravated murder trial and thus uphold his conviction. Because we separately reverse his rape convictions, and evidence of those convictions was presented to the jury in the penalty phase of the aggravated murder trial, we reverse the death sentence. We also conclude that the prosecutor committed misconduct during closing argument of the penalty phase, an independent ground for reversing the death sentence. Because we reverse the death sentence there is no need to address either the constitutional arguments or the statutory review of the sentence.

III

Conclusion
ś 192 We reverse Gregory's convictions for the rape of R.S. We affirm the aggravated first degree murder conviction for the murder of G.H., but we reverse the death sentence. We remand for resentencing in the murder case.
WE CONCUR: Chief Justice GERRY L. ALEXANDER, Justices TOM CHAMBERS, CHARLES W. JOHNSON, SUSAN OWENS and BARBARA A. MADSEN.
SANDERS, J. (concurring in result).
ś 193 While I agree with the majority's result, I disagree with its reasoning and analysis regarding the jury instruction on consent as well as application of the rape shield law to the facts of this case.
I. Jury Instruction Improperly Shifts Burden to Defendant to Prove Consent
ś 194 Although the jury in a first degree rape case must be convinced beyond a reasonable doubt that sexual intercourse occurred as the result of forcible compulsion, RCW 9A.44.050(1)(a), i.e., "physical force which overcomes resistance, or a threat, express *1258 or implied, that places a person in fear of death or physical injury to herself or himself or another person, or in fear that she or he or another will be kidnapped," RCW 9A.44.010(6), the trial court instructed the jury that it was the burden of the defendant to prove consent:
Instruction 15. A person is not guilty if the sexual intercourse is consensual. "Consent" means that at the time of the act of sexual intercourse, there are actual words or conduct indicating a freely given agreement to have sexual intercourse. The burden is on the defendant to prove by a preponderance of the evidence that the sexual intercourse was consensual.
"Preponderance of the evidence" means that you must be persuaded considering all the evidence in the case that it is more probably true than not true.
18 Verbatim Report of Proceedings (18 RP) (Sept. 28, 2000) at 2889. The prosecutor was able to effectively shift the burden of proof to the defendant to show consent based upon this instruction by arguing in closing argument:
And the defendant doesn't typically bear a burden in a criminal case. It's the State's burden to prove a crime beyond a reasonable doubt, absolutely, beyond a reasonable doubt. It's a fair burden, and it's a burden the State accepts. But when he says this is consensual, that's his burden. And the Court's instruction to you is that that's his burden to prove that. Now that he says this is a consensual act, it's his burden to prove it.

18 RP at 2971.
ś 195 Consent is the reciprocal opposite of forcible compulsion. The majority, however, affirms this instruction based upon State v. Camara, 113 Wash.2d 631, 640, 781 P.2d 483 (1989), which in turn relied upon Martin v. Ohio, 480 U.S. 228, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987). Allen Gregory now asks us to overrule Camara, arguing that Camara misconstrued Martin. I agree with Gregory and would overrule Camara.
ś 196 Martin was not a rape case but an aggravated murder case. A self-defense instruction allowed acquittal if the jury found, by a preponderance of the evidence, Martin "had not precipitated the confrontation, that she had an honest belief that she was in imminent danger of death or great bodily harm, and that she had satisfied any duty to retreat or avoid danger." Martin, 480 U.S. at 233, 107 S.Ct. 1098. Thus self-defense did not negate any element the State was required to prove to obtain an aggravated murder conviction but rather provided an affirmative defense which the defendant had the burden to prove by a preponderance of the evidence if, and only if, the State proved each and every element of the charged crime beyond a reasonable doubt.[1]
ś 197 However, in the context of first degree rape, forcible compulsion (an element of the offense) is absolutely incompatible with consent. The two cannot coexist. Nevertheless the jury was instructed that it was the defendant's burden to prove "consent" by a preponderance of the evidence, notwithstanding the State's burden to prove forcible compulsion beyond a reasonable doubt. This makes no sense. It is a contradiction. The due process clause of the fourteenth amendment to the United States Constitution prohibits shifting the burden to the defendant to prove or disprove an element of the crime. Mullaney v. Wilbur, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). Camara was wrongfully decided and harmfully so because it allows an unconstitutional shifting of the burden of proof. It should be overruled.
II. Rape Shield Statute
ś 198 As may be gleaned from the discussion above, the evidentiary issue at the heart *1259 of this case is whether or not Robin Sehmel consented to sex as an act of prostitution rather than forcible compulsion. That was certainly Gregory's version of the events. And Gregory offered to prove Robin Sehmel's considerable prostitution history so as to enable the jury to evaluate the credibility of the competing stories. However, the trial court precluded Gregory from offering any evidence of prostitution which might have occurred prior to the evening in question. I submit this was error.
ś 199 The rape shield law was enacted to protect rape victims; but it should not be used to shield disclosure of criminal conduct or undermine the right of a defendant to present probative evidence on a relevant, central issue.
ś 200 The majority confuses relevant evidence with unduly prejudicial evidence. Here evidence of Robin Sehmel's prostitution, including prior prostitution convictions in 1992 and 1995, and work for an escort service in 1996 and 1997 were certainly relevant because they were directly tied to Gregory's defense that the allegations concerned consensual sex with a prostitute.
ś 201 Sehmel's and Gregory's version of events differed markedly. Robin Sehmel testified that on August 20, 1998 she went to her friend David Moon's house on North 8th and Cedar Streets in Tacoma for a barbecue. She testified that she left Moon's house at 1:30 a.m. and walked down Cedar Street to 6th Avenue. Sehmel approached a Mustang she thought belonged to a friend, Joseph Daniels. After realizing the Mustang did not belong to her friend, Sehmel testified she nevertheless accepted a ride with the stranger (later identified as Gregory).[2] Instead of taking her home, she claimed Gregory took her to a parking lot behind a nearby middle school where he pulled a knife and forced her to perform oral sex before raping her.
ś 202 Gregory testified Sehmel is a prostitute who flagged him down to offer sex for money. He testified she willingly accompanied him to the middle school parking lot where they engaged in consensual sex. Gregory testified Sehmel then fabricated the rape story retaliating against him for refusing to pay even more money after the condom broke.
A. Robin Sehmel's Prostitution History
ś 203 On August 8, 2001 defense counsel interviewed Sehmel. However, before the interview started the prosecutor told Sehmel that she did not have to answer any questions if she did not wish to. The State also prevented defense counsel from asking her about her criminal history, among other things.
ś 204 Despite the inability to question Sehmel about her prior prostitution activities during the first interview, Gregory made an offer of proof based on independent investigation.
ś 205 The Pierce County Law Enforcement Support Agency (LESA) listed numerous criminal matters involving aliases attributed to Robin Sehmel. In addition, LESA provided 10 pages of arrest and conviction reports regarding Sehmel. Included in the reports were records of a July 17, 1992 conviction for "sexual misconduct" in Tacoma Municipal Court; a March 28, 1995 conviction for prostitution in Tacoma Municipal Court; an August 30, 1991 arrest for prostitution; and a June 26, 1996 arrest for "indec cond." Clerk's Papers (CP) at 210-11. The LESA records demonstrated that Sehmel worked regularly as a prostitute in Tacoma. On August 30, 1991, she was observed on Pacific Avenue in Tacoma. The arresting officer saw her enter a car and then followed the car to a "dark secluded parking lot." When the arresting officer approached the car he observed Sehmel "performing oral intercourse" on the client. CP at 538-39. Upon arrest the client stated he had paid Sehmel $20 for her services.
ś 206 On March 28, 1995 two undercover officers observed Sehmel on South Tacoma Way. The officers described this as a "high *1260 prostitution area." CP at 501. When the officers pulled to the curb, they asked Sehmel if she was "dating" and if she wanted to go for a "ride." Id. She said "yes" and got in the car with both men. The officers told her they each had $40 to spend. Sehmel told them they could each receive a "blow job" for that price. Id. at 502. After the offer and agreement, she was arrested.
ś 207 On May 11, 1996, a Tacoma police officer was "working a prostitution enforcement detail" on South Tacoma Way. CP at 507. The officer observed Sehmel get into a car driven by a man and then drive to a secluded industrial park. The officer then observed her in the car engaged in sexual activity with the driver. Upon her arrest for "public indecency," Robin Sehmel gave a false name. CP 510-11, 514. She admitted that the client had paid her $20 for her services.
ś 208 On June 26, 1996 she was again observed on South Tacoma Way exposing her bare breasts to passing cars. Gregory also submitted the affidavit of David Moon, asserting that Sehmel was working regularly as a prostitute in 1998.
ś 209 Prior to trial the State sought to prohibit defense inquiry into inter alia, Robin Sehmel's criminal history, her prostitution activities, arrests, convictions, and indecent exposure, work as a police informant, and dependency proceedings.
ś 210 Defense counsel objected arguing that the topics were relevant. The court ruled that evidence of Sehmel's prostitution activities, arrests, and convictions were inadmissible because they were "too remote in time from the incident (8/21/98)" and "occurred in a completely different section of Tacoma from where she met [Gregory]." CP at 275-76 (Order Den. Admis. of Victim's Prior Sexual Conduct). The court also asserted that the declaration of David Moon contained only "vague statements that are based on hearsay and do not explain his basis for claiming it was `common knowledge' that [Robin Sehmel] was a prostitute in 1998." Id. The trial court also refused to consider evidence of other arrests, which did not result in convictions, claiming the arrests were not probative.
ś 211 When defense counsel objected and asked the court what offer of proof it would consider "sufficient," the trial judge responded:
We don't have anything that says in 1998 [Sehmel] was out on the streets on 6th Avenue. We don't have anybody saying that she engaged in an act of prostitution with this victim.
RP (Aug. 21, 2000) at 276. (Of course, Gregory, "this victim," testified she did in fact engage in prostitution with him.)
ś 212 The trial court held as a matter of law there was insufficient evidence to even warrant a hearing under the rape shield statute; however, the court did allow the defense to interview Sehmel again and inquire into whether she had engaged in prostitution activity on the streets of Tacoma between 1995 and 1998. In that interview Sehmel admitted she worked as a prostitute in 1996-1997, worked for an escort service in 1997, and admitted was still using drugs in 1998, but denied she worked as a prostitute that year.
ś 213 Despite this confirmation of her more recent prostitution activities, the court again refused to allow Gregory to offer his evidence. CP at 445-46 (Supplemental Order Re: Victim's Sexual Conduct). At trial Gregory was prohibited absolutely from inquiring into or referencing any prostitution activity by Sehmel prior to August 21, 1998. Gregory was allowed only to argue she was acting as a prostitute on the night of her encounter with Gregory.

B. Robin Sehmel's Prior Prostitution is Relevant
ś 214 Evidence of prostitution was essential to prove consent which, if established, would negate an element of the crime of rape-forcible compulsion. The evidence was also essential to establish Sehmel's motive to lie or falsely accuse. However, that evidence which could have raised a reasonable doubt was withheld from the jury.
ś 215 While the jury may have believed it is exceedingly unlikely that a woman who is not a prostitute would engage in the described sexual conduct with a stranger absent *1261 forcible compulsion, the excluded evidence demonstrates that the complaining witness had willingly participated in the exact same conduct with strangers on numerous occasions in the past. This evidence puts the claim in an entirely new light, a light not available to the jury to illuminate the evidence.
ś 216 Denied his right to introduce evidence of prior prostitution history, Gregory was not only deprived of evidence to support his defense theory, and his constitutional right to defend himself, but the State then used the absence of this relevant evidence of prostitution to its advantage. For example the State asked Sehmel questions on direct examination about her counseling at a sexual assault center and how she felt about the incident.
ś 217 In closing argument the State also effectively used the absence of this evidence. For example the prosecutor faulted the defense for calling her a prostitute as a wanton insult:
Look at the tone that was taken with her in cross-examination. Look at the attempts to twist what she said. Look at the accusations made of her. He called her a prostitute. She denied it.
18 RP at 2915. Then later,
He has got to make Robin look like a prostitute, got to make her look bad.
18 RP at 2923. And again:
So now he says, "I did have vaginal sex with her. And not only was it consensual, she is a prostitute," a little extra insult to injury. . . .
18 RP at 2923-24.
C. Rape Shield Statute
ś 218 Rape shield statutes were enacted to promote important policies and "reverse certain antiquated misconceptions concerning rape." Drake v. Nevada, 108 Nev. 523, 526, 836 P.2d 52 (1992). However, when dealing with illegal acts of prostitution the policies behind the rape shield laws largely disappear as this is different in kind from excludable evidence pertaining to marital history, promiscuity, etc. RCW 9A.44.020(2). As the Drake court pointed out, "Illegal acts of prostitution are not intimate details of private life. They are criminal acts of sexual conduct engaged in, for the most part, with complete strangers." 108 Nev. at 527, 836 P.2d 52. Rape shield statutes were not intended to afford special protection to acts of illegal prostitution just because those acts happen to involve sexual conduct; nor were they intended to serve as a means to commit perjury or deprive defendants of their constitutional right to present a defense and confront witnesses.[3]
ś 219 Even assuming evidence of prostitution is covered by the statute, past sexual behavior is still admissible if it is: (1) relevant, (2) its probative value is not substantially outweighed by a substantial danger of undue prejudice, and (3) its exclusion would result in denial of substantial justice to the defendant. RCW 9A.44.020(3).[4]
*1262 1. Relevance
ś 220 As properly noted by the majority, evidence is relevant
if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. The threshold to admit relevant evidence is low and even minimally relevant evidence is admissible. State v. Darden, 145 Wash.2d 612, 621, 41 P.3d 1189 (2002).
Majority at 1241 (emphasis added).
ś 221 Under the rape shield statute the relevance inquiry is heightened in the sense one must show something more than simply past consensual sex. See majority at 1215-16 ("This court has concluded that the rape shield relevancy inquiry must be whether, under ER 401, `the [victim's] consent to sexual activity in the past, without more, makes it more probable or less probable that [he or] she consented to sexual activity on this occasion.'" (emphasis added) (alterations in original) (quoting State v. Hudlow, 99 Wash.2d 1, 10, 659 P.2d 514 (1983))). Here there was something more.
ś 222 The majority admits:
This case came down to a credibility contest between Gregory and R.S Because Gregory's version of the events was that R.S. had consensual sex with him for money, admissible evidence of recent, factually similar prostitution would have been reasonably likely to impact the outcome of the trial.
Majority at 1220.
ś 223 While the majority properly identifies the applicable rules, it nevertheless fails to engage in a proper analysis of relevance. Instead, the majority incorrectly applies the remoteness standard to determine relevance rather than the weight to which the evidence is entitled and then skips ahead to conclude the prejudicial effect of the prostitution evidence outweighs any relevance the evidence has to the outcome of the case.
ś 224 Sehmel's admission (but not in the presence of the jury) that she engaged in prostitution for years, which she only claimed ceased close to the date in question, is evidence of recent, factually similar prostitution, which the majority admits would have likely impacted the outcome of the trial. Moreover, the evidence is particularized â she admitted to a history of streetwalking prostitution and arrests. However the majority seems at ease accepting her testimony that she ceased streetwalking in 1995 and prostitution in 1997, asserting its remoteness goes to relevance, not weight. This is error. See *1263 United States v. Brito, 427 F.3d 53, 64 (1st Cir.2005) ("The nature of the underlying felony generally goes not to its admissibility per se but, rather, to its weight in the balancing of probative worth and prejudicial impact." (citing 4 Jack and B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 609.05[3][b] (2d ed.2005))); United States v. Evanoff, 10 F.3d 559, 563 (8th Cir.1993) ("[T]he recency or remoteness of any particular activity simply affects the weight the court will give to that particular evidence."); Manning-El v. Wyrick, 738 F.2d 321, 322-23 (8th Cir.1984) ("[R]emoteness in time goes to the weight of the evidence, not the admissibility."); State v. Harold, 45 Wash.2d 505, 510, 275 P.2d 895 (1954) ("Ordinarily, remoteness affects the weight, rather than the admissibility of the evidence.").
ś 225 In State v. Morgan, 146 Wash. 109, 112, 261 P. 777 (1927) we held:
In the case of People v. Marino, 33 Cal. App. 448, 165 Pac. 564 [ (1917) ], it was held that the remoteness of prior acts may have lessened the weight of the evidence but did not destroy its relevancy. In Sykes v. State, 112 Tenn. 572, 82 S.W. 185 [ (1904) ], acts three years prior; State v. Dukes, 119 N.C. 782, 25 S.E. 786 [(1896)], acts two years prior; and State v. Markins, 95 Ind. 464 [(1884)] (quoted from in State v. Wood, 33 Wash. 290, 74 Pac. 380 [ (1903) ] acts that would be barred by the statute of limitations, were held to be admissible in evidence.
(Emphasis added.) See also State v. Evans, 45 Wash.App. 611, 617, 726 P.2d 1009 (1986) (holding the lapse between the prior bad act and the present one affects the weight rather than the admissibility of the evidence).
ś 226 Additionally, evidence of Sehmel's prior prostitution, when viewed in the context of her pending child custody dispute and probationary status, goes toward establishing a motive to lie, and thus doubly satisfies the "plus more" requirement of relevancy under the rape shield statute.
2. The Prostitution Evidence Is Not Unduly Prejudicial
ś 227 Whether evidence may be excluded as unduly prejudicial requires a comparison between its probative value and "unfair" prejudice which might result from its admission.
ś 228 Evidence Rule 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
ś 229 The majority opines this evidence was appropriately excluded because it was of little probative value due to its "remoteness." However other courts have found the passage of 2 or even 12 years does not render the evidence "too remote" to be probative. For example, the Ninth Circuit has held:
Given the similarity and relevance of the offenses, we are not troubled by the fact that they occurred seven and eight years earlier. This circuit has not adopted a bright line rule concerning remoteness in time, Spillone, 879 F.2d at 519, and where the prior acts were similar to those charged, previous decisions have upheld admission of evidence of acts up to twelve years old. See United States v. Ross, 886 F.2d 264, 267 (9th Cir.1989) (acts occurring twelve years ago not too remote), cert. denied, 494 U.S. 1083, 110 S.Ct. 1818, 108 L.Ed.2d 947 (1990).
United States v. Rude, 88 F.3d 1538, 1550 (9th Cir.1996). See also United States v. Meacham, 115 F.3d 1488, 1495 (1997) ("Similarity of prior acts . . . may outweigh concerns of remoteness in time."); United States v. Hadley, 918 F.2d 848, 851 (9th Cir.1990) ("The similarity of the prior act to the offense charged outweighs concerns regarding its remoteness.") (admitting evidence of acts committed 10 years earlier under Fed. R.Evid. 404(b)).
ś 230 Given there is no bright line rule with respect to remoteness, the prostitution activities, convictions, and arrests of Sehmel occurred up to, and possibility continued at the time of the incident in question, as well as the similarity of the prior acts to the incident in question, the alleged "remoteness" would not render this highly relevant *1264 evidence inadmissible as unduly prejudicial because its probative value was not substantial. Its weight is for the jury to determine.
ś 231 The majority also asserts the prejudicial effect of Sehmel's prior criminal prostitution history renders the evidence otherwise inadmissible:
Gregory acknowledges but then ignores a related purpose that is evident from the plain language of RCW 9A.44.020(3)(d) â to eliminate prejudicial evidence that has little, if any, relevance to the issues of credibility or consent. The statute clearly contemplates that where there is a substantial danger of undue prejudice to the truth finding process, such evidence will be excluded. Hudlow, 99 Wash.2d at 16, [659 P.2d 514]. Such prejudice might occur if the victim's past sexual conduct "confuse[s] the issues, mislead[s] the jury, or cause[s][it] to decide the case on an improper or emotional basis." Id. at 14, [659 P.2d 514].
Majority at 1214-15 (alterations in original). I submit if the evidence is irrelevant we need not consider whether it is unduly prejudicial. However this evidence is directly relevant to credibility and consent for the reasons previously explored.
ś 232 The majority then speculates about the prejudicial effect evidence of prostitution would likely have on the jury, stating: "[b]ecause the introduction of prior acts of prostitution could create substantial prejudice to the truth finding process, we decline the defendant's invitation to make a sweeping rule that the rape shield statute does not apply to prior acts of prostitution." Majority at 1214-15. But contrary to the reasoning of the majority, the only prejudice to the truth finding process in this case is the elimination of highly relevant evidence in a case that hinges on the issue of consent, credibility, and motive to lie.[5] The jury must be told the truth before it can accurately find the facts. Possible embarrassment to the complaining witness cannot justify exclusion of such evidence. Hudlow, 99 Wash.2d at 13-14, 659 P.2d 514.
ś 233 Moreover, any perceived prejudicial effect that evidence of Sehmel's prostitution may have had could have been cured with a specific jury instruction to limit the purpose for which the evidence of prostitution was being admitted.[6]See ER 105.
ś 234 Additionally the majority's analysis ignores the approach we applied in Hudlow. The probative value of the evidence must be weighed before considering the prejudicial effect, and even then the court should "consider the effect of excluding such evidence on defendant's right to a fair trial" and view that effect in light of the potential "prejudice to the truthfinding process itself." Hudlow, 99 Wash.2d at 13-14, 659 P.2d 514.
3. Denial of Substantial Justice to Defendant
ś 235 The Sixth Amendment, applied to the states through the Fourteenth Amendment, guarantees criminal defendants a fair opportunity to present exculpatory evidence free from arbitrary state evidentiary rulings to protect a defendant's right to cross-examine witnesses. See Rock v. Arkansas, 483 U.S. 44, 56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); State v. Johnson, 90 Wash.App. 54, 69, 950 P.2d 981 (1998); State v. Rehak, 67 Wash. App. 157, 162, 834 P.2d 651 (1992).
ś 236 The majority attempts to skirt the constitutional right of confrontation by asserting the evidence is irrelevant. Majority at 1216 n. 6 ("`Of course, a criminal defendant has no constitutional right to have irrelevant evidence admitted in his or her defense.'" (quoting Hudlow, 99 Wash.2d at 15, *1265 659 P.2d 514)). However, as previously discussed, this evidence is highly relevant. Moreover in a factually similar case the Supreme Court held the lower court's decision to withhold certain evidence from the jury denied the defendant his Sixth Amendment right to confront witnesses. Olden v. Kentucky, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988).
ś 237 In Olden an African-American defendant was convicted of sexually assaulting a Caucasian woman, Matthews. Matthews testified that after the assault the defendant and a friend drove her to the vicinity of the home of another African-American named Russell. Russell corroborated Matthews by testifying he heard a noise, saw Matthews get out of the defendant's friend's car, and Matthews immediately told him she had been raped by the defendant and his friend. The defendant asserted the defense of consent.
ś 238 At the time of the alleged rape, Matthews and Russell were married to and living with other people, but were involved in an extramarital relationship. The defense theory was Matthews concocted the rape story to protect her relationship with Russell, who otherwise would have grown suspicious upon seeing her disembark from the friend's car. To show Matthews' motive to lie, the defendant sought to introduce evidence that Matthews and Russell were cohabiting; however the trial court granted the prosecutor's motion in limine to keep all evidence of Matthews' and Russell's living arrangement from the jury. Although the Kentucky Court of Appeals affirmed on the basis of racial prejudice, the Supreme Court reversed:
"The exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.". . . . "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby `to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'"
Id. at 231, 109 S.Ct. 480 (citations omitted) (quoting Davis v. Alaska, 415 U.S. 308, 316-17, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); Delaware v. Van Arsdall, 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).
ś 239 The Olden court held the evidence was not only relevant but crucial to demonstrate the alleged victim's motive to lie:
It is plain to us that "[a] reasonable jury might have received a significantly different impression of [the witness'] credibility had [defense counsel] been permitted to pursue his proposed line of cross-examination."
Id. at 232, 109 S.Ct. 480 (alterations in original) (quoting Van Arsdall, 475 U.S. at 680, 106 S.Ct. 1431). The court reasoned, "Speculation as to the effect of jurors' racial biases cannot justify exclusion of cross-examination with such strong potential to demonstrate the falsity of [the alleged victim's] testimony." Id.
ś 240 Our majority attempts to distinguish Olden by claiming the evidence in Olden was relevant to the victim's motive to lie, majority at 1216 n. 5; however, the claimed distinction is the precise issue we must confront â whether Robin Sehmel engaged in prostitution rather than being raped, and then lied about it. Moreover, such evidence is relevant to establish a motive to retaliate and lie with respect to the issue of consent when viewed in context of her probationary status, pending child custody action, and past prostitution convictions.
ś 241 Employing similar reasoning to Olden, the court in Johnson v. State, 332 Md. 456, 632 A.2d 152 (1993) held evidence of the complainant's sexual relationship with the defendant was admissible where the evidence is relevant to suggest a motive to falsely accuse the defendant of rape.
ś 242 In Johnson the complainant acknowledged at a rape shield hearing that she was a crack addict, and she would exchange sex for drugs (i.e., "freak") when she wanted to get high. Id. at 472, 632 A.2d 152. She admitted "freaking" in the immediate neighborhood of the alleged rape for approximately six months, most recently one week before the alleged rape. Id. at 473, 632 A.2d 152. At trial the complainant testified that she *1266 was a crack addict, that she had spent all of her money on an eight-hour crack binge, but had obtained additional money from a friend, and was attempting to purchase more crack from a man, when he, the defendant, and another man raped her. The defendant alleged the complainant willingly had sex with the three men in exchange for their promise to deliver crack for sex, then falsely accused them of rape when the wouldâ be supplier reneged. The Johnson court concluded her addiction created a "disposition" to "freak," and this disposition provided sufficient special relevance to overcome the inflammatory and prejudicial nature of the evidence. It then held it was reversible error to preclude the defendant from cross-examining the complainant about her "freaking":
As we have seen, the critical issue in this case is whether, on this occasion, the victim was freaking for cocaine or was raped. And, because these are the only possible explanations for what occurred, evidence that she has freaked for cocaine in the past and, particularly, the very recent past, has special relevance to that issue; such evidence transcends mere evidence of bad character or, in the context of this case, sexual promiscuity. In turn, it is relevant to, and probative of, the victim's motive. From a finding that on this occasion she was freaking for cocaine but did not receive the bargained for cocaine, the jury could then infer that the victim had an ulterior motive for making a false accusation of rape against the petitioner.
Id. at 471-72, 632 A.2d 152 (footnote omitted).
ś 243 In summary the Johnson court found the evidence admissible when: (1) there was proof that the complainant bartered herself for cocaine; (2) she had done so frequently, (3) there was greater similarity between the complainant's prior conduct and the defendant's version of events, and (4) the alleged motive to lie was plausible and persuasive.
ś 244 Johnson is a close fit to the case at bar. First, Robin Sehmel admittedly engaged in a long history of prostitution in the city of Tacoma for several years continuing into at least 1997 â within one year of the incident at issue. Second, Sehmel engaged in acts remarkably similar to the incident in question by approaching a stranger's car on a Tacoma street corner, getting in, driving with the stranger to a secluded spot, and then engaging in consensual sex for money. Next, there was great similarity between Sehmel's prior conduct and Gregory's version of events. Finally, like the complainant in Johnson, Sehmel's motive to lie about the event in retaliation and to protect her custody dispute and probationary status was plausible and persuasive.
ś 245 Exclusion of this evidence of prostitution therefore cut out the heart of the defendant's right to confront his accuser and thereby defend himself. Forced to defend with his hands tied behind his back, he was denied his right to a fair trial.
III. Conclusion
ś 246 In summary, even if the rape shield statute on its face related to evidence of prostitution, which I find most problematic, the trial court abused its discretion, if discretion it has, under RCW 9A.44.020(3)(c) by refusing to even order a threshold hearing to consider the proffered evidence in light of the statutory criteria relating to relevance, undue prejudice and, finally, to the substantial justice due the defendant in such a serious criminal proceeding.
ś 247 I would hold the trial court's jury instruction which places the burden to prove consent on the defendant violates his most fundamental due process right to have every element of the charge against him, including forcible compulsion, proved by the State beyond a reasonable doubt. I would also hold that the trial court's exclusion of highly relevant and probative evidence of prostitution was an abuse of her discretion under the rape shield statute and denied the defendant his constitutional right to confront witnesses against him and offer probative evidence in his own defense.
ś 248 That said, the majority comes to the right result in this case for other reasons; although I would hope the trial court will not repeat the errors referenced in this concurring *1267 opinion in any future proceeding on remand.
ś 249 Therefore I concur in result only.
I CONCUR: Justice MARY E. FAIRHURST.
J.M. JOHNSON, J. (dissenting).
ś 250 Today the majority of the Washington State Supreme Court wrongly reverses the death sentence of convicted murderer Allen Gregory and reverses his earlier rape conviction involving a different victim. Both judgments â including the penalty â were imposed only after a jury deliberated fully and fairly. The majority's result disregards two important constitutional provisions, both found in the first article of our constitution: the right of trial by jury (Wash. Const. art. I, § 21) and rights of victims (Wash. Const. art. I, § 35). The violation of those constitutional provisions is most apparent with respect to murdered victim, Geneiene H. Our constitutional jury trial right is always entitled to protection because it finds truth and dispenses justice when it benefits defendants.
ś 251 The court second-guesses an admittedly discretionary decision of a trial judge in an earlier rape trial who declined the day before trial to review sealed custody files of the victim's (R.S.) children. The trial judge's decision was vindicated when these files later proved devoid of the prostitution evidence claimed. (I earlier dissented from this court's order directing an in camera review.)
ś 252 The majority's undermining of the separate rape trial verdict provides a bootstrap by which it proceeds to undermine the penalty separately pronounced by a deliberative jury that found Gregory guilty of a horrific, aggravated murder, and separately sentenced him to death for that crime.
ś 253 The court finally makes an unwarranted conclusion: that a prosecutor's remarks about prison life, which are within the common knowledge of everyday citizens and the jury â and not objected to at trial â also undermines Gregory's death sentence.
ś 254 I would uphold the first (rape/murder) jury's carefully considered death sentence, as well as the other jury's separate rape conviction. Each of Gregory's convictions and the separate death sentence judgment resulted from proper decision-making by the respective trial courts and juries after long trials, during which Gregory's rights were carefully protected. This included a two-month murder jury trial, followed by a penalty phase jury trial and deliberations with mitigating testimony over seven days.
ś 255 The majority of this court infringes upon the province of the jury, one of the most sacred of our constitutional safeguards. The right to jury trial does protect rights of the defendant, but also those of the victims. The majority's decision comes in total disregard of Washington's victims of crimes-rights (Wash. Const. art. I, § 35 (amend.84)) and the values that provision constitutionally incorporates. As a consequence, the victims and their families do not obtain the justice our laws and constitution assure. This is especially and sadly true for brutally murdered Geneiene H. I therefore dissent.

Facts

Murder of Geneiene H.
ś 256 On July 27, 1996, Geneiene H. was brutally raped and murdered by Gregory in her home. She was by all accounts a totally innocent, blameless victim. Of necessity, I briefly summarize testimony the jury heard in the guilt phase of the trial for this crime. (An excerpt from the victim impact testimony from Geneiene H.'s mother can be found at pages 1221-22, infra.)
ś 257 Geneiene H.'s clothes were cut with a knife. Her hands were bound so tightly as to cut circulation in her hands. While alive, she suffered numerous traumatic injuries and blunt force injuries to her face, torso, and extremities. She had two black eyes, a laceration on her right eyelid, forehead abrasions, and scalp hemorrhages. Her bruised left temple was consistent with a severe blow to her head.
ś 258 There was a half-inch deep stab wound on Geneiene H.'s neck. Her blood was on the kitchen floor, and the blood pool indicated that she had been dragged through the blood to the bedroom.
*1268 ś 259 Geneiene had three severe stab wounds to her back, inflicted with a single-edged knife. Those stab wounds were all at least three inches deep. One of the stab wounds was so deep as to penetrate Geneiene's right lung. Another penetrated her left lung and cut her aorta. Geneiene would have been conscious for some time after being stabbed and continued to struggle against her violent attacker.
ś 260 She had devastating neck injuries. Her neck was slit three separate times. One of the slices was seven inches long. Another was more than seven inches long and deep enough to cut through her windpipe and through her esophagus. The sixth vertebra in her neck was fractured. Her blood covered the wall and floor of her bedroom. These blood patterns were consistent with the throat wounds and indicate that she was alive at the time her throat was cut.
ś 261 Later, there was no cash found in Geneiene H.'s house. Her purse was found in the bedroom, its contents dumped out on the bed and floor. Geneiene always wore a favorite pair of diamond stud earrings, which were never recovered.
ś 262 There was extensive evidence of sexual assault. Gregory brutally raped Geneiene H., the horrifying details of which will not be repeated here but were described to the jury.
ś 263 After Geneiene H.'s body was discovered, the Washington State Patrol Crime Lab (WSP Lab) obtained a DNA (deoxyribonucleic acid) profile from the sperm found, which was analyzed and retained. In 1998, Gregory was arrested for raping a separate, surviving victim, R.S. (discussed further infra). As a result of Gregory's arrest for the later crime, a sample of his blood was collected and provided to the WSP Lab. A DNA profile was obtained on that blood sample. That profile matched the DNA profile obtained from the sperm on Geneiene's bedspread. The odds of a random match between those profiles were 1 in 235 million.
ś 264 The WSP Lab also obtained DNA profiles from vaginal swabs and from known blood samples of Geneiene H. and Gregory. The DNA profile from Gregory's blood matched the DNA profile from the sperm fraction of the vaginal swabs. The odds of a random match between those profiles were 1 in 2,500. Samples of hair found on Geneiene H.'s body were consistent with Gregory's hair.
ś 265 Swabs and blood samples were sent to Forensic Science Associates in California. DNA testing was conducted. Gregory's DNA profile matched the DNA profile from sperm found on Geneiene H.'s bedspread and her body. The odds of a random match between Gregory's DNA and DNA from the evidence were 1 in 190 billion.
ś 266 Following a two-month trial, Gregory was convicted by a jury of aggravated first degree murder. That jury found the State had proved the existence of the following aggravating circumstance:
The murder was committed in the course of, in furtherance of, or in immediate flight from a Rape in the First or Second Degree or a Robbery in the First Degree.
Murder Case Clerk's Papers (MCP) at 2490.
ś 267 Note that the separate crime against R.S. was not found as any aggravating circumstance; indeed, that crime was not even presented to the jury in the "guilt phase." The jury's finding of guilt for aggravated first degree murder was based entirely on the rape/murder of Geneiene H.
ś 268 As required by law, a second hearing or penalty phase was to be heard by the same jury. The statutory purpose is to determine whether there are not sufficient mitigating circumstances to merit leniency, instead of a death sentence. RCW 10.95.040. A "mitigation specialist" was hired for Gregory by the State for this separate penalty phase of the trial. That trial was held before the same jury that convicted him of Geneiene H.'s murder.
ś 269 The jury later determined, as required by RCW 10.95.060(4), that there were not sufficient mitigating circumstances to merit leniency and Gregory was sentenced to death. He appealed to this court.

Earlier Rape of R.S.
ś 270 R.S. testified that on the evening of August 20, 1998, she left an acquaintance's *1269 house to return home. She stopped briefly to speak to another acquaintance she ran into along the way. While speaking with this acquaintance, R.S. spotted a vehicle that she mistakenly believed belonged to a friend. R.S. went over to the car only to discover the driver was Gregory. He offered her a lift home. After initially refusing the offer, R.S. got into the car. When Gregory failed to turn where R.S. directed, she became worried and examined the door to get out. Gregory pulled a knife and drove behind a school; he kept driving when he saw a group of kids there. He eventually stopped the car, grabbed R.S.'s hair, and held the knife against her head. At knifepoint, Gregory proceeded to orally, vaginally, and anally rape R.S. Further details of Gregory's violent rape of R.S. are set forth in the majority opinion.
ś 271 Afterward, Gregory pushed R.S. out of the car. She managed to remember the license plate number of Gregory's vehicle. Detectives determined that Gregory was the owner of the car matching that license plate.
ś 272 Following his arrest, Gregory denied he had any contact with R.S. He detailed to detectives a complete alibi for that night. After obtaining a search warrant, police searched Gregory's car. They discovered the buck knife, as well as a condom. The condom had the same lot number as a condom wrapper found by an officer at the crime scene. A forensic scientist with the WSP Lab compared the rape kit seminal fluid with a sample of blood. He testified that 1 in 360 African Americans would have DNA similar to Gregory's.
ś 273 A jury subsequently found Gregory guilty of three counts of first degree rape. Gregory appealed to this court.

Analysis

R.S. Rape Conviction Reversal â Denial of In Camera Request
ś 274 In Gregory's rape trial, defense counsel requested the trial court to review sealed dependency files relating to R.S.'s children. Defense counsel sought to find nonexistent evidence that R.S. had recently engaged in prostitution to bolster Gregory's latest defense. After dropping the alibi defense, Gregory had claimed the sex was consensual (i.e., prostitution). The majority wrongly holds that the trial court erred by not conducting an in camera review of those sealed child dependency files.
ś 275 I dissented from an earlier order of this court directing the in camera review, but the review was conducted by another judge, revealing no evidence of recent prostitution. Gregory's rape conviction should be upheld. I shall summarize why the trial judge was correct (and later vindicated).
ś 276 This court has held: "In order to make an adequate threshold showing to justify an in camera inspection, a defendant must make a particularized factual showing that information useful to the defense is likely to be found in the records." State v. Kalakosky, 121 Wash.2d 525, 550, 852 P.2d 1064 (1993). See also Pennsylvania v. Ritchie, 480 U.S. 39, 58 n. 15, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).
ś 277 A criminal defendant may not require the trial court to search through a privileged file without first establishing a basis for his claim that the file contains material evidence. United States v. Valenzuela-Bernal, 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). Evidence is material only if there is a reasonable probability that it would impact the outcome of the trial. Ritchie, 480 U.S. at 58 n. 15, 107 S.Ct. 989. A reasonable probability is probability sufficient to undermine confidence in the outcome. Id. The decision whether to conduct an in camera review of privileged records is subject to an abuse of discretion standard. Kalakosky, 121 Wash.2d at 549-50, 852 P.2d 1064.
ś 278 Here, when defendant's trial counsel sought an in camera review of sealed dependency files of R.S.'s children, the sole argument was that he "supposed" that the files might contain information that R.S. had been engaging in prostitution. This request was made on the day the case was set for trial. The trial court denied the request, citing the privileged nature of the dependency files and privacy interests of R.S.'s children. The trial court also granted defense counsel's request *1270 to reinterview R.S. to ask her about alleged prostitution activities from 1995 through 1998.
ś 279 Upon these facts, the majority does not establish that the trial court's denial of an in camera review was an abuse of discretion. The majority's conclusion seems to reflect a presumption favoring any defense request for in camera review of confidential material. That is surely not the standard set in our cases.

Subsequent in Camera Review Confirms Trial Court's Ruling; No Evidence of Prostitution
ś 280 In camera review was ordered by the majority of this court (over my dissent) and revealed that the prostitution information sought by the defendant did not exist. Unfazed, the majority today compounds its earlier erroneous conclusion that the trial court abused its discretion. The majority now insists that other evidence in those files might be material. On that basis, the majority reverses the rape conviction. I strongly disagree and confidently predict this case has limited value as precedent, since it will be overruled or disregarded in any case not involving death penalty proceedings. It has been said bad cases make bad law, but this is true only if a court allows it.
ś 281 The majority points to information in the child dependency files indicating a June 2000 drug relapse by R.S., which contradicts R.S.'s statement in a 2000 interview that she had not used drugs since 1999. (Both dates are years after the crime of which R.S. was the victim.) The trial court conducting the in camera review concluded that such information may be relevant, but did not decide it was material. The majority concludes that the information was material and that failure to produce that evidence, day of trial, constitutes reversible error. The majority is incorrect, and the analysis is unlikely to be viable precedent.

Evidence Rule (ER) 608(b)
ś 282 The majority's holding is that Gregory could have impeached R.S.'s credibility by using the files on cross-examination to ask whether she had lied in an August 8, 2000, interview about her drug use after 1999. This is erroneous in light of ER 608(b). It bears reminder that this crime was committed in 1998, two years before.
ś 283 Evidence of a witness's prior misconduct is only admissible if it is probative of the witness's character for truthfulness or untruthfulness pursuant to ER 608. ER 608(b) goes on to provide, in pertinent part:
Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness. . . .
(Emphasis added.)
ś 284 The majority's conclusion that the information was material overstates its importance because defense counsel could not have introduced the testimony of the social worker whose affidavit was in the (sealed) dependency file. This affidavit would not be admitted under ER 608(b).

The Dependency Files Did Not Contradict Testimony About a 1998 Crime
ś 285 It is not reasonably probable that the outcome of the trial would have been different even had the jury heard evidence that R.S. had once lied about drug consumption (years after the rape). Such impeachment does not contradict any evidence adduced at trial. The jury already heard evidence that R.S. consumed drugs and alcohol on the day of the rape. The jury did not hear any evidence suggesting that this drug consumption was a one-time incident or occurred only in R.S.'s past. Because R.S.'s testimony did not include statements inconsistent with the August 8, 2000, interview, ER 613(b)'s provision for admission of extrinsic evidence to prove prior inconsistent statements clearly does not apply.

*1271 Other Means of Impeachment Were Available to Gregory

ś 286 Defense counsel's cross-examination of R.S. reveals many available means of impeachment. Alternative measures for impeachment are significant in determination of the materiality of undisclosed evidence.
ś 287 Here, defense counsel impeached R.S. by adducing that she had been convicted of several crimes of dishonesty â including five convictions for theft in the third degree. Defense counsel also impeached R.S. by adducing she had given a false name to police on several occasions. Further, defense counsel adduced that when R.S. provided a statement to Detective Pollard about what had happened, she twice mentioned that Gregory had held a gun to her head rather than a knife. Moreover, defense counsel generally tried to impeach R.S. with her inability to recall details of the events.
ś 288 Since Gregory was availed of ample means of impeaching R.S.'s credibility besides confronting her with one false statement as to the last time she had consumed drugs after the crime, the trial court would have been within its discretion in denying admission under ER 608(b).
ś 289 The jury heard much impeachment evidence regarding R.S., but still believed her version of events rather than Gregory's. Gregory had been very inconsistent in his statements about the night of the rape. Detective DeVault testified that Gregory first claimed an alibi. Gregory later denied any contact with R.S. on the night of the rape. He later denied ever having sex with R.S. in his car. At trial, however, Gregory claimed there was sexual contact with R.S. in his car, but that it was a consensual act.
ś 290 The jury could assess which version â Gregory's or R.S.'s â was more consistent with the evidence. That R.S. might have once lied about drug usage years later in 2000 would not have conceivably changed the outcome of the trial.

Materiality is Tied to the Specificity of the Request
ś 291 It is also important that the in camera review of the dependency files ordered by this court revealed no information regarding prostitution. In a United States Supreme Court case involving a remand for an in camera review, that court noted that "the degree of specificity of [the defendant's] request may have a bearing on the trial court's assessment on remand of the materiality of the nondisclosure." Ritchie, 480 U.S. at 58 n. 15, 107 S.Ct. 989. While the trial court here declined to address the materiality of the information, this court should follow Ritchie's guidance and consider whether it fell within the parameters of the original request.
ś 292 Evidence of prostitution was the sole reason defense counsel sought the dependency files. It cannot be said that the trial court wrongfully denied Gregory access to evidence that does not exist. It certainly cannot be said that the trial court's denying Gregory's access to nonexistent information amounts to an abuse of discretion. The mere possibility that an item of undisclosed information might have helped the defense does not establish "materiality" in the constitutional sense. United States v. Agurs, 427 U.S. 97, 109-10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).
ś 293 Unlike the majority, I would also uphold Gregory's rape conviction by a jury that fully and fairly considered all relevant evidence.

The Appropriate Remedy is a Stay of the Death Sentence
ś 294 Even if I were to agree with the majority's reversal of Gregory's convictions for the rape of R.S., I would not reverse Gregory's death sentence stemming from the homicide case. At most, I would stay the decision on Gregory's death sentence pending retrial for the rape of R.S. If he is reconvicted, the death sentence should stand.
ś 295 Gregory was found guilty of the murder after a two-month trial. After that trial's completion, a special sentencing proceeding was held. See RCW 10.95.050. The same jury sentenced Gregory to death after that sentencing proceeding. The jury had first concluded Gregory was eligible for the death penalty when including in the guilty verdict a finding of an aggravating factor in the commission *1272 of the murder; namely, the robbery or rape of Geneiene H. See RCW 10.95.020.
ś 296 Then, after separate penalty proceedings, the same jury declined to find any mitigating circumstances warranted leniency for Gregory. See RCW 10.95.030(2), .060(4), .070.
ś 297 The murder trial and sentencing were separate proceedings before the jury. Gregory's conviction at trial for the murder of Geneiene H. was not affected by the later disclosure to the jurors of Gregory's prior conviction for the rape of R.S. Rather, such disclosure only pertains to the jury's sentencing phase.
ś 298 Even under the majority's mistaken analysis, the ultimate outcome of the retrial for the rape of R.S. should determine whether or not the disclosure of Gregory's rape convictions to the jury in the homicide case affects his death sentence. Such a disposition would respect the rights of the murdered victim and respect the decisions of the jury.

Disclosure of Prior Rape Convictions Most Certainly Inconsequential
ś 299 The majority's reversal of Gregory's death sentence is all the more regrettable in light of the jury verdict of guilt and its finding of aggravating factors in the murder of Geneiene H. MCP at 2488, 2490. Disclosure of Gregory's R.S. rape conviction impacted neither of these determinations. Gregory was found guilty and deemed eligible for the death penalty separate and apart from his prior rape conviction. MCP at 2488, 2490 ("The murder was committed in the course of, in furtherance of, or in immediate flight from a Rape in the First or Second Degree or a Robbery in the First Degree.") Instead, the disclosure of Gregory's rape conviction as part of his long criminal record was only part of the jury determination whether mitigating factors warrant leniency.
ś 300 The jury in the murder case endured a two-month trial, some of which was summarized at the beginning of this opinion. The jury deliberated and ultimately convicted Gregory and found aggravating circumstances without any mention of his separate conviction for the rape of R.S.
ś 301 At the penalty proceeding, the transcript of arguments and testimony presented to the jury spans some 500 pages. A handful of passing references were made to Gregory's rape of R.S., but the jury was provided with all of Gregory's criminal history. The overwhelming preponderance of the arguments and testimony focused upon the horrific murder of Geneiene H. and defense counsel's insistence that mitigating factors justified leniency. As the prosecutor argued to the jury: "For the crimes against Geneiene [H.] alone, you don't need anything else to find that this defendant deserves the death penalty." Murder Case Verbatim Report of Proceedings (MRP) at 7747.
ś 302 Although our statute places upon the State the burden of demonstrating that aggravating circumstances outweigh mitigating circumstances, "the defendant appropriately bears the burden of proffering mitigating circumstances â a burden of production." Kansas v. Marsh, ___ U.S. ___, 126 S.Ct. 2516, 2527, 165 L.Ed.2d 429 (2006); State v. Benn, 120 Wash.2d 631, 668, 845 P.2d 289, cert. denied 510 U.S. 944, 114 S.Ct. 382, 126 L.Ed.2d 331 (1993). See RCW 10.95.060(2).
ś 303 Here, most of the testimony at the sentencing hearing was provided by witnesses favorable to Gregory, asking for leniency. The jury also heard victim impact testimony provided by Geneiene H.'s mother, see Wash. Const. art I, § 35; MRP 7239-52, and brief rebuttal testimony of a former employer of Gregory, MRP at 7667-80. The jury heard from twelve witnesses called by defense counsel. See testimony in MRP beginning at 7345, 7356, 7376, 7472, 7493, 7502, 7508, 7549, 7567, 7594, 7636, and 7664. The jury even heard a "mitigation specialist" hired by the State to testify on Gregory's behalf. MRP at 7636. The jury plainly rejected defense counsel's best offerings of mitigating evidence on behalf of Gregory and concluded there were not sufficient mitigating circumstances to merit leniency. See RCW 10.95.060(4). For a likely explanation of the jury decision, reread pages 3-6, supra (crime description summary).
*1273 ś 304 To be sure, this court is constrained by United States Supreme Court precedent holding that if the sentencer was allowed to "hear evidence that would not otherwise have been before it," due process mandates reversal. Brown v. Sanders, 546 U.S. 212, 126 S.Ct. 884, 891, 163 L.Ed.2d 723 (2006). Nonetheless, common sense and the record show that this jury was overwhelmingly focused upon the murder of Geneiene H. At most, the judgment should be stayed to allow retrial of the separate rape case. If convicted, there is no reason to vacate the sentence for the rape and murder of Geneiene.

Closing Argument Misconduct â Comment on Prison Conditions
ś 305 The majority also wrongly holds that the prosecutor's reference to prison conditions in closing arguments of the murder trial's penalty phase requires reversal of Gregory's death sentence. For reasons that follow, I disagree with the majority.
ś 306 To demonstrate improper prosecutorial argument, a defendant must show both the impropriety of the attorney's comments and their prejudicial effect. State v. Russell, 125 Wash.2d 24, 85, 882 P.2d 747 (1994). To demonstrate prejudice, the defendant must establish a substantial likelihood that the misconduct affected the jury's verdict. State v. Dhaliwal, 150 Wash.2d 559, 578, 79 P.3d 432 (2003). The majority wrongly concludes that Gregory satisfies these burdens.
ś 307 Improper arguments of counsel should be objected to at trial so the judges can cure by stopping the objected-to arguments and instructing the jury. Where, as here, the defense fails to object to an improper comment at trial, any claim of error is deemed waived unless the prosecutor's remarks were so flagrant and ill-intended that any resulting prejudice could not have been neutralized by a curative instruction to the jury. State v. Brown, 132 Wash.2d 529, 561, 940 P.2d 546 (1997).
ś 308 The majority concedes the defense counsel did not object to statements regarding prison life made by the prosecution during closing argument. Majority at 1256. Rather, Gregory's counsel made several pages of similar remarks in defendant's closing argument. MRP at 7753 ("Common sense will tell you a number of things about prison life"). See majority at 1256. Ironically, the majority overlooks the conceded fact that juries embody "the commonsense judgment of the community." Taylor v. Louisiana, 419 U.S. 522, 530, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).
ś 309 The majority also overstates the surprise or significance of arguments about prison life to this jury's deliberations. See majority at 1256 ("The characterization of prison life is central to the question of which sentence is appropriate. . . ."). Characterizations of life in prison are matters of common knowledge, as defense counsel conceded in his argument before the jury. MRP at 7753.
ś 310 The majority posits that images of prison life bias the jury. I disagree. Here, during closing argument the prosecutor described prison life as another form of society. MRP at 7721-22. Defense counsel had ample opportunity to object to the prosecutor's statement, but failed to do so and instead chose to make a similar contrasting argument. The defense simply made a tactical decision that similar arguments would help his client.
ś 311 This court recently found absence of an objection by defense counsel "`strongly suggests to a court that the argument or event in question did not appear critically prejudicial to an appellant in the context of the trial.'" State v. McKenzie, 157 Wash.2d 44, 53 n. 2, 134 P.3d 221 (2006) (emphasis omitted) (quoting State v. Swan, 114 Wash.2d 613, 661, 790 P.2d 610 (1990)). In analyzing a claim of prosecutorial misconduct, this court concluded the deputy prosecutor went too far in references to "McKenzie's theft of C.T.'s innocence." Id. at 61, 134 P.3d 221. Nonetheless, we held that these comments made in closing arguments in another rape case, "which prompted no objection from defense counsel, did not rise to the level of misconduct warranting a new trial." Id. This court concluded that, with objection, "[a]ny prejudicial effect could have been mitigated by a timely instruction to the jury." Id.
*1274 ś 312 The question in this case does not significantly differ from the issue in McKenzie. That case should control. See also Loeffelholz v. C.L.E.A.N., 119 Wash.App. 665, 709-10, 82 P.3d 1199 (comments by prosecutor during closing argument not objected to were not preserved for appeal), review denied, 152 Wash.2d 1023, 101 P.3d 107 (2004).
ś 313 Appellate courts will not sanction a party's failure to object at trial to identify error which the trial court might correct. State v. Scott, 110 Wash.2d 682, 685, 757 P.2d 492 (1988). Failure to object deprives the trial court of this opportunity to prevent or cure the error. Such decisions at trial are often tactical â the defense chooses to argue the same issue. Gregory's counsel did so here.
ś 314 The jury was instructed by the trial court to "[d]isregard any remark, statement or argument that is not supported by the evidence." MCP at 2975 (Court's Instruction to the Jury (Penalty Phase), Instruction No. 1, at 2). Juries are presumed to have followed the trial court's instructions, absent evidence proving the contrary. State v. Davenport, 100 Wash.2d 757, 763, 675 P.2d 1213 (1984); State v. Cerny, 78 Wash.2d 845, 850, 480 P.2d 199 (1971), vacated on other grounds, 408 U.S. 939, 92 S.Ct. 2873, 33 L.Ed.2d 761 (1972). The constitutional role of the jury requires court respect for the jury and its deliberations. See Wash. Const. art. I, §§ 21, 22.
ś 315 Defense counsel's rebuttal argument may also be seen as a waiver of the earlier motion in limine. Surely the defense's failure to object to the prosecutor's remarks amounted to a waiver, where defense went forward â at length â to argue the same issue.
ś 316 Here, the prosecutor's remarks â and those of defense counsel â were neither flagrant nor ill-intentioned. Gregory failed to demonstrate that the remarks prejudiced him. Even in the absence of the counsel's remarks, the jurors were free to consider the living conditions of prisoners serving life sentences without parole versus prisoners serving time on death row before facing execution.
ś 317 The majority acknowledges that if it is to find reversible error on this matter, it must "conclude that a curative instruction would not have been effective, a very difficult standard to meet." Majority at 1257. The majority admits that this matter truly presents a "close question." Id. at 1257. But such a "close question" does not satisfy this "very difficult standard to meet." The majority can only find a reversible error here by disregarding the requisite standard (and our recent case).
ś 318 The remarks at issue neither deprived Gregory of due process of law nor denied him a fair sentence. The conduct of the prosecutor did not amount to reversible error. Here, too, the majority is in error.

Import of the Victims' Rights Amendment to our Constitution
ś 319 Whereas many of our sentencing and death penalty procedures are spelled out in statute, the victims of crimes-rights amendment is constitutional. The mandate of article I, section 35 of the Washington Constitution â the victims of crimes-rights amendment â must be taken into account when courts conduct and review sentencing hearings. The guaranty to victims of a "meaningful role in the criminal justice system" is hollow if the due deliberations of a jury over matters of commonsense judgment can be set aside in the absence of clear violations of law. Wash. Const. art. 1, § 35. The provision for victims' representatives to speak at sentencing hearings is rendered nugatory where a jury's sentencing decision is reversed because a reviewing court assumes a jury did not carry out its duty. The deliberations of properly instructed juries should not be set aside on such "close questions" by judges not present at the proceedings. The mandate of the victims of crimes-rights amendment strongly cuts against the majority's conclusion.
ś 320 Here, victim impact testimony was provided by Geneiene H.'s mother. It is fitting to recall her answer when the prosecution asked about the things Geneiene H. loved the most:
Her family . . . her friends, her cats. She loved having her place where she could . . . *1275 have flowers. . . . [S]he loved doing her artwork, her needlework. She loved movies. She loved life, loved Christmas. God, how she loved Christmas.
MRP at 7247.

CONCLUSION
ś 321 I would uphold Gregory's death sentence and his earlier conviction of a separate rape. Gregory's convictions and the death sentence resulted from consideration of extensive evidence and argument, extended deliberation, and proper decision-making by the respective juries. Both victims and the defendant received appropriate attention and protection of their rights by trial judges and jurors who saw the perpetrator, heard from witnesses, viewed the evidence, and listened to the impacted families â on both sides. Far removed in place and time, this court overturns the jury without legal justification. Our constitutional guaranty of jury trial requires we respect a jury's decision against â as well as favoring â defendants. That assures the jury system advances justice.
ś 322 On remand, a new jury may be impaneled for a new trial for the rape of R.S. The death penalty decision for the murder of Geneiene H. should have been stayed pending the decision of the prosecutor to retry Gregory for that R.S. rape.
ś 323 In spite of the lamentable decision of the majority, redress may remain available to the State and to the victims. Our statutes and precedent also allow the reconvening of the penalty jury to consider again whether mitigating circumstances outweigh a death penalty. Justice may yet be served.
ś 324 I dissent.
NOTES
[1] The following abbreviations will be used throughout this opinion: RCP â Rape Case Clerk's Papers; RRP â Rape Case Verbatim Report of Proceedings; MCP â Murder Case Clerk's Papers; MRP â Murder Case Verbatim Report of Proceedings.
[2] The trial court refused to consider evidence of other arrests for sexually related crimes because no convictions resulted, finding that mere arrests were not probative.
[3] Gregory cites to two cases to support his argument that the rape shield statute should not apply to acts of prostitution. See State v. Johnson, 121 N.M. 77, 908 P.2d 770, 775 (1995); Drake v. State, 108 Nev. 523, 836 P.2d 52, 55 (1992). The New Mexico case was later overruled by that state supreme court. State v. Johnson, 1997-NMSC-36, 123 N.M. 640, 650, 652, 944 P.2d 869, 879, 881 (1997) (requiring a case by case evaluation of relevance). Moreover, other state courts have applied their rape shield statutes to exclude evidence regarding prior acts of prostitution where those acts were not relevant. See, e.g., Commonwealth v. Jones, 2003 Pa.Super. 220, 826 A.2d 900, 909 (2003); Commonwealth v. Houston, 430 Mass. 616, 722 N.E.2d 942, 945-46 (2000).
[4] The Morley court also determined that the trial court did not abuse its discretion when it excluded hearsay testimony from a separate witness claiming that the victim had reported engaging in prostitution to raise money in the past. Morley, 46 Wash.App. at 159-60, 730 P.2d 687.
[5] While the concurrence claims remoteness should be a matter of weight, not admissibility, none of the cases it cites involves the question of relevance under the rape shield statute. In addition, some of those cases in fact stand for the opposite proposition, namely that remoteness impacts admissibility. See, e.g., State v. Morgan, 146 Wash. 109, 113, 261 P. 777 (1927) (discussing with approval a Connecticut case that recognized that remoteness may be a controlling factor supporting exclusion of evidence); United States v. Brito, 427 F.3d 53, 64 (1st Cir.2005) (considering remoteness as a factor when determining admissibility under Federal Rule of Evidence 609). Others emphasize that whether evidence is too remote to be relevant is within the discretion of the trial court. See, e.g., State v. Harold, 45 Wash.2d 505, 510, 275 P.2d 895 (1954).
[6] Gregory seems to argue that his Sixth Amendment and article I, section 22 rights were violated by the application of the rape shield statute in this case because he was denied an avenue for proving his consent defense. However, this court has already held that application of RCW 9A.44.020 to prevent the introduction of irrelevant evidence does not violate any constitutional right to argue a consent defense. Hudlow, 99 Wash.2d at 15, 659 P.2d 514 ("Of course, a criminal defendant has no constitutional right to have irrelevant evidence admitted in his or her defense."). While Gregory argues that we must overturn Hudlow in light of Olden v. Kentucky, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988), that case discusses a defendant's right to present relevant evidence regarding the victim's motive to lie, id. at 232, 109 S.Ct. 480, not a right to present irrelevant evidence.
[7] While Gregory seems to argue that the State also opened the door with testimony that R.S. hated Gregory, this testimony occurred during an offer of proof and was never repeated to the jury.
[8] Gregory and the concurrence also speculate that R.S. lied to avoid arrest or negative consequences in her dependency proceeding. While R.S.'s prior prostitution activities might have been relevant with regard to this theory had the police initiated contact with R.S. and Gregory during their encounter, they ignore the fact that R.S. initiated contact with police; there was no evident reason for her to lie to avoid trouble with the police.
[9] Another case has been clarified. See State v. Herndon, 145 Wis.2d 91, 426 N.W.2d 347 (1988), limited by State v. Pulizzano, 155 Wis.2d 633, 456 N.W.2d 325, 335 (1990) (requiring evidence of prior sexual conduct to be relevant and necessary to the defendant's case, more probative than prejudicial, and involve similar circumstances).
[10] The concurrence attempts to draw a comparison between this case and Johnson, 332 Md. 456, 632 A.2d 152. Concurrence at 23. However, the concurrence ignores the fact that the Johnson victim had exchanged sex for drugs only one week before the incident in question. Id. at 153-54.
[11] In State v. Diemel, 81 Wash.App. 464, 468, 914 P.2d 779, review denied, 130 Wash.2d 1008, 928 P.2d 413 (1996), the defendant argued that the tests for in camera review of privileged records set forth in Ritchie and Kalakosky were inconsistent. Id. at 468, 914 P.2d 779. Diemel asserted that Kalakosky's "particularized showing" could be construed as a higher burden than constitutionally allowed by the "plausible showing" suggested in Ritchie. Id. The Diemel court rejected this theory, concluding that both Ritchie and Kalakosky require some showing of materiality. Id. "[C]onsiderable speculation," and "little factual basis or foundation" were all that supported Diemel's assertion that the requested records might contain evidence that the victim consented to sex with the defendant. Id. at 469, 914 P.2d 779. This was not sufficient under either Ritchie or Kalakosky. Requiring a particularized showing does not conflict with the Ritchie requirement that the defendant must establish a basis for his or her claim.
[12] Gregory seems to argue that when R.S. told the jury that she had discussed the incident with a rape counselor, that she opened the door to cross-examination as to what she told her counselor. However, R.S. did not discuss any details of her counseling visits, only that she received counseling. Therefore, the trial court acted well within its discretion when it concluded that the State had not opened the door.
[13] Gregory notes that during closing arguments, when listing the people that R.S. talked to about the rape, the State suggested her statement to the rape counselor was consistent with her other statements about the incident. At that point, the proper objection would have been that the State was making an argument not supported by the evidence. No such objection was made and Gregory does not make an argument here that the prosecutor's statement constituted misconduct.
[14] In other evidentiary rulings, the trial court excluded any inquiry into or reference to R.S.'s prior drug use, other than her drug use on the night in question, which she admitted during direct and cross-examination. The trial court also excluded any reference to dependency proceedings involving R.S., including court recommended drug treatment. The court excluded any reference to R.S.'s work as a police informant. Finally, the court excluded any reference to R.S.'s family or prior pregnancies. None of these evidentiary rulings was challenged on appeal.
[15] The Diemel court held that "[a] claim that privileged files might lead to other evidence or may contain information critical to the defense is not sufficient to compel a court to make an in camera inspection." Diemel, 81 Wash.App. at 469, 914 P.2d 779 (emphasis added). Speculation was simply not enough. Id. However, Gregory made a more concrete connection between his theory of the case and what he expected to find in the dependency files, i.e., it was reasonable to believe that if R.S. was still engaging in prostitution in 1998, evidence of that would be reflected in the dependency files, and if so, the reports contained therein could reveal potential witnesses.
[16] Article IV, section 2 of the Washington Constitution requires "[i]n the determination of causes all decisions of the [supreme] court shall be given in writing and the grounds of the decision shall be stated." In order to publish an opinion which states the grounds for our decision, we now find it necessary to refer to portions of the record. However, the record otherwise remains sealed.
[17] In this court, defense counsel moved for unsealing of the sealed materials so that they could view the relevant materials. We granted that motion in part, transferred packets of the sealed findings of fact and relevant pages of the sealed files to counsel, and requested that the parties submit briefing as to whether the information identified in the supplemental findings of fact was material (including whether it would have been admissible), whether the information would have led to relevant, admissible, and material evidence, and whether nondisclosure was harmless beyond a reasonable doubt.
[18] While the dependency files also reveal that R.S. lied to the dependency court regarding her September 2000 relapse, this occurred on October 2, 2000, after R.S.'s testimony in the Gregory case. Therefore, it could not have been used to impeach her. Furthermore, R.S.'s September 2000 relapse occurred after her interview with defense counsel in August 2000, so she did not lie about the September relapse in the interview.
[19] Gregory also argues that the trial court should have evaluated the DSHS records, in addition to the court dependency files. Chapter 13.50 RCW governs files and records kept by juvenile justice or care agencies. RCW 13.50.010 explains that the official juvenile court file is the legal file containing the petition or information, motions, memoranda, briefs, findings, and court orders. RCW 13.50.010(1)(b). The social file means the records and reports of the probation counselor, or in this case, the reports of the guardian ad litem and the DSHS caseworkers. See RCW 13.50.010(1)(d). The term "records" includes the legal and social files and the records of the juvenile care agency, including DSHS.

The purpose of remand for in camera review is to correct error by placing attorneys in the same position as they were in when in camera review was requested. See Alvarez, 358 F.3d at 1209. The arguments of Gregory's counsel at the time reflect his request that the court review files accessible to the judge, without additional discovery. The court social file contains both caseworker and guardian ad litem reports containing periodic summaries of the child's and parent's progress, recommendations, information supporting such recommendations, and services offered to the parent and child. The files also contain background information, including the case history. The social file is extensive enough to reveal the reasoning behind DSHS recommendations. Information supporting DSHS recommendations and all court orders are reflected in the court files. We conclude that there is no need for review of additional DSHS records.
[20] "`Forcible compulsion' means physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person, or in fear that she or he or another person will be kidnapped." RCW 9A.44.010(6).
[21] Very recently the United States Supreme Court decided Dixon v. United States, 548 U.S. ___, 126 S.Ct. 2437, 165 L.Ed.2d 299 (2006). In that case, the Court concluded that due process permitted a jury instruction that required a defendant to prove the defense of duress by a preponderance of the evidence. Id. at 2442. In doing so, the Dixon Court, like the Riker court, noted that while duress did not negate an element of the crime at issue, "there may be crimes where the nature of the mens rea would require the Government to disprove the existence of duress beyond a reasonable doubt." Id. at 2442 n. 4. Even though the Dixon Court did not entirely rule out the possibility that duress could negate the mens rea element of a crime, the Dixon Court did not explicitly overrule Martin, or even suggest that it was limiting Martin's scope. Therefore, Dixon does not affect our reliance on Martin in this case.
[22] Gregory also argues that Spicer v. Gregoire, 194 F.3d 1006 (9th Cir.1999), disagreed with the Camara opinion. Id. at 1008. However, the relied upon portion of the Spicer opinion was describing Spicer's arguments, and the court did not endorse this conclusion. The court actually concluded that it need not reach the constitutionality of the jury instruction, so it did not decide this issue. Id.
[23] See Land, 121 Wash.2d at 500-01, 851 P.2d 678 (holding that business communities can constitute a neutral or general community).
[24] There has been some disagreement as to the impact of a failure to object at trial upon a claim on appeal that a prosecutor's argument amounted to an improper comment on a constitutional right. Compare, e.g., State v. Belgarde, 110 Wash.2d 504, 510-12, 755 P.2d 174 (1988) (analyzing comment on constitutional right independently from claims of nonconstitutional prosecutorial misconduct) and Jones, 71 Wash.App. at 809-10, 863 P.2d 85 (analyzing comment on constitutional right under RAP 2.5(a) for manifest error) with State v. Jordan, 106 Wash.App. 291, 296-97, 23 P.3d 1100 (2001) (analyzing alleged comment on Sixth Amendment right during closing argument under a prosecutorial misconduct standard of review, asking whether a curative instruction would have cured the defect) and State v. Klok, 99 Wash.App. 81, 83-84, 992 P.2d 1039 (2000) (same). See also State v. Holmes, 122 Wash.App. 438, 93 P.3d 212 (2004) (providing yet another analysis where a comment on the Fifth Amendment right to silence arises during testimony). Because we hold that R.S.'s testimony and the prosecutor's argument did not constitute a comment on the defendant's Sixth Amendment rights, we need not resolve this issue here.
[25] In his reply brief, Gregory points to additional instances during closing argument where the prosecutor discussed how much courage it takes for a rape victim to participate in a trial and where the prosecutor explained R.S.'s anger on the stand. To the extent that these are separate claims that the prosecutor commented on a constitutional right, the same analysis applies.
[26] Gregory relies on Hance v. Zant, 696 F.2d 940 (11th Cir.1983), but that case was decided before the Witt Court clarified that jurors may be excused even if they are not unmistakably clear.
[27] It is important to note that the Ninth Circuit has held that where there is only a Sixth Amendment challenge (rather than a First Amendment challenge) to exclusion of a defendant's family member or members, the hearing requirement is met where the court has given the defendant an opportunity to object. United States v. Sherlock, 962 F.2d 1349, 1358 (1989).
[28] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[29] "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932).
[30] State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986).
[31] Gregory does not seem to assert, nor has he pointed to another court that has adopted, a lesser standard than "closely related."
[32] The trial court in the rape case eventually denied the motion to suppress the first blood draw. It determined that the order for the first blood draw was properly entered as an agreed order.
[33] Gregory also argued that the State may not, without a warrant, compare the defendant's DNA profile to evidence obtained in an investigation of a separate crime. The court disagreed.
[34] The prosecutor testified that Gregory was alleging ineffective assistance of counsel based on the signed order for the September 1998 blood draw. In addition, some of the tests on the first blood draw were conducted by a scientist who had recently been investigated and fired. These concerns prompted the motion for the second blood draw.
[35] Gregory points to one sentence in State v. Olivas, 122 Wash.2d 73, 856 P.2d 1076 (1993), to support his argument that the chemical analysis of a bodily fluids sample is a further intrusion of the suspect's privacy interests. Id. at 83, 856 P.2d 1076. However, that sentence does not describe the holding of the Olivas court, but instead describes the appellants' arguments in that case. Id. at 83, 856 P.2d 1076. The appellants in Olivas relied on Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 616, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), which explained

physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable. The ensuing chemical analysis of the sample to obtain physiological data is a further invasion of the tested [person's] privacy interests.
Id. at 616, 109 S.Ct. 1402.
[36] Other states have consistently agreed. For example, in People v. King, 232 A.D.2d 111, 663 N.Y.S.2d 610 (1997), the New York Appellate Division concluded "[p]rivacy concerns are no longer relevant once the sample has already lawfully been removed from the body, and the scientific analysis of a sample does not involve any further search and seizure of a defendant's person." Id. at 614. "[O]nce constitutional concerns have been satisfied, a blood sample is not unlike other tangible property which can be subject to a battery of scientific tests." Id.

Similarly, the Georgia Court of Appeals has noted that once blood is lawfully obtained by the State, DNA results are like fingerprints that can be compared with evidence arising from unrelated crimes without any Fourth Amendment violation. See Bickley v. State, 227 Ga.App. 413, 489 S.E.2d 167, 170 (1997); see also Wilson, 752 A.2d at 1272 ("Once an individual's fingerprints and/or his blood sample for DNA testing are in lawful police possession, that individual is no more immune from being caught by the DNA sample he leaves on the body of his rape victim than he is from being caught by the fingerprint he leaves on the window of the burglarized house or the steering wheel of the stolen car.").
[37] Gregory cites to former WAC 446-75-030 (1991) for his proposition that a DNA profile established as part of one investigation could be used only in the case for which the DNA was originally analyzed. Chapter 446-75 WAC governs DNA procedures for the Washington State Patrol, specifically providing for collection and maintenance of a databank for DNA identification of convicted felons. See former WAC 446-75-060 (1991). In addition, Washington State Patrol labs conduct DNA analysis to support criminal investigations conducted by various law enforcement agencies across the state. See former WAC 446-75-030(1). Within this context, former WAC 446-75-030(2) read "DNA identifications made in response to a criminal investigation shall not be entered into any permanent or temporary databank. Such results shall be returned to the requesting agency." When a local law enforcement agency asked the state patrol to conduct a DNA analysis for a local criminal investigation, the resulting DNA identification could not be entered into the state patrol's databank; it had to be returned to the requesting agency. However, this regulation did not state that a DNA identification or profile cannot be compared with evidence collected in a different investigation. Therefore it did not create an expectation of privacy in a suspect's DNA profile once an investigating agency lawfully had that profile in its possession.
[38] We have also questioned testimony from Dr. Mueller. Gore, 143 Wash.2d at 309 n. 9, 21 P.3d 262.
[39] While Gregory argues that he should not have been expected to object at trial and draw attention to the prosecutor's comments, a tactical decision not to object does not change the analysis. State v. Smith, 144 Wash.2d 665, 679-80, 30 P.3d 1245, 39 P.3d 294 (2001).
[40] Actually, for the RFLP test, the chance of a random match in the African American community was 1 in 235 million, and for the STR test, the chance of a random match in the African American community was 1 in 190 billion, but Gregory does not assert prejudice resulted from these errors.
[41] The State asked Barth to produce a blood sample to exclude him as the donor of the DNA left at the scene of the crime, Barth agreed, and he was excluded.
[42] The State concedes that if the rape convictions are reversed, the death sentence must also be reversed. Consol. Br. of Resp't at 161.
[43] No argument was made to the trial court regarding Washington's due process and cruel punishment clauses or the Sixth Amendment. Therefore, to the extent that we evaluate these arguments, we do so under RAP 2.5(a)'s limitations on arguments raised for the first time on appeal. "[T]he appellant has the burden to demonstrate that the alleged error actually affected his or her rights. `[I]t is this showing of actual prejudice that makes the error "manifest," allowing appellate review.'" McNeal, 145 Wash.2d at 357, 37 P.3d 280 (second alteration in original) (quoting State v. McFarland, 127 Wash.2d at 333, 899 P.2d 1251).
[44] No argument was made to the trial court regarding any particular constitutional provisions. Therefore, to the extent that this court evaluates these arguments, it must do so under RAP 2.5(a)'s limitations on arguments raised for the first time on appeal.
[45] The recent case cited by the dissent, State v. McKenzie, 157 Wash.2d 44, 134 P.3d 221 (2006), is distinguishable. First, that case did not implicate the more liberal application of procedural rules permitted in reviewing the sentencing phase of a capital case. Second, that case did not involve a situation where a prosecutor actively sought a ruling prohibiting discussion of a particular subject and then blatantly violated that ruling.
[46] Gregory also asserts that the argument raising the risk of future escape was also improper. However, "`future dangerousness or the probable lack of future dangerousness of the defendant is a relevant factor for a jury's consideration'" at the penalty phase. In re Pers. Restraint of Davis, 152 Wash.2d at 704, 101 P.3d 1 (quoting State v. Finch, 137 Wash.2d 792, 864, 975 P.2d 967 (1999)), see also RCW 10.95.070(8). Gregory fails to cite to any prohibition against the argument that future escape is a risk.
[1] Quixotically the majority appears to find comfort in Dixon v. United States, 548 U.S. ___, 126 S.Ct. 2437, 165 L.Ed.2d 299 (2006), majority at ___ n. 21, because "the Dixon Court did not explicitly overrule Martin. . . ." Of course, why would the Dixon Court want to overrule Martin if Martin stands for the proposition that the burden to prove an affirmative defense may be placed on the defendant's shoulders only when it does not negate an element of the offense? Dixon supports precisely that reading of Martin in that it stresses the burden of proof may be placed upon the shoulders of the defendant to prove duress because "the existence of duress normally does not controvert any of the elements of the offense itself." 126 S.Ct. at 2441. Dixon therefore supports Gregory's claim Camara was wrongfully decided and should be overruled.
[2] At trial, defense counsel demonstrated that Sehmel's testimony was suspect. David Moon testified Sehmel had never been to a barbeque at his home and she had not been to his home on the night in question. Moreover, the Department of Licensing records revealed that no Mustang had ever been registered to Sehmel's friend Joseph Daniels.
[3] When a trial court excludes defense evidence under evidentiary rules that "serve no legitimate purpose" or are "disproportionate to the ends that they are asserted to promote" it violates due process. Holmes v. South Carolina, ___ U.S. ___, 126 S.Ct. 1727, 1732, 164 L.Ed.2d 503 (2006). In Holmes the Court held it was improper for a trial judge to exclude evidence of a third party suspect based solely on the strength of the prosecutor's case. Specifically, the Court said:

The point is that, by evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt. Because the rule applied by the State Supreme Court in this case did not heed this point, the rule is "arbitrary" in the sense that it does not rationally serve the end that the [evidentiary rule was] designed to further.
Id. at 1735. When the trial court applied the rape shield statute here it also violated due process because the exclusion did not rationally serve the end the statute was designed to further.
[4] RCW 9A.44.020 provides:

(1) In order to convict a person of any crime defined in this chapter it shall not be necessary that the testimony of the alleged victim be corroborated.
(2) Evidence of the victim's past sexual behavior including but not limited to the victim's marital history, divorce history, or general reputation for promiscuity, nonchastity, or sexual mores contrary to community standards is inadmissible on the issue of credibility and is inadmissible to prove the victim's consent except as provided in subsection (3) of this section. . . .
(3) In any prosecution for the crime of rape or for an attempt to commit, or an assault with an intent to commit any such crime evidence of the victim's past sexual behavior including but not limited to the victim's marital behavior, divorce history, or general reputation for promiscuity, nonchastity, or sexual mores contrary to community standards is not admissible if offered to attack the credibility of the victim and is admissible on the issue of consent only pursuant to the following procedure:
(a) A written pretrial motion shall be made by the defendant to the court and prosecutor stating that the defense has an offer of proof of the relevancy of evidence of the past sexual behavior of the victim proposed to be presented and its relevancy on the issue of the consent of the victim.
(b) The written motion shall be accompanied by an affidavit or affidavits in which the offer of proof shall be stated.
(c) If the court finds that the offer of proof is sufficient, the court shall order a hearing out of the presence of the jury, if any, and the hearing shall be closed except to the necessary witnesses, the defendant, counsel, and those who have a direct interest in the case or in the work of the court.
(d) At the conclusion of the hearing, if the court finds that the evidence proposed to be offered by the defendant regarding the past sexual behavior of the victim is relevant to the issue of the victim's consent; is not inadmissible because its probative value is substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice; and that its exclusion would result in denial of substantial justice to the defendant; the court shall make an order stating what evidence may be introduced by the defendant, which order may include the nature of the questions to be permitted. The defendant may then offer evidence pursuant to the order of the court.
(4) Nothing in this section shall be construed to prohibit cross-examination of the victim on the issue of past sexual behavior when the prosecution presents evidence in its case in chief tending to prove the nature of the victim's past sexual behavior, but the court may require a hearing pursuant to subsection (3) of this section concerning such evidence.
[5] See State v. Crims, 540 N.W.2d 860, 867 (Minn. Ct.App.1995) ("[T]he rape shield statute serves to emphasize the general irrelevance of a victim's sexual history, not to remove relevant evidence from the jury's consideration.").
[6] The majority claims State v. Harold, 45 Wash.2d 505, 510, 275 P.2d 895 (1954), "emphasize[s] that whether evidence is too remote to be relevant is within the discretion of the trial court." Majority at 1216 n. 5. Harold admitted into evidence testimony regarding prior acts of intercourse to show lustful disposition with an instruction telling the jury that this evidence was not proof of the commission of the crime charged, observing: "Ordinarily, remoteness affects the weight, rather than the admissibility of the evidence." Harold, 45 Wash.2d at 510, 275 P.2d 895.